

FILED by ___ D.C.
ELECTRONIC

**Sep 17 2003**

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

JOSEFINA FIERROS and NORMA SOLANO,  CASE NO. 03-14031-CIV-MOORE/LYNCH
on behalf of themselves and all others
similarly situated,

       Plaintiffs,

v.

TAMPA FARM SERVICE, INC.

       Defendant.

_____/

## DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendant, Tampa Farms, Inc. (Tampa Farms) pursuant to Rule 56 Fed R. Civ. P., moves for entry of an order granting  partial summary judgment in its favor and against Plaintiffs, Josefina Fierros (Fierros) and Norma Solano (Solano).

### OVERVIEW

This is an action in which the plaintiffs, Fierros and Solano, two agricultural employees, are seeking to hold their employer, Tampa Farms, liable for failure to pay overtime wages at time-and-a-half.  Tampa Farms claims it is entitled to the agricultural exemption from paying overtime wages. There are no issues of fact in dispute, and this issue can be resolved as a matter of law.[1]

Tampa Farms owns approximately 2.5 million egg producing hens at three Florida farm locations, including the Indiantown, Florida farm where the plaintiffs were employed.[2]  In mid-2001, Tampa Farms suffered a power surge at the Indiantown farm that knocked out the

---

[1]   Fierros and Solano are also seeking to represent all similarly situated employees at Tampa Farms, namely the other packers, stackers, basket washers, packing machine maintenance personnel and cooler workers.  The facts and law set forth herein would apply to each similarly situated employee as well.

[2]   Tampa Farms has acquired a fourth farm location in Florida, however the fourth farm was not operating during the time frame covered by this lawsuit.

FTL:1098710:1

ventilation fans ("ventilation incident"), resulting in the loss of 120,000 laying hens.  To cover for the unexpected production losses, Tampa Farms purchased "nest run" eggs on the open market, then processed and packaged them at the Indiantown facility.  The purchase of eggs on the spot market never exceeded the number of eggs it lost due to the ventilation event.  Due to the higher cost of spot market eggs and additional transportation charges, Tampa Farms never profited by purchasing eggs to meet its production expectation.

Fierros and Solano were each employed as egg packers at the Tampa Farms facility in Indiantown.   They claim that because Tampa Farms purchased nest run eggs on the open market, Tampa Farms should lose its agricultural exemption to the Fair Labor Standards Act (FLSA).  As a matter of law, however, Tampa Farms does not lose its exemption by purchasing eggs to meet shortfalls caused by and unexpected drop in production.   Based upon the uncontested facts and issues of law set forth herein, Tampa Farms is entitled to summary judgment in its favor and against plaintiffs Fierros and Solano, and all those similarly situated.

### UNDISPUTED FACTS

The following facts are not in dispute:

1.     Tampa Farms produces and processes eggs at its farming operations in Indiantown, Okeechobee, and Dover, Florida.  Conveyor belts transport the eggs from the hen houses to a processing area at each farm.  (Affidavit of M. Bynum[3])

2.     Egg processing consists of washing, weighing/grading, testing and packing the eggs in cartons.  This portion of the work is entirely mechanized.  Once the eggs are in cartons, the "packers" place cartons in crates or baskets which have been cleaned by the "basket washers."  The "stackers" then stack the crates or baskets on pallets, and the "cooler workers"

---

[3]    Affidavit of M. Bynum is attached hereto as Exhibit A.  Fully executed Affidavit will be filed separately.
FTL:1098710:1

RUDEN, McCLOSKY, SMITH, SCHUSTER & RUSSELL, P.A

2

move the pallets into the refrigerated loading dock for shipment to market.  (Affidavit of M. Bynum)

3.   Packers, stackers, basket washers, and cooler workers generally work more than 40 hours per week.  At Indiantown these processing employees are not paid overtime.  (Affidavit of M. Bynum)

4.   The Okeechobee farm is the only Tampa Farms facility which was designed for processing eggs that are purchased on the open market.  Okeechobee is the only Tampa Farm facility which routinely processes eggs purchased in the open market.  Since purchased eggs are routinely processed at Okeechobee, most workers at Okeechobee are paid overtime during any week when eggs are purchased.  At all times material to this case, the Okeechobee facility had a special machine to transfer purchased eggs to the processing equipment.  (Affidavit of M. Bynum)

5.   The Indiantown farm was not designed to process purchased eggs and does not do so routinely.  The only time the Indiantown farm processes purchased eggs is to cover for an unexpected loss of production.  Very rarely (i.e. three to four times a year) the Indiantown plant will also purchase eggs to meet holiday demand.  (Affidavit of M. Bynum)

6.   Solano and Fierros packed eggs for Tampa Farms in the Indiantown, Florida facility.  (Depositions of Fierros[4], p. 20, lines 1-9 and Solano[5], p. 13, line 15-p. 14, line 10) Fierros and Solano are seeking to bring this suit individually and on behalf of all those similarly situated.  (See Complaint)  Opt in notices will be sent to all packers, stackers, basket washers, and cooler workers at Okeechobee and Indiantown within a few weeks.  (See Order dated

---

[4]   Deposition excerpts of Fierros are attached as Exhibit B.
[5]   Deposition excerpts of Solano are attached as Exhibit C.

FTL:1098710:1

September 8, 2003).  The undisputed facts in this Motion for Partial Summary Judgment apply to all potential members of the class as well.

7.     Both Solano and Fierros admit that packing eggs occurs on the defendant's farm, that packing is part of Tampa Farms agricultural operations, and that eggs cannot be shipped to market without being packed.  (Depositions of Fierros, p. 33, lines 12-14 and Solano, p. 22, lines 16-25)

### Overtime related to Loss of Egg Production

8.     In July 2001, there was an unexpected high voltage power surge at the Indiantown facility, damaging the motors in the ventilation fans in the chicken houses, resulting in the loss of 120,000 birds at the Indiantown facility with a corresponding 10% decline in egg production (the "ventilation incident").  (Affidavit of M. Bynum)

9.     As a result of the ventilation incident, Tampa Farms was required to purchase "nest run" eggs on the open market to cover its production shortfalls and process them at Indiantown. It took more than a year to recover from the production shortfalls caused by the ventilation incident.  In the 12 month period between July 2001 and July 2002, Tampa Farms hens produced 1.6 million dozen fewer eggs than expected, and Tampa Farms purchased 1.58 million dozen during the same time frame to cover the shortfall.  (Affidavit of M. Bynum)

10.     The nest run eggs were processed on the farm in the same manner as the eggs produced by the hens owned by Tampa Farms.  The purchased eggs were placed by hand on the conveyor belt, washed, tested, graded, packed, stacked and shipped to market.  Fierros and Solano packed the nest run eggs together with the eggs produced in the adjoining chicken houses.  (Affidavit of M. Bynum)

11.     With the cost to purchase and transport nest run eggs, Tampa Farms does not make any money on eggs it buys to cover for the short fall in production.  (Affidavit of M. Bynum)

**Unrecorded Time**

12.     The second portion of the plaintiffs claim is that they were not paid for all the hours they worked.  Fierros and Solano are unable to identify which hours the company failed to pay them, are unable to identify which days the company failed to pay them, and have no documents contradicting Tampa Farm's payroll records.  (Depositions of Fierros, p. 50, line 22-p. 51, line 2 and Solano, p. 43, line 18-p. 44, line 23)  However, to avoid any potential issues of fact, this Motion for Partial Summary Judgment is limited to the legal issue of whether the agricultural exemption applies to egg packers, stackers, basket washers and cooler workers.

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

Defendant is entitled to summary judgment in its favor and against Plaintiffs based upon the following issues of law.

**a.      Standards for Entry of Summary Judgment.**

Under Rule 56(c) of the Federal Rules of Civil Procedure: The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). Summary judgment is appropriate only if the record evidence shows that there is no genuine issue as to any material fact. Fed.R.Civ.P. 56(c).

However, the non-moving party may not "rest upon the mere allegations and denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient. Thus, to preclude summary judgment, Defendant is required to present significantly probative evidence, evidence which is more than "merely colorable". *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505. 2511, 91 L.Ed.2d 202 (1986).

Here, the Plaintiffs do not have significantly probative evidence to defeat the FLSA exemption for agricultural workers at the Indiantown farm.

> **b.      Plaintiffs, Egg Packers, are Agricultural Employees Under the Fair Labor Standards Act ("FLSA"), thus Plaintiffs are Exempt from the FLSA and therefore, are not Entitled to Overtime Pay from Defendant Pursuant to 29 U.S.C. § 213(B)(12).**

The general rule under the FLSA is:

> Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed. 29 U.S.C. § 207(a)(1).

However, agricultural employees are <u>exempt</u> from the FLSA and are not entitled to overtime compensation. Section 213(b)(12) in part, states:

> <u>The provisions of section 207 of this title shall not apply with respect to any employee employed in agriculture</u> or in connection with the operation or maintenance of ditches, canals, reservoirs, or waterways, not owned or operated for profit, or operated on a sharecrop basis, and which are used exclusively for supply and storing of water, at least 90 percent of which was ultimately delivered for agricultural purposes during the preceding calendar year…. 29 U.S.C. § 213(b)(12).

FTL:1098710:1

RUDEN, McCLOSKY, SMITH, SCHUSTER & RUSSELL, P.A

6

Plaintiffs, egg packers, stackers, basket washers, and cooler workers at the Indiantown facility[6], are agriculture employees within the meaning of the agriculture exemption under the FLSA. The United States Supreme Court first addressed the scope of the agricultural exemption under the FLSA in *Farmers Reservoir & Irrigation Co. v. McComb,* 337 U.S. 755, 760-763 (1949). In *Farmers Reservoir,* the Court held that the determinative issue in analyzing the scope of the exemption was not whether the work "is necessary to agricultural production . . . [but whether it] can itself be termed agriculture." *Id*, at *759-760.* The Court noted that the exemption recognized two types of agricultural activity: primary and secondary. *Id.*

Primary agriculture includes such specific practices as cultivation, tillage of the soil, growing and harvesting of any agriculture. Secondary agriculture has a broader meaning. It is defined to include things other than primary agricultural activities, which are performed either by a farmer or on a farm, incidental to or in conjunction with such farming operations. *Id.* at 760-763; *see also,* 29 C.F.R. §§ 780.105, 780.158. To meet the secondary agricultural definition, the activity must satisfy two criteria: it must be performed either by a farmer or on a farm and it must be incidental to or in conjunction with farming operations.

The case at bar is similar to *Mitchell v. Hornbuckle,* 155 F. Supp. 205, 210-211 (N.D. GA. 1957), in which the court held that packing shed employees who prepared tomato plants for shipment and transportation were within the meaning of agricultural employees under the FLSA. *Id.* In *Mitchell*, one of the primary issues was whether the employees who packed tomato plants on the farm for shipment were employees engaged in agriculture within the meaning of the FLSA. Following the decision in *Farmers Reservoir*, the district court ruled, "packing shed employees, if not engaged in agriculture or farming in the primary meaning, are certainly

---

[6]     Tampa Farms pays the processing workers overtime at the Okeechobee facility on weeks when eggs are purchased.

FTL:1098710:1

RUDEN, McCLOSKY, SMITH, SCHUSTER & RUSSELL, P.A

7

engaged in agriculture and farming in the broader or secondary meaning." *Id.* at 210. The court in *Mitchell* further stated "in the words of the statutory definition, they (packing employees) are engaged in harvesting of agricultural commodities and (in) practices performed by a farmer as an incident to or in conjunction with such farming operations, including preparation for market, delivery to market or to carriers for transportation to market." *Id. See also, Maneja v. Waialua Agricultural Co.,* 349 U.S. 254 (1955) (secondary agriculture criteria met by farm's railroad employees, engaged in the transportation of the sugar cane to processing plant and the crews' equipment and supplies to and from fields, and by employees engaged in repairing farm implements); and *National Labor Relations Board v. Strain Poultry Farms, Inc.,* 405 F.2d 1025, 1027-1029 (5th Cir. 1969) (truck drivers and haulers who transported chickens from a farm to markets are engaged in agriculture and are agricultural employees under the FLSA exemption.).

Following the decisions and reasoning of the U.S. Supreme Court in *Farmers Reservoir* and *Maneja* and the application of these decisions by the Fifth Circuit, Plaintiffs, who are egg packers on Defendant's farm, are engaged in agricultural employment and are agricultural employees within the meaning of the agricultural exemption of the FLSA. Plaintiffs, if not considered as primary agricultural employees, are certainly within the meaning of the agricultural employees under the secondary or broader interpretation of the agricultural employee exemption of the FLSA; therefore, Plaintiffs are not entitled to overtime compensation. Similarly, the statutory exemption applies to the basket washers, stackers, and cooler workers who are equally involved in egg processing.

### c. Defendant Did not Lose the Agriculture Exemption Under the FLSA by Purchasing Nest Run Eggs to Compensate for a Reduction in Egg Production Caused by an Unforeseen Circumstance that Killed 120,000 of Defendant's Chickens.

Defendant did not lose the agricultural exemption under the FLSA by purchasing nest run eggs to compensate for a reduction in Defendant's egg production. This reduction in production was caused by an unforeseen circumstance, which killed approximately 120,000 of Defendant's chickens. In July 2001, an unforeseen ventilation incident killed 120,000 of Defendant's chickens causing a reduction of eggs produced. It took more than a year to bring the farm back to full production. Consequently, Defendant purchased eggs to meet the corresponding loss in eggs to supply customers.

As a general rule, the agricultural exemption under the FLSA is lost if farmers purchase and resell agricultural commodities without actually producing or growing the commodity. *See, Adkins v. Mid-American Growers, Inc.,* 167 F.3d 355, 356-358 (7th Cir. 1999) and *Mitchell v. Hunt,* 263 F.2d 913 (5th Cir. 1959). However, there is an exception to this general rule, in which courts have repeatedly permitted farmers to purchase commodities to compensate for production shortfalls in order to continue to supply and maintain their customers, without losing the agricultural exemption under the FLSA. The Court in *Adkins* stated that defendant, operator of a greenhouse, did not lose the agricultural exemption under the FLSA by ordering plants from outside growers to meet production shortfalls caused by "blight or other disasters." *Id.* at 357. The greenhouse operator was permitted to order plants from outside growers to fulfill contract obligations with customers without losing the agricultural exemption. *Id. See also, Walling v. Rocklin*, 132 F.2d 3, 7 (8th Cir. 1942) (occasional purchase by defendants, greenhouse operators, from outside greenhouses to meet production decline due to storms, frosts and other emergencies

did not result in defendants losing the agricultural exemption under the FLSA.); *Wirtz v. Jackson & Perkins Co.,* 312 F.2d 48, 51 (2d Cir. 1963) (defendants, plant growers, did not lose agricultural exemption by purchasing plants from other growers to fill shortages caused by 'adverse weather conditions' and other emergencies); and *Mitchell v. Hornbuckle,* 155 F. Supp. 205, 211-212 (N.D. GA. 1957) (defendant, tomato farmer, 'did not defeat' the agricultural exemption under the FLSA by purchasing two (2) percent of his volume to meet his sales when such purchases were necessary because of 'crop failures and other emergencies').

Applying the analysis of *Walling, Wirtz,* and *Mitchell*, Defendant did not lose its agricultural exemption by purchasing eggs from outside producers. These purchases were necessary to meet corresponding reduction in egg production due to an unforeseen emergency involving the ventilation system at the chicken farm, which killed approximately 120,000 of defendant's chickens. Consequently, Plaintiffs and others on the processing line are not entitled to overtime compensation, because Defendant, as a matter of law, did not lose the agricultural exemption under the FLSA.

### d.   As a Matter of Law, Defendant's De Minimis Production of Eggs to Meet Spike in Demand Associated with Holidays Does not Result in the Loss of the Agriculture Exemption Under the FLSA.

Defendant's de minimis purchase of eggs does not result in the loss of the agricultural exemption under the FLSA. Generally, there is a spike in demand for eggs associated with various holidays including Easter, Christmas, Thanksgiving and Passover. Defendant purchases less that one (1) percent of its annual production of eggs to meet this spike in demand. (Affidavit of M. Bynum)  Again, to maintain the agricultural exemption under the FLSA, farmers are required to produce almost all of their agricultural products that are sold. *See, Adkins v. Mid-*

RUDEN, McCLOSKY, SMITH, SCHUSTER & RUSSELL, P.A

*American Growers, Inc.,* 167 F.3d 355, 356-358 (7th Cir. 1999) and *Mitchell v. Hunt,* 263 F.2d 913 (5th Cir. 1959).

However, the Second Circuit has reasoned and held that outside purchases to meet spike in demand do not result in the loss of the agricultural exemption, if the quantity ordered from outside producers is small or de minimis. *Damutz v. Pinchbeck, Inc.,* 158 F.2d 882, 883 (2d Cir.1946). In *Damutz,* the Second Circuit first held that "an employee who fired boilers that produced steam for defendant's greenhouse was an agricultural employee under the FLSA and thus, was not entitled to overtime compensation." *Id*. The court further held that the defendant did not lose its agricultural exemption under the FLSA even though the defendant ordered approximately one-half of one percent of his annual plant production from outside growers for resale. The court stated, "this business (i.e. the outside purchases) was rightly disregarded under the de minimis doctrine." *Id.*

Following the analysis of the Second Circuit in *Damutz,* Defendant, in the present case, did not lose its agricultural exemption by purchasing less than one percent of its annual egg production to meet spikes in demand associated with various holidays. These occasional purchases fall within the de minimis doctrine. As a result, Plaintiffs maintain their agricultural employee status under the FLSA and are not entitled to overtime compensation.

<strong>CONCLUSION</strong>

Based upon the undisputed facts and issues of law set forth above, Tampa Farms is entitled to summary judgment in its favor and against plaintiffs on the application of the agricultural exemption at the Indiantown Plant.

FTL:1098710:1

RUDEN, McCLOSKY, SMITH, SCHUSTER & RUSSELL, P.A
11

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was furnished by

U.S. Mail to: **David H. Spalter, Esquire**, Law Office of David H. Spalter, P.A., Rolling Hills

Executive Center, 3325 S. University Drive, Suite 102, Davie, Florida 33328 and **Lee J.**

**Baggett, Esquire**, Lewis, Mortell & Lewis, P.A., 1115 East Ocean Boulevard, Stuart, Florida

34996 Counsel for Plaintiffs, this ___17th___ day of _____September_____ 2003.

Respectfully submitted,

RUDEN, McCLOSKY, SMITH,
SCHUSTER & RUSSELL, P.A.
Attorneys for Defendant
200 East Broward Boulevard, 15th Floor
Fort Lauderdale, Florida 33302
(954) 764-6660; Fax:  (954) 764-4996

By:___s/Thomas K. Gallagher_____
        Thomas K. Gallagher
        Florida Bar No. 793574

<u>Co-Counsel for Defendant:</u>
David B. Earle, Esquire
Ross, Earle & Bonan, P.A.
Royal Palm Financial Center
759 South Federal Highway, Suite 212
Stuart, FL 34994
(772) 287-1745
(772) 287-8045 (Fax)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

JOSEFINA FIERROS and NORMA SOLANO,    CASE NO. 03-14031-CIV-MOORE/LYNCH
on behalf of themselves and all others
similarly situated,

     Plaintiffs,

v.

TAMPA FARM SERVICE, INC.

     Defendant.

_____/

STATE OF FLORIDA      )
                     ) SS
COUNTY OF HILLSBOROUGH   )

### AFFIDAVIT OF MICHAEL BYNUM

     BEFORE ME, an officer authorized to take oaths under the laws of the State, this day

personally appeared MICHAEL BYNUM, who being by me first duly sworn deposes and states

as follows:

     1.     I am the president of Tampa Farm Service, Inc.  The statements contained in this

affidavit are true and correct and based upon my personal knowledge.

     2.     Tampa Farms produces and processes eggs at its farming operations in

Indiantown, Okeechobee, and Dover, Florida.  Conveyor belts transport the eggs from the hen

houses to a processing area at each farm.

     3.     Egg processing consists of washing, weighing/grading, testing and packing the

eggs in cartons.  This portion of the work is entirely mechanized.  Once the eggs are in cartons,

the "packers" place cartons in crates or baskets which have been cleaned by the "basket

FTL:1098453:1

washers". The "stackers" then stack the crates or baskets on pallets, and the "cooler workers" move the pallets into the refrigerated loading dock for shipment to market.

4.      Packers, stackers, basket washers, and cooler workers generally work more than 40 hours per week. At Indiantown these processing employees are not paid overtime.

5.      The Okeechobee farm is the only Tampa Farms facility which was designed for processing eggs that are purchased on the open market. Okeechobee is the only Tampa Farm facility which routinely processes eggs purchased in the open market. Since purchased eggs are routinely processed at Okeechobee, most workers at Okeechobee are paid overtime during any week when eggs are purchased. At all times material to this case, the Okeechobee facility had a special machine to transfer purchased eggs to the processing equipment.

6.      The Indiantown farm was not designed to process purchased eggs and does not do so routinely. The only time the Indiantown farm processes purchased eggs is to cover for an unexpected loss of production. Very rarely (i.e. three to four times a year) the Indiantown plant will also purchase eggs to meet holiday demand.

7.      In July 2001, there was an unexpected high voltage power surge at the Indiantown facility, damaging the motors in the ventilation fans in the chicken houses, resulting in the loss of 120,000 birds at the Indiantown facility with a corresponding 10% decline in egg production (the "ventilation incident").

8.      As a result of the ventilation incident, Tampa Farms was required to purchase "nest run" eggs on the open market to cover its production shortfalls and process them at Indiantown. It took more than a year to recover from the production shortfalls caused by the ventilation incident. In the 12 month period between July 2001 and July 2002, Tampa Farms

hens produced 1.6 million dozen fewer eggs than expected, and Tampa Farms purchased 1.58 million dozen during the same time frame to cover the shortfall.

9.      The nest run eggs were processed on the farm in the same manner as the eggs produced by the hens owned by Tampa Farms.  The purchased eggs were placed by hand on the conveyor belt, washed, tested, graded, packed, stacked and shipped to market

10.     With the cost to purchase and transport nest run eggs, Tampa Farms does not make any money on eggs it buys to cover for the short fall in production.

11.     Generally, there is a spike in demand for eggs associated with various holidays including Easter, Christmas, Thanksgiving and Passover. Defendant purchases less that one (1) percent of its annual production of eggs to meet this spike in demand.

FURTHER DEPONENT SAYETH NAUGHT

Dated  September 17, 2003      _____

MICHAEL BYNUM


Sworn to and subscribed before me this _____ day of _____ 2003.


_____

Notary Public


_____

Typed, printed or stamped name of Notary Public

My Commission Expires:

FTL:1098453:1

1

1
2
3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. CIV-MOORE 03-14031

4
5

JOSEFINA FIERROS and NORMA SOLANO,
on behalf of themselves and all others
similarly situated,

6
7

        Plaintiffs,

vs.

8

TAMPA FARMS SERVICES, INC.,
a Florida corporation,

9

        Defendant.

10

_____/

**CERTIFIED COPY**

11
12

VIDEOTAPED DEPOSITION

OF JOSEFINA FIERROS

13      DATE:                Friday, September 5, 2003

14      TIME:                1:40 o'clock P.M.

15      PLACE:               422 Camden Avenue
                             Stuart, Florida

16      TAKEN BY:            Defendant

17      REPORTER:            Deanne S. Morris, RPR, Notary
18                           Public of the State of Florida
                             at Large.

19      APPEARANCES:

20

21      FOR THE PLAINTIFFS:

22                           LAW OFFICE OF DAVID H. SPALTER, P.A.
                             BY:  DAVID H. SPALTER, ESQUIRE
23                           Rolling Hills Executive Center
                             3325 S. University Drive
24                           Suite 102
                             Davie, Florida  33328

25

**DEFENDANT'S EXHIBIT B**

20

1    Q    All right.  And then you began -- you began work
2    then at Tampa Farms Services in January, February, 2002?
3    A    No, the beginning of January.
4    Q    Okay.
5    A    I started a year there.
6    Q    What jobs were you working at Tampa Farms
7    Services?
8    A    I pack eggs.  I would pack eggs, and I would
9    assist the person that would direct us.
10    Q    In what way did you assist the person who would
11    direct you?
12    A    We would come in in the morning to start the day.
13    And --
14         THE VIDEOGRAPHER:  Excuse me.  We have a cell
15    phone going off on silent and I'm picking it up,
16    unfortunately.
17         MR. GALLAGHER:  I don't think it's mine.
18         THE VIDEOGRAPHER:  Somebody's on silent.
19         MR. GALLAGHER:  I'm on silent.
20         MR. SPALTER:  Mine doesn't work on silent.
21         MR. EARLE:  I left my in the car.
22         THE VIDEOGRAPHER:  It's gone now.
23         MR. GALLAGHER:  Let me -- let me go ahead and
24    turn this one off.
25         THE VIDEOGRAPHER:  Yeah.  It will interfere with

ESQUIRE REPORTING - STUART & FORT PIERCE, FLORIDA

33

1     Q    Okay.  So you take the carton and you put it in
2  the box and you fill the box with cartons.  And then what
3  do you do with the box --
4     A    Yes.
5     Q    -- that is full?
6     A    Right in front of us there is a conveyor belt
7  that we push the box towards to and then the box leaves.
8     Q    Okay.  And so your sole job when you're packing
9  is to take cartons of eggs and place them into the box and
10 then move the box back onto the conveyor belt?
11    A    Yes.
12    Q    Packaging the eggs like that is necessary to ship
13 them to market, correct?
14    A    Yes.
15    Q    That's part of agriculture?
16         MR. SPALTER:  Object -- objection.  That calls
17    for a legal conclusion.
18 BY MR. GALLAGHER:
19    Q    Go ahead and answer.
20    A    Yes, ones that left on the belt, the box would be
21 checked by some of my co-workers and then it would be
22 separated into the 6, 12, 18, you know, 24.
23    Q    Okay.  When you were performing your duties up
24 front and preparing the cones, or preparing the papers,
25 working with the machines, exchanging the cones, helping

50

1   because it was my lunch time, that half hour.

2       Q    And did they take away the half hour for lunch?

3       A    That's what he told me they were taking away.

4       Q    Okay.  Was that explanation satisfactory to you?

5       A    No.  No.

6       Q    Why not?

7       A    Well, because if it was a half an hour a day, he

8   -- he didn't have to take so many hours away.

9       Q    How many -- so a half hour a day would be three

10  hours per week, correct?

11      A    Exactly.

12      Q    Okay.  And did they take more than three hours a

13  week away?

14      A    More than three weeks -- three hours in a week.

15  I'm sorry.

16      Q    How much per week did they take away?

17      A    It was never really a fixed number.  They take

18  six, seven, eight, ten, sometimes more.  It was never

19  fixed.

20      Q    Did you keep your own time records?

21      A    Explain that again.

22      Q    Yeah.  Do have you any writings, any written

23  documentation of any kind, which would show how many hours

24  you actually worked?

25      A    No.  No, at the end of the week we would take our

ESQUIRE REPORTING - STUART & FORT PIERCE, FLORIDA

51

1  punch card and I would check how many hours I had worked
2  and then I would calculate that.  And then when we got the
3  check the week -- next week, then I would see there were
4  less hours.
5      Q     And after the second time you asked Marino and he
6  told you it was because they were taking away lunch hours,
7  did you ever bring it up to him again?
8      A     Yes.
9      Q     And what did Marino tell you then?
10     A     They -- he told me that the reason they're taking
11 them away from me was because I would not go -- not go
12 directly to my line to prepare my stuff immediately, and
13 that is why they were taking them away from me.
14     Q     Okay.  And what did you say to Joaquin about
15 that?  Or, excuse me, Marino?
16     A     Well, then I told him that that's fine then and I
17 will go directly to the line from now on and so hopefully
18 they're not going to discount them anymore.
19     Q     Okay.  Was that satisfactory?
20     A     No, they continued to do it.
21     Q     Did you go back to Marino and ask again why?
22     A     And I complained again.
23     Q     What did Marino say then?
24     A     Then he told me that they were taking these hours
25 away because it was part of the bonuses they were giving

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. CIV-MOORE 03-14031

JOSEFINA FIERROS and NORMA SOLANO,
on behalf of themselves and all others
similarly situated,

     Plaintiffs,

vs.

TAMPA FARMS SERVICES, INC.,
a Florida corporation,

     Defendant.

_____/

**CERTIFIED COPY**

VIDEOTAPED DEPOSITION

OF NORMA SOLANO

DATE:             Monday, September 8, 2003

TIME:             11:47 o'clock A.M.

PLACE:           422 Camden Avenue
                  Stuart, Florida

TAKEN BY:       Defendant

REPORTER:       Deanne S. Morris, RPR, Notary
                  Public of the State of Florida
                  at Large.

APPEARANCES:

FOR THE PLAINTIFFS:

                  LAW OFFICE OF DAVID H. SPALTER, P.A.
                  BY: DAVID H. SPALTER, ESQUIRE
                  Rolling Hills Executive Center
                  3325 S. University Drive
                  Suite 102
                  Davie, Florida  33328

**DEFENDANT'S
EXHIBIT C**

13

1        And how many children do you have?

2    A    Two.

3    Q    Okay.  How old are they?

4    A    One is four and one is three.

5    Q    Okay.  Tell me the jobs that you have held for

6 Tampa Farms Services, Inc. from the first employment.

7    A    First I started out with the chicks when the

8 little chicks arrive.  And then from there I went to the

9 houses with all the chickens.  And then from there I went

10 up to the packing area.

11    Q    When were you first hired to work with the

12 chicks?

13    A    It was in 1997.  I did not remember the month.

14 In 1997 is when I went to the three areas.

15    Q    How long did you work in the packing house before

16 you first quit?

17    A    I started out in '97.  Um, and I had to leave

18 twice because of pregnancies.  Then in 1998 I left to have

19 one of my children, and then I came back, and then I left

20 again.  And then in 2000 I came back again.  And it was

21 about August or September I came back.

22    Q    August or September of 2000?

23    A    No, 2002.

24    Q    Okay.  When did you leave in 2000?

25    A    In what month?

14

1      Q      Yes.

2      A      About June.

3      Q      And then you took off until -- from June 2000

4    through September 2002?

5      A      Yes, I was two years without work.  Almost two

6    years.

7      Q      Okay.  And when you came back in September 2002,

8    you -- in or about September 2002, you went to the packing

9    area again?

10      A      Yes.

11      Q      Okay.  Your husband does not work in the egg

12    processing area, correct?

13      A      No.

14      Q      He does not supervise anyone in the egg packing

15    area, correct?

16      A      No, but he's around there.

17      Q      Okay.  What is he doing in the egg packing area?

18      A      He is all over the place, not just there.  He

19    goes around the offices, about -- around the houses.  He

20    just goes around the whole area into the whole plant.

21      Q      His job is in charge of the chicken manure, is it

22    not?

23      A      Yes.  Yes, the dirt.

24      Q      All right.  And that is not in the egg processing

25    area or in the offices, is it?

ESQUIRE REPORTING - STUART & FORT PIERCE, FLORIDA

22

1  eggs themselves were bad?

2      A    Um, well, a few times Daniel told us that

3  somebody had come and complained that some of the eggs had

4  had blood on them and, you know, I don't know what, but

5  that they had blood on them and that we weren't getting a

6  bonus that week.

7      Q    Wasn't it true that you didn't get a bonus when

8  you didn't work the day you were scheduled?

9      A    What do you mean?  I don't understand.

10     Q    If you were scheduled for a particular day during

11 the week or for six particular days and you didn't show up

12 on one of those scheduled days, you wouldn't be entitled to

13 the bonus for the other days?

14     A    If you did not ask for permission to miss that

15 day, yes, they would take the bonus away.

16     Q    The -- is it your understanding that packing the

17 eggs was a necessary element of getting those eggs to the

18 marketplace?

19     A    Yes.

20     Q    Okay.  You have to answer audibly.

21     A    Yes, I remember.  I forget sometimes.

22     Q    And it is true that the eggs can't be delivered

23 to the marketplace if you don't -- if you don't pack them,

24 correct?

25     A    Yes, they have to be packed.

43

1  would take our bonuses away.  When the machine was broken

2  down for a long period of time, they would also take our

3  bonuses away.

4      Q    Do you have any documents that would support what

5  you just testified to?

6      A    I'm not going to be saving documents.  I really

7  don't have anything like that.

8      Q    Are you aware of any paperwork that would show

9  that you were not paid for hours that the machine broke

10  down?

11      A    No, there's no documents -- there's no documents,

12  but we would know this at the end of the week.  When we

13  would check the checks or check our hours and compare the

14  hours, and we knew how many hours we had worked, then we

15  would discover that there was no -- they had not paid us

16  for those hours.  And there is no documents for that.  We

17  just checked ourselves and knew that we hadn't been paid.

18      Q    Did you write down on a separate paper how many

19  hours you were working on any given week?

20      A    The mack -- the machine would tell us, or the

21  clock that we had would tell us how many hours we were

22  working during the week.  And then we would take those

23  hours and discount the half hour lunches we would have and

24  the hours -- well, we would start counting from 7:30 on

25  until the time that the machine stopped.

44

1      Q    Okay.  Did you document what time the machine
2  stopped every day?

3      A    No.

4      Q    Okay.  Do you know how many hours that you -- how
5  many hours do you claim that you were not paid for during
6  the time period from approximately September 2002 through
7  January 2003?

8      A    I don't know.  I've never -- I don't know.  I
9  haven't done the math.  Sometimes I would be missing six,
10 five hours.  It would be -- it would be different.

11     Q    Per week?

12     A    It wasn't -- it was con -- it wasn't constant.
13 Some weeks there was some time missing, some there were
14 not.  But usually, yeah, there was -- there were a few
15 hours missing.

16     Q    Okay.  If you worked for four months, out of
17 those four months how many weeks do you believe you had
18 missing time?

19     A    I didn't really notice.

20     Q    Do you -- do you have any idea whatsoever how
21 much money you're trying to claim that Tampa Farms owes
22 you?

23     A    No.

24     Q    Now, if you knew you were not gonna get paid when
25 the machine went down and your home is right behind the