## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 03-14031-CIV-MOORE/LYNCH

JOSEFINA FIERROS and NORMA SOLANO,
on behalf of themselves and all others similarly
situated,

       Plaintiffs,

vs.

TAMPA FARM SERVICE, INC., a Florida
corporation,

       Defendant.

_____/

NIGHT BOX
FILED

OCT - 1 2003

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

### PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT, CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT, AND INCORPORATED STATEMENT OF UNDISPUTED FACTS AND MEMORANDUM OF LAW

Plaintiffs, Josefina Fierros and Norma Solano, by and through counsel and pursuant to

Local Rules 7.1 and 7.5 of the Southern District Local Rules, hereby submit their Opposition to

Defendant, Tampa Farm Service, Inc.'s (hereafter "TFS") Motion for Partial Summary Judgment.

Moreover, as Plaintiffs believe that the undisputed facts entitle them to partial summary

judgment as a matter of law, Plaintiffs also hereby move for Partial Summary Judgment pursuant

to Fed.R.Civ.P. 56 and Southern District Local Rule 7.5, and submit their supporting Statement

of Undisputed Facts and Memorandum of Law.[1]

---

[1] Plaintiffs recognize that, to the extent that they are moving for relief herein, they do so on a date subsequent to the deadline for filing motions in this action. However, Plaintiffs have already filed a Motion for Continuance and to Enlarge Pretrial Deadlines. If that Motion is granted, this Motion would be rendered timely. If the court denies that Motion, and is not otherwise willing to entertain this Cross-Motion for Partial Summary Judgment, Plaintiffs ask that the Court simply treat this document as their response to Defendant's Motion for Partial Summary Judgment.

Fierros, et al. v. Tampa Farm Service, Inc.
Case No. 03-14031-CIV-MOORE/LYNCH
Plaintiffs' Opposition to Defendant's Motion
for Partial Summary Judgment and Cross-Motion
for Partial Summary Judgment

## INTRODUCTION

Plaintiffs formerly worked for TFS in its egg packaging facility in Indiantown, Florida. In this action, Plaintiffs are seeking recovery of unpaid overtime compensation pursuant to the Fair Labor Standards Act ("FLSA") on behalf of themselves and all others similarly situated.[2]

The central issue in this action is whether Plaintiffs were exempt from the FLSA pursuant to the agricultural exemption. The parties agree that employees engaged in the packing of agricultural commodities produced by their employer are subject to this exemption. The parties further agree that employees engaged in packing agricultural commodities produced by an outside grower or produced are not subject to the exemption. Finally, the parties agree that Plaintiffs (and those similarly situated to Plaintiffs) packed and processed outside eggs in several workweeks during the relevant period of time.

The parties' positions diverge on the issue of the significance of the Plaintiffs' involvement in the nonagricultural task of packing outside eggs. TFS asserts that such involvement was *de minimus* in that it was infrequent and occurred primarily when necessary to cover shortfalls in production. TFS further asserts that such *de minimus* nonagricultural work does not preclude the application of the agricultural exemption, and moves for partial summary judgment on this issue.

Plaintiffs assert that TFS's Motion must be denied and, instead, they are entitled to partial summary judgment as a matter of law on the discrete issue of whether the agricultural exemption may be applied in workweeks when Plaintiffs packed outside eggs. Thus, this document

[2] Contemporaneously with the filing of this Opposition/Cross-Motion, Plaintiffs are sending Court-approved Notice to similarly situated individuals advising them of their right to opt-in to this lawsuit.

Fierros, et al. v. Tampa Farm Service, Inc.
Case No. 03-14031-CIV-MOORE/LYNCH
Plaintiffs' Opposition to Defendant's Motion
for Partial Summary Judgment and Cross-Motion
for Partial Summary Judgment

constitutes both Plaintiffs' Opposition to Defendant's Motion for Partial Summary Judgment and

Plaintiffs' Cross-Motion for Partial Summary Judgment.

Plaintiffs' primary argument is that, under the precedent of the U.S. Supreme Court, the

Eleventh Circuit, the Ninth Circuit and the Department of Labor's Regulations, the *de minimus*

theory is inapplicable to the question of whether the agricultural exemption applies. Thus, as it is

undisputed that Plaintiffs engaged in nonexempt work in multiple workweeks, as a matter of law,

they cannot be subject to the agricultural exemption in those workweeks.

Plaintiffs further assert that, even if a *de minimus* doctrine were applicable, TFS has

failed to establish that its outside egg purchases were significantly trivial to invoke that doctrine.

Rather, Plaintiffs assert that these purchases were sufficiently significant to preclude the

application the *de minimus* doctrine.

PLAINTIFFS' STATEMENT OF UNDISPUTED
AND DISPUTED MATERIAL FACTS

I.      Statement of Undisputed Facts Supporting Plaintiffs' Cross Motion for Partial Summary
        Judgment

TFS operates a vertically integrated egg production and processing facility in Indiantown,

Florida. Transcript of Deposition of Michael Bynum, Exhibit A, attached hereto, p. 13.

Plaintiffs were employed at that facility as egg packers and were paid an hourly wage plus

incentive pay. Id. at pp. 6, 15-16. When they worked in excess of forty hours in a workweek,

they did not receive time and one-half (overtime compensation). Id. at 42.

While the majority of eggs processed at TFS's Indiantown facility are produced in the

facility's henhouses, it also processes eggs purchased from outside farms. Id. at pp. 44-46 Such

purchases were made to cover production shortfalls and also fluctuations in demand. Id. at pp.

3

Fierros, et al. v. Tampa Farm Service, Inc.
Case No. 03-14031-CIV-MOORE/LYNCH
Plaintiffs' Opposition to Defendant's Motion
for Partial Summary Judgment and Cross-Motion
for Partial Summary Judgment

51-52. For example, during holidays such as Christmas, Easter, Passover and Thanksgiving, demand can rise necessitating the purchase of outside eggs. Id. Since February 2000, TFS has purchased eggs from at least six different outside farms. Id. at pp. 53-55. During this period, TFS purchased ungraded or "nest run" eggs from outside farms during at least 48 calendar weeks.[3] Id. at 65-67; Chart (Prepared by Michael Bynum) of Nest Run Egg Purchases, Exhibit B, attached hereto.[4] TFS also purchased graded eggs from outside farms during this period on several occasions. Exhibit A, p. 87 (Bynum confirms that chart does not account for purchase of outside graded eggs)[5]; Invoices Showing Purchase of Graded Eggs, Composite Exhibit C, attached hereto.

While TFS disputes that outside graded eggs were packed by Plaintiffs (a point which will be addressed below), it concedes that Plaintiffs packed outside "nest run" eggs. See Defendant's Motion for Partial Summary Judgment, p. 4, ¶ 10 (citing to Affidavit of Michael Bynum).

II.    Statement of Disputed Material Facts in Opposition To Defendant's Motion for Partial Summary Judgment

   A.    Outside Egg Purchases

Plaintiffs dispute several contentions made by TFS relating to the frequency of their involvement in the packing of eggs purchased from outside farms.

---

[3] Plaintiffs dispute that they only packed outside eggs during 48 total weeks from February 2000 through the date of their termination. However, it is undisputed that outside "nest run" eggs were purchased in at least 48 calendar weeks during this period.

[4] Plaintiffs note that TFS's attorneys objected to the introduction of this chart as an exhibit during the deposition of Michael Bynum on the ground that it was originally produced to Plaintiffs as an attachment to a letter conveying a settlement offer. However, while the settlement letter would be inadmissible under Fed.R.Evid. 408, the chart, which purports to be a mere summary of TFS's purchase invoices, is admissible as the rule "does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations."

[5] "Nest run" eggs are ungraded. Exhibit A, p. 59.

Fierros, et al. v. Tampa Farm Service, Inc.
Case No. 03-14031-CIV-MOORE/LYNCH
Plaintiffs' Opposition to Defendant's Motion
for Partial Summary Judgment and Cross-Motion
for Partial Summary Judgment

    1.    <u>Plaintiffs Packed Graded Eggs Purchased From Outside Producers In Addition To "Nest Run" Eggs</u>

TFS's representations regarding the volume of outside eggs handled by Plaintiffs is grounded on its assertion that Plaintiffs only ungraded "nest run" eggs.  The source of this assertion is Michael Bynum, TFS's President, who testified that graded eggs typically are not packed by TFS's packers.  Exhibit A, pp. 59-60.  Mr. Bynum also testified that he is typically at the Indiantown facility only four times a year for meetings, so it is questionable whether he even has personal knowledge on this issue.  <u>Id.</u> at 99.  Nonetheless, based upon his presumption that Plaintiffs never packed graded eggs purchased from outside farms, TFS has excluded these eggs from its analysis.

Mr. Bynum's presumption is, in actuality, incorrect.  Plaintiffs packed graded outside eggs on a regular basis.  Second Affidavit of Jose Serur, Exhibit E, attached hereto; Second Affidavit of Marin Escobedo, Exhibit F, attached hereto.  The reason for this, as Mr. Escobedo (one of Plaintiffs' former supervisors) testified, is that "graded eggs would come on pallets and not in Publix packaging" and therefore these eggs would have to be washed and packed in Publix cartons.  Exhibit F, ¶ 3; <u>see also</u> Exhibit C.[6]  Thus, the "evidence" presented by TFS vastly understates the volume of outside eggs processed by Plaintiffs, thereby creating an issue of material fact that precludes summary judgment in their favor.

    2.    <u>A Disputed Issue of Material Fact Remains with Respect to the Number of Weeks During Which Plaintiffs Packed Outside Eggs</u>

It should be noted as well that TFS has presented no evidence whatsoever regarding the number of workweeks during which Plaintiffs packed outside eggs.  This is not surprising, as Mr.

---

[6] As will be discussed below, it is also inappropriate to exclude Graded outside eggs purchased already packaged for Publix, as the resale of such eggs impacts the agricultural exemption as well.

Fierros, et al. v. Tampa Farm Service, Inc.
Case No. 03-14031-CIV-MOORE/LYNCH
Plaintiffs' Opposition to Defendant's Motion
for Partial Summary Judgment and Cross-Motion
for Partial Summary Judgment

Bynum testified that TFS does not have any records reflecting when outside eggs are processed.

Exhibit A, pp. 62-63.   Nonetheless, this is a material issue, as the question of whether the

agricultural exemption will apply is determined on a workweek by workweek basis.

Conversely, Plaintiffs have presented undisputed evidence that they, and the similarly

situated employees, processed and packed outside eggs virtually every week.  Exhibit E, ¶ 4;

Exhibit F; ¶ 3.   This evidence is provided by Jose Serur, TFS's assistant farm manager in

Indiantown, and Marin Escobedo, a supervisor in the egg packing facility at Indiantown.  These

witnesses, unlike Mr. Bynum, are present at the Indiantown facility on a daily basis and,

consequently, have the opportunity to observe the operations at that facility.

B.    Facts Relating to "Unrecorded Time"

Though TFS acknowledges that its Motion for Partial Summary Judgment is limited to

the issue of whether the agricultural exemption applies to Plaintiffs, it nonetheless asserts (as a

purported "undisputed fact") that Plaintiffs "are unable to identify which hours the company

failed to pay them, are unable to identify which days the company paid them, and have no

documents contradicting Tampa Farms' payroll records."    Defendant's Motion for Partial

Summary Judgment, p. 5, ¶ 12.  This statement is false and misleading.  TFS has produced time

records for the Plaintiffs in the course of this case.  In most workweeks, these records reflect a

total number of hours recorded by a timeclock, which was then reduced via handwritten

adjustment by a manager of TFS.  See Sample Timecards of Plaintiffs, Composite Exhibit D,

attached hereto.[7]  Plaintiffs contest the validity of the downward adjustment of their hours, and

---

[7] The attached samples reflect only a small percentage of the timecards in Plaintiffs possession showing reductions of this type.  As TFS acknowledges that their Motion for Partial Summary Judgment is not directed to this issue, Plaintiffs have not submitted all of the relevant timecards.  Plaintiffs further note that there are periods during which Plaintiff Norma Solano worked for which TFS did not produce any timecards (presumably, they no longer exist).

Fierros, et al. v. Tampa Farm Service, Inc.
Case No. 03-14031-CIV-MOORE/LYNCH
Plaintiffs' Opposition to Defendant's Motion
for Partial Summary Judgment and Cross-Motion
for Partial Summary Judgment

TFS has not presented any evidence specifically justifying these downward adjustments. Plaintiffs seek a half-time premium for each hour worked in excess of forty in a workweek for which they have received straight time wages, and time and one-half their regular rate for each such hour for which they have received no compensation. The fact that Plaintiffs are not personally sufficiently familiar with the method of calculating overtime under the FLSA to testify as to the precise amount of backpay they are owed does not, as TFS absurdly suggests, constitute an admission that they cannot establish their entitlement to backpay in the course of this lawsuit.

## MEMORANDUM OF LAW

### I.    Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure mandates that summary judgment be granted if the undisputed facts established by the pleadings, depositions, interrogatory responses, admissions, and affidavits, if any, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986). An issue of fact is "material" if it is identified by the controlling substantive law as an essential element of the non-moving party's case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). An issue of material fact is genuine if it is supported by evidence that could lead a trier of fact to find for the non-moving party, and is not based solely on evidence that is "merely colorable" or is "not significantly probative." Id.

Fierros, et al. v. Tampa Farm Service, Inc.
Case No. 03-14031-CIV-MOORE/LYNCH
Plaintiffs' Opposition to Defendant's Motion
for Partial Summary Judgment and Cross-Motion
for Partial Summary Judgment

II.     FLSA Burdens of Proof

        Both TFS's Motion for Partial Summary Judgment and Plaintiffs' Cross-Motion turn on

the question of whether the agricultural exemption may be applied to Plaintiffs.  TFS asserts that

is should prevail at this stage on this issue because "Plaintiffs do not have significantly probative

evidence to defeat the FLSA exemption for agricultural workers at the Indiantown farm."  To the

extent that this assertion suggests that it is Plaintiffs' burden to <u>disprove</u> that the exemption

applies, TFS has incorrectly described the burden of proof in this action.

        It is well-settled that FLSA exemptions are to be construed narrowly, and that "the

employer has the burden of showing it is entitled to the exemption.  See, e.g., Evans v. McClain

of Georgia, Inc., 131 F.3d 957, 965 (11th Cir. 1997); Nicholson v. World Business Network, Inc.,

105 F.3d 1361, 1364 (11th Cir.), cert. denied, 522 U.S. 949, 118 S.Ct. 368 (1997); Jeffery v.

Sarasota White Sox, Inc., 64 F.3d 590, 594 (11th Cir. 1995).  Thus, if TFS is unable to

demonstrate that is it entitled to the agricultural exemption, it cannot prevail.

III.    The Agricultural Exemption Does Not Apply To Employees Engaged In The Processing
        Of Commodities Obtained From An Outside Farm

        As TFS correctly states, employees involved in the packing and processing of agricultural

commodities that are produced by their employer fall within the agricultural exemption set forth

in Section 213(b)(12) of the FLSA.  However, its is also well-settled that employees who, in

addition to processing commodities produced by their employer, also process commodities

processed by outside growers are not subject to this exemption.  See, e.g. Marshall v. Abbot

Farms, Inc., 559 F.2d 1006, 1007 (5th Cir. 1977) (employees engaged in processing and packing

eggs that were obtained from "contract" growers were not subject to the agricultural exemption

to the FLSA); Marshall v. Gulf and Western Industries, Inc., 552 F.2d 124 (5th Cir. 1977)

8

Fierros, et al. v. Tampa Farm Service, Inc.
Case No. 03-14031-CIV-MOORE/LYNCH
Plaintiffs' Opposition to Defendant's Motion
for Partial Summary Judgment and Cross-Motion
for Partial Summary Judgment

(agricultural exemption did not apply to tomato packaging facilities that processed tomatoes grown by independent farmers); Mitchell v. Hunt, 263 F.2d 913 (5th Cir. 1959) (work involving outside commodities not subject to agricultural exemption); Brennan v. Gustafson's Dairy, Inc., 382 F.Supp. 964 (M.D.Fla. 1974) (processing of milk purchased from outside producer rendered employees non-exempt because the performance by an employee of both exempt and non-exempt work during same week defeats the exemption); see also 29 C.F.R. §§ 780.137, 780.138 and 780.141.

These cases are grounded upon the long-held maxim that an employee's performance of both exempt and nonexempt work in the same workweek precludes application of the exemption. See, e.g. Marshall v. Gulf & Western Industries, 552 F.2d 124, 126 (5th Cir. 1977); Hodgson v. Wittenburg, 463 F.2d 1219, 1221 (5th Cir. 1972).

In 1992, the Department of Labor (DOL) investigated TFS's facilities and, specifically, addressed the application of the agricultural exemption with respect to employees working in its packaging facility. See U.S. DOL Investigation Records and Narrative Report, Exhibit G, attached hereto. The DOL, relying on the decision of the Fifth Circuit in Marshall v. Abbott Farms, found that "only EE's working on eggs owned and produced by the firm on their own farm would be exempt." Id.

It is undisputed that TFS's employees in Indiantown (and elsewhere) have processed, and continue to process eggs, purchased from outside farms. Consequently, those employees were not, and are not, exempt under the agricultural exemption during any workweek when outside eggs were and are processed.

9

Fierros, et al. v. Tampa Farm Service, Inc.
Case No. 03-14031-CIV-MOORE/LYNCH
Plaintiffs' Opposition to Defendant's Motion
for Partial Summary Judgment and Cross-Motion
for Partial Summary Judgment

IV.   Where Outside Commodities Are Processed, The Agricultural Exemption Cannot Be Preserved By The Invocation Of The *De Minimus* Doctrine

TFS readily acknowledges there have been several workweeks during the period relevant to this lawsuit in which Plaintiffs were involved in packing eggs purchased from outside farms.[8] Nonetheless, and notwithstanding the DOL's previous finding with respect to its operations, TFS asserts that it is entitled to invoke the agricultural exemption during the entire period of Plaintiffs' employment because (TFS claims) outside egg purchases represented only a small percentage of the overall output of the Indiantown egg packaging facility and were only made in exceptional circumstances to cover production shortfalls.

By arguing that degree of Plaintiffs' non-exempt work (packing outside eggs) was insufficient to destroy the exemption, TFS seeks to apply a *de minimus* theory.[9]   However, the application of the *de minimus* theory in this context was been specifically rejected by the only binding Appellate Court opinion on point in Brennan v. Sugar Cane Growers Cooperative of Florida, 486 F.2d 1006 (5th Cir. 1973).[10]   There, the court addressed the issue of whether employees of a sugar cane processor were exempt from the overtime requirements of the FLSA notwithstanding that they performed some non-exempt work.   In finding that these employees were not exempt, the court cited the rule that "no exemption may be allowed for compensation of

---

[8] As will be discussed in greater detail below, there remain disputed issues of fact as to the number of weeks during which outside eggs were packed by Plaintiffs.  However, as there is no dispute over the fact that outside eggs were packed by Plaintiffs during some number of weeks, they are entitled to a finding, as a matter of law, that they were non-exempt during those weeks.

[9] TFS asserts that the outside egg purchases must be disregarded because they were small in volume, and also because they were necessitated by unforeseen circumstances.  The distinction between purchases that are contended to be *de minimus* in volume and those which are contended to be *de minimus* because they arise from extraordinary circumstances is immaterial.  To the extent that TFS contends that, for any reason, there should be a tolerance of some amount of non-exempt work before the exemption is destroyed, it is, in essence, asking this Court to adopt a *de minimus* doctrine which is contrary to Fifth/Eleventh Circuit precedent.

[10] Cases decided by the Court of Appeals for the Fifth Circuit before 1981 are binding precedent on the Eleventh Circuit today. Hope v. Pelzer, 122 S.Ct. 2508, 2516 (2002); Bonner v. Prichard, 661 F.2d 1206 (11th Cir. 1981).

Fierros, et al. v. Tampa Farm Service, Inc.
Case No. 03-14031-CIV-MOORE/LYNCH
Plaintiffs' Opposition to Defendant's Motion
for Partial Summary Judgment and Cross-Motion
for Partial Summary Judgment

employees whose work consists of both exempt and non-exempt activity" and stressed that "the

doctrine of *de minimus* has no viable place in the interpretation of the FLSA." Id. at 1012-13.

In asking this Court to apply a *de minimus* theory, TFS simply ignores this binding

precedent.  Furthermore, as will be demonstrated below, the Fifth/Eleventh Circuit's position on

this issue is consistent with the U.S. Supreme Court's and the Ninth Circuit Court of Appeals'

position, and the Department of Labor's regulations, on this issue.  TFS ignores this authority as

well, and relies instead upon decisions of the Second, Seventh and Eighth Circuits that are

contrary to the precedent of the Fifth/Eleventh Circuit.  Clearly, the authorities cited by TFS are

not binding in the case at bar, and must be disregarded.

The line of cases relied upon by TFS originate with two decisions from the 1940s,

Walling v. Rocklin, 132 F.2d 3 (8th Cir. 1942) and Damutz v. William Pinchbeck, Inc, 158 F.2d

882 (2nd Cir. 1946).  In both cases, the courts held that a *de minimus* amount of non-exempt work

by agricultural workers related to the products purchased from other growers would not defeat

the agricultural exemption.  Walling, 132 F.2d at 7 (five to ten percent sales from outside

producers was "negligible" and did not defeat application of agricultural exemption); Damutz,

158 F.2d at 882 (small part, less than one-half of one percent, of defendant's business relating to

flowers obtained from another grower was "rightly disregarded" under the *de minimus* doctrine).

Though it did not address the earlier Walling decision directly, the U.S. Supreme Court

rejected the application of the *de minimus* doctrine in addressing a coverage issue under the

FLSA in Mabee v. White Plains Pub. Co., 327 U.S. 178, 66 S.Ct. 511 (1946).[11]  There, the

appellate ower court found that the employer was engaged in interstate commerce, but that such

---

[11] Mabee was decided several months before Damutz.

11

Fierros, et al. v. Tampa Farm Service, Inc.
Case No. 03-14031-CIV-MOORE/LYNCH
Plaintiffs' Opposition to Defendant's Motion
for Partial Summary Judgment and Cross-Motion
for Partial Summary Judgment

activities were *de minimus* and therefore were not sufficient to trigger FLSA coverage.   The

Supreme Court reversed, and held that, notwithstanding the fact that only one-half of one percent

of the employer's business involved interstate commerce.  327 U.S. at 180-82.

Notwithstanding this criticism of its use, the *de minimus* theory was applied again in

Mitchell v. Hornbuckle, 155 F.Supp. 205 (M.D.Ga. 1957), another case relied upon by TFS.

There, the district court found, citing Walling, that an agricultural employer that purchased two

percent of its volume from outside growers did not defeat the exemption from the FLSA.  Id. at

211.   The Second Circuit also reiterated its application of the *de minimus* doctrine in Wirtz v.

Jackson & Perkins Company, 312 F.2d 48 (2nd Cir. 1963) (citing Rocklin, Damutz and Mitchell).

Several years later, the Department of Labor's (DOL) issued regulations on this issues

and expressly rejected the application of a *de minimus* theory to preserve the agricultural

exemption.   The DOL's regulation at 29 C.F.R. § 780.137 provides that the agricultural

exemption can only be applied with respect to practices "performed in connection with the

farming operation of the same farmer" and "the requirement is not met with respect to employees

engaged in any practices performed by their employer in connection with farming operations that

are not his own." (e.g. "the processing by a farmer of commodities of other farmers.") (emphasis

added).   By using the term "any practices," the DOL expressed a desire to preserve the

agricultural exemption only with respect to employers that process commodities that are

produced entirely at the employer's farm.[12]

This position is echoed and further emphasized in 29 C.F.R. § 780.141, which provides:

> No practice performed with respect to farm commodities is within
> the [the agricultural exemption] by reason of its performance on a

---

[12] The DOL provides, as an example of this principle, that "employer of a fruit grower who dry or pack fruit not
grown by their employer" are not exempt from the FLSA.  29 C.F.R. § 780.138.

Fierros, et al. v. Tampa Farm Service, Inc.
Case No. 03-14031-CIV-MOORE/LYNCH
Plaintiffs' Opposition to Defendant's Motion
for Partial Summary Judgment and Cross-Motion
for Partial Summary Judgment

> farm unless <u>all of such commodities are the products of that farm</u>.
> Thus, the performance on a farm of <u>any practice</u>, such as packing
> or storing, which may be incidental to farming operations cannot
> constitute a basis for considering the employees engaged in
> agriculture if the practice is performed upon <u>any commodities</u> that
> have been produced elsewhere than on such farm (see <u>Mitchell v.
> Hunt</u>, 263 F.2d 913).

(emphasis added).   Again this language reflects an unambiguous rejection of the notion that the

processing of commodities produced by an outside grower can ever be disregarded as *de*

*minimus.*

The Fifth Circuit's decision in <u>Brennan v. Sugar Cane Growers Cooperative</u>, holding that

"the doctrine of *de minimus* has no viable place in the interpretation of the FLSA" was rendered

in 1974, an represented an adoption and extension of the Supreme Court's rationale in <u>Mabee</u>,

and a ruling that is entirely consistent with the DOL's regulations.   This decision must also be

regarded as a rejection of the Second and Eighth Circuit's application of the *de minimus* theory to

preserve the agricultural exemption.[13]   The Fifth Circuit reiterated its position in <u>Brennan v.

Wilson Building, Inc.</u>, 478 F.2d 1090, 1097 (5th Cir. 1973) (rejecting the attempt to revitalize the

*de minimus* doctrine in FLSA cases), <u>citing</u> <u>Maryland v. Wirtz</u>, 392 U.S. 183, 192-93, 88 S.Ct.

2017 (1968) (rejecting *de minimus* doctrine in FLSA coverage issue).

In several subsequent decisions, the Fifth Circuit found that the agricultural exemption

was inapplicable with respect to employees that processed commodities purchased from outside

farms or growers.   <u>See</u>, <u>e.g.</u>, <u>Marshall v. Abbot Farms, Inc.</u>, 559 F.2d 1006, 1007 (5th Cir. 1977)

(employees engaged in processing and packing eggs that were obtained from "contract" growers

were not subject to the agricultural exemption to the FLSA); <u>Marshall v. Gulf and Western</u>

---

[13] Moreovoer, as the <u>Mitchell v. Hornbuckle</u>, decision was rendered by a district court within the Fifth Circuit, it was
implicitly overturned by the <u>Brennan v. Sugar Cane Growers</u> decision.

Fierros, et al. v. Tampa Farm Service, Inc.
Case No. 03-14031-CIV-MOORE/LYNCH
Plaintiffs' Opposition to Defendant's Motion
for Partial Summary Judgment and Cross-Motion
for Partial Summary Judgment

Industries, Inc., 552 F.2d 124 (5th Cir. 1977) (agricultural exemption did not apply to tomato packaging facilities that processed tomatoes grown by independent farmers). Likewise, the only Florida district court decision on point reached the same conclusion. Brennan v. Gustafson's Dairy, Inc., 382 F.Supp. 964 (M.D.Fla. 1974) (processing of milk purchased from outside producer rendered employees non-exempt because the performance by an employee of both exempt and non-exempt work during same week defeats the exemption).

In 1990, the Ninth Circuit joined the 5th Circuit in rejecting of the *de minimus* doctrine in Dole v. West Extension Irrigation District, 909 F.2d 349 (9th Cir. 1990). There, the Court considered whether the agricultural exemption could be preserved where only three percent of the employer's land was used for nonagricultural purposes. Citing Brennan v. Sugar Cane Growers and Mabee v. White Plains Publishing Co., the Court found that "even if the amount is very small, the doctrine of *de minimus* has no viable place in the interpretation of the FLSA. Id. at 351.

The case most heavily relied upon by TFS, Adkins v. Mid-American Growers, Inc., 167 F.3d 355 (7th Cir. 1999), is a departure from the rejection of the *de minimus* doctrine by the U.S. Supreme Court, Fifth/Eleventh Circuit, Ninth Circuit and the DOL. This point is well-illustrated by a review of the lower court decision in Adkins. There, the district court addressed the question of whether the purchase of a small amount of outside commodities would cause an employer to lose the agricultural exemption. Adkins v. Mid-American Growers, Inc., 965 F.Supp. 1076, 1081 (N.D.Ill. 1997). The employer asserted that a number of cases had applied the *de minimus* doctrine in FLSA cases. The district court found, however, that these cases involved an entirely different issue of whether "insubstantial and insignificant periods of time"

<u>Fierros, et al. v. Tampa Farm Service, Inc.</u>
Case No. 03-14031-CIV-MOORE/LYNCH
Plaintiffs' Opposition to Defendant's Motion
for Partial Summary Judgment and Cross-Motion
for Partial Summary Judgment

need be included in the statutory workweek. <u>Id.</u> These cases, the district court held, were "easily distinguishable" from the question of whether the agricultural exemption can apply to employees who perform some nonagricultural work, and that they were unpersuasive in light of the decisions in <u>Dole</u> and <u>Brennan</u> "which suggest that the doctrine of *de minimus* should not apply to exemptions under the FLSA." <u>Id.</u>

The Seventh Circuit reversed, holding that the nonexempt work was "too slight" and constituted "a tiny peripheral activity," and, consequently, did not destroy the exemption. <u>Adkins</u>, 167 F.3d at 358-359.  It also stated that small outside purchases to cover production shortfalls did not destroy the exemption. <u>Id.</u> at 357.  In support of these conclusions, the Seventh Circuit cited <u>Damutz</u>, <u>Wirtz</u> and <u>Walling</u>, but (seemingly ignoring the district court's analysis) made no mention of <u>Mabee</u>, <u>Brennan</u>, <u>Dole</u> or the DOL Regulations cited above. <u>Id.</u> at 357-58.

Finally, in January of this year, the Eleventh Circuit implicitly reaffirmed the rejection of the *de minimus* rule in <u>Ares v. Manuel Diaz Farms, Inc.</u>, 318 F.3d 1054 (11th Cir. 2003).  In that case, the employer was found to be covered by the agricultural exemption because it "sells <u>only</u> its own products." <u>Id.</u> at 1057 (emphasis added).  The Court contrasted this situation the circumstance presented in <u>Marshall v. Gulf & Western Industries, Inc.</u>, in which it was held that "because a tomato packing plant packed tomatoes grown by other producers in addition to its own products, it could not claim the agricultural exemption." <u>Ares</u>, 318 F.3d at 1057, <u>citing</u>, <u>Marshall</u>, 552 F.2d at 126.

The line of cases relied upon by TFS are in direct conflict with the controlling precedent of the Fifth/Eleventh Circuit, the U.S. Supreme Court and the DOL Regulations.  Therefore, controlling, the *de minimus* analysis applied in <u>Adkins</u>, <u>Damutz</u>, <u>Walling</u> and <u>Wirtz</u> must be

Fierros, et al. v. Tampa Farm Service, Inc.
Case No. 03-14031-CIV-MOORE/LYNCH
Plaintiffs' Opposition to Defendant's Motion
for Partial Summary Judgment and Cross-Motion
for Partial Summary Judgment

rejected.   The rule in this Circuit is simple and straightforward: in any week that an employee performs any nonagricultural work, including the processing of commodities produced by another farm, the agricultural exemption does not apply.   Neither the degree of such nonagricultural work, nor the circumstances that necessitate such nonagricultural work, is material.

TFS has admitted that Plaintiffs packed eggs purchased from outside farms in several workweeks.  Thus, TFS's Motion for Partial Summary Judgment must be denied, and this Court should instead grant partial summary judgment to Plaintiffs, holding, as a matter of law, that the agricultural exemption does not apply in those workweeks.

IV.    Assuming *Arguendo* That The *De Minimus* Rule Could Be Applied, Fact Issues Remain With Respect To The Volume And Frequency Of Plaintiffs' Packing Of Outside Eggs

Even if a *de minimus* theory could be applied in the context of the impact of outside egg purchases, TFS has not established that these purchases were, in fact, *de mimimus*.  The only evidence on this issue is proved by the Affidavit of TFS President Michael Bynum.  Mr. Bynum asserts that "nest run" egg purchases were purchased only "to cover for an unexpected loss of egg production" and "to meet holiday demand."

This testimony does not reflect the extent of outside egg purchases.  As was discussed above, Mr. Bynum only addresses ungraded "nest run" egg purchases.  As was demonstrated above, TFS also frequently purchase graded eggs from outside farms, and many of these eggs were packed by Plaintiffs.  See Exhibits C, E and F.  Furthermore, even graded eggs that were purchased by TFS and immediately resold without processing are relevant to the inquiry of whether the agricultural exemption applies.  As the Eleventh Circuit recently confirmed, when a company simply resells commodities purchased from an outside grower it acts as a wholesaler or

Fierros, et al. v. Tampa Farm Service, Inc.
Case No. 03-14031-CIV-MOORE/LYNCH
Plaintiffs' Opposition to Defendant's Motion
for Partial Summary Judgment and Cross-Motion
for Partial Summary Judgment

a "jobber rather than a farmer," and is not covered by the agricultural exemption.  <u>Ares v.</u>

<u>Manuel Diaz Farms, Inc.</u>, 318 F.3d 1054, 1057 note 4 (11th Cir. 2003).

Mr. Bynum's testimony also does not address the number of weeks during which

Plaintiffs packed outside eggs.  This is the operative question as the exemption is considered on a

workweek by workweek basis.  Again, Mr. Bynum conceded in his deposition that TFS is not

able to provide this information, as it does not possess any records showing when outside eggs

were packed by Plaintiffs.  Exhibit A, pp. 62-63.

Indeed, even if the "nest run" egg purchases were all that was at issue, it is highly

questionable that these purchases were *de minimus*.  As the chart prepared by TFS reflecting

these purchases demonstrates, "nest run" eggs were purchased in no less than 48 workweeks

during the relevant period, and in the vast majority of workweeks between September 2001 and

January 2003.  Exhibit B.

Thus, even if the *de minimus* doctrine was applicable, the undisputed facts fall well short

of establishing that outside egg purchases by TFS were, in fact, *de minimus*.   Indeed, the Court

could easily find, based on TFS's admissions and as a matter of law, that these purchases were

<u>not</u> *de minimus,* thereby entitling Plaintiffs to judgment as a matter of law even if the authority

cited by TFS is applicable.


CONCLUSION

The undisputed facts demonstrate that Plaintiffs performed the nonagricultural task of

packing outside eggs in several workweeks.  As the Eleventh Circuit does not permit this

nonagricultural work to be disregarded as *de minimus* (and as the undisputed facts show that

these activities were not *de minimus*), Defendant's Motion for Partial Summary Judgment must

17

Fierros, et al. v. Tampa Farm Service, Inc.
Case No. 03-14031-CIV-MOORE/LYNCH
Plaintiffs' Opposition to Defendant's Motion
for Partial Summary Judgment and Cross-Motion
for Partial Summary Judgment

be denied and this Court should instead grant Plaintiff's Cross-Motion for Partial Summary

Judgment.

Date:  October 1, 2003

Respectfully submitted,


David H. Spalter, Esquire
Florida Bar No. 966347
LAW OFFICE OF DAVID H. SPALTER, P.A.
3325 South University Drive, Suite 102
Davie, Florida  33328
Telephone: (954) 382-6220
Facsimile: (954) 382-5223
Email: EmploymentEsq@aol.com

J.D. Lewis, III, Esquire
Florida Bar No. 206377
Lee J. Baggett, Esquire
Florida Bar No. 467189
LEWIS, MORTELL & LEWIS, P.A.
1115 East Ocean Boulevard
Stuart, Florida  34996
Telephone: (772) 286-7861
Facsimile: (772) 288-2013
Email: LEEBAGG@aol.com

Attorneys for Plaintiffs

Fierros, et al. v. Tampa Farm Service, Inc.
Case No. 03-14031-CIV-MOORE/LYNCH
Plaintiffs' Opposition to Defendant's Motion
for Partial Summary Judgment and Cross-Motion
for Partial Summary Judgment

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was served via U.S. Mail on this ___1___

day of October, 2003, upon the following individuals:

David B. Earle, Esq.
Ross, Earle and Bonan, P.A.
Royal Palm Financial Center, Suite 212
759 South Federal Highway
Stuart, Florida  34994

Thomas K. Gallagher, Esq.
Ruden, McClosky, Smith, Schuster & Russell, P.A.
200 East Broward Boulevard, 15th Floor
Fort Lauderdale, Florida  33302

David H. Spalter, Esq.

# Exhibit A

1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF FLORIDA
2
         CASE NO. CIV-MOORE 03-14031
3

4    JOSEFINA FIERROS and NORMA SOLANO,
     on behalf of themselves and all others
5    similarly situated,

6         Plaintiffs,                    **CERTIFIED**
7    vs.                                 **COPY**

     TAMPA FARMS SERVICES, INC.,
8    a Florida corporation,

9         Defendant.
                                              /
10   ————————————————————————————

11            DEPOSITION OF MICHAEL BYNUM

12
     DATE:                Friday, September 5, 2003
13
     TIME:                9:50 o'clock A.M.
14
     PLACE:               422 Camden Avenue
15                        Stuart, Florida

16   TAKEN BY:            Plaintiffs

17   REPORTER:            Deanne S. Morris, RPR, Notary
                          Public of the State of Florida
18                        at Large.

19   APPEARANCES:

20   FOR THE PLAINTIFFS:

21                        LAW OFFICE OF DAVID H. SPALTER, P.A.
                          BY:  DAVID H. SPALTER, ESQUIRE
22                        Rolling Hills Executive Center
                          3325 S. University Drive
23                        Suite 102
                          Davie, Florida  33328
24

25

           ESQUIRE REPORTING - STUART & FORT PIERCE, FLORIDA

13

1      MR. GALLAGHER:  Okay.

2      THE WITNESS:  I'm not aware of any Department of

3  Labor investigation within the last five years.

4  BY MR. SPALTER:

5      Q    Okay.  And how about any other lawsuits?

6      A    I'm not aware of any other lawsuits pertaining to

7  that type of matter.

8      Q    Pertaining to alleged claims of unpaid overtime?

9      A    That would be correct.

10      Q    Okay.  Let's talk about the facilities that Tampa

11  Farms operates at Indiantown, Florida.

12      Tell me just sort of the basic structure of the

13  facilities as they sit today in terms of buildings and

14  operations and -- and what is done in each part of the

15  facility.

16      A    Okay.  Indiantown is what is known as a

17  vertically integrated egg operation.  It's fairly standard

18  in our industry.  And at that site you basically have all

19  phases of egg production processing and grading.

20      We have a feed mill which produces the feed for

21  the chickens.  We have pullet rearing houses where the

22  young birds that will become mature later house.  We have

23  egg laying houses where hens that are producing eggs house.

24  And we have a egg grading plant in which those eggs are

25  delivered by conveyer belts.

15

1   into a shipping container.  That container could be a

2   plastic egg crate, which holds 15 dozen typically, or it

3   could be a cardboard case which might hold 15 to 30 dozen.

4   And that -- that's their function, to place the eggs into

5   packing crates.

6        Q    Okay.  Are there any other duties that they

7   perform during a typical day?

8        A    That's their primary function, packing.

9        Q    Okay.  Did they also have, for example, clean-up

10  duties?

11       A    At the end of the processing day they will tidy

12  up their work area, yes.

13       Q    How long does that process take, if you know?

14            MR. GALLAGHER:  Object.  Which?

15  BY MR. SPALTER:

16       Q    The process of cleaning up at the end?

17       A    Oh, approximately 15 minutes.

18       Q    How are the packers paid?

19       A    They're paid by the hour.

20       Q    And let me just -- let me state that unless I

21  were to state otherwise, I'm referring to Indiantown.  So

22  rather than repeating myself with each question, if you

23  could just presume I'm referring to Indiantown unless I say

24  otherwise.

25       A    That's understood.

16

1      Q      What hourly rate does a packer typically start
2   at?
3      A      It's -- it's somewhere near minimum wage.  At or
4   near minimum wage.
5      Q      Okay.  And are there opportunities for a packer
6   to get a high rate of pay?
7      A      Yes.  The -- there are opportunities.
8      Q      And what would those circumstances typically be
9   then?
10     A      One of them is an incentive tied to a couple
11  planned performance parameters.  One is cases processed per
12  labor hour.
13     Q      So this would be like a bonus?
14     A      It's an incentive rate.
15     Q      Okay.  And are all packers eligible for that?
16     A      To my knowledge.
17     Q      And are there opportunities for a packer to have
18  a higher base wage?
19     A      I'm not really familiar with the progression of
20  the wage -- base wage rate is for those employees.  I think
21  they're all pretty much at the same number.
22     Q      Okay.  Approximately how many hours per week does
23  a typical packer work?
24     A      That would -- that would depend on the level of
25  production on the farm.  I would say nominally eight hours

6

1  BY MR. SPALTER:

2      Q     All right.  You've been produced today as a

3  representative of Tampa Farms Services, Inc.  And if you

4  look at the second page of Exhibit 1, there's a number of

5  topics that we asked the company to produce a

6  representative who is capable of speaking about.  So let's

7  go through that real briefly.

8           If you look at number one, the first topic is

9  *"The job duties performed by the Plaintiffs and those*

10 *individuals employed in the job categories listed in the*

11 *Magistrate's Report of Recommendation as those who are*

12 *similarly situated to the Plaintiffs."*  Now, the Plaintiffs

13 in this action would be Norma Solano and Josefina Fierros.

14 Are you familiar with the positions they held and the

15 duties they performed?

16     A     Yes, I am.

17     Q     Now, the other job duties -- I'm sorry, other

18 positions that we are talking about are -- well, let me

19 backtrack.

20           What position do you understand the Plaintiffs to

21 have been engaged in?

22     A     They were packers.

23     Q     Okay.  Now, let me -- let me go through some

24 other positions and -- and the first one is a stacker.  Is

25 that a distinct position that you have at Tampa Farms?

ESQUIRE REPORTING - STUART & FORT PIERCE, FLORIDA

42

1       clarify?

2            MR. SPALTER:   Clarify what overtime compensation

3       means?

4            MR. GALLAGHER:   Yes.

5   BY MR. SPALTER:

6       Q    Do any of these employees receive time and a half

7   when they work in excess of 40 hours per week?

8       A    At the Indiantown plant we're talking about,

9   correct?

10      Q    Correct.

11      A    My understanding is these are exempt agricultural

12  employees performing an exempt agricultural job function.

13      Q    Okay.  So since the start of 2000, none of these

14  employees in Indiantown have received time and a half; is

15  that correct?

16      A    To the best of my knowledge.  I haven't reviewed

17  each and every employee for each and every week.

18      Q    Okay.  But as far as you know, there's never been

19  a change in the payroll structure such that any of these

20  five positions have started receiving time and a half for

21  all hours worked in excess of 40 between the start of 2000

22  and today?

23      A    No.

24      Q    Do you know if cooler workers are currently being

25  paid time and a half?

ESQUIRE REPORTING - STUART & FORT PIERCE, FLORIDA

44

1    one plant to another and it becomes confusing.

2          Q    Why would employees at Okeechobee be paid time

3    and a half for that position and not at Indiantown?

4          A    Okeechobee, the Okeechobee plant was designed to

5    handle our shortfall in production, so periodically we

6    might have to purchase eggs outside of our own production

7    stream.

8          Q    You're talking now about off line eggs?

9          A    That's correct, yes.

10         Q    Okay.  Isn't that also true of Indiantown?

11         A    Is what true in Indiantown?

12         Q    That you purchase off line eggs for Indiantown as

13   well?

14         A    Indiantown purchases off line -- to purchase off

15   line eggs in Indiantown would be to meet a shortfall in

16   production.  The purpose in Okeechobee were to meet other

17   instances.  For instance, a demand was higher for some

18   reason.

19         Q    What's the difference between a shortfall in

20   production and demand being higher?

21         A    Well, they are different events; one is a supply

22   mandated purchase, the other is a demand or sales mandated

23   purchase.

24         Q    Okay.  Well, why would it -- why would there

25   never be a demand mandated purchase for Indiantown?

ESQUIRE REPORTING - STUART & FORT PIERCE, FLORIDA

45

1      A      Because Okeechobee was designed to be the plant
2    that would handle the spikes in demand.
3      Q      How often are off line eggs purchased for
4    Indiantown?
5      A      Fairly infrequently.
6      Q      Well, can you be more specific?  Is that once a
7    year, once a month, once a week?
8      A      It really depends.  Over what period of time are
9    we talking about?  Last -- you know.
10     Q      Well, again, the focus of this is mainly going to
11   be from the start of 2000 up to today.
12     A      Okay.
13     Q      So we'll assume that's the time period.
14     A      Okay.
15     Q      So with what frequency during that time period
16   would you say that Indiantown has purchased off line eggs?
17     A      Well, it varied.  I know in 2000 -- I'm not
18   thinking in terms necessarily of the frequency, but I know
19   like in 2000 Indiantown produced a little over 99 percent
20   of what it sold, so less than one percent of the eggs.  In
21   2001 the percentage was a little bit higher and we -- that
22   was due to a ventilation event that occurred on July 15,
23   2001.
24     Q      Okay.  Well, I understand the percentages, but
25   I'm not sure that that fully answers my question.  Did you

ESQUIRE REPORTING - STUART & FORT PIERCE, FLORIDA

1   know the frequency in terms of was it a weekly event, was

2   it a monthly event, was it an inconsistent event?  How

3   would you describe the frequency that you purchased off

4   line eggs for the Indiantown facility?

5        A   I couldn't describe it -- I could not describe it

6   as weekly.  I could not describe it as monthly.  I would

7   have to describe it as infrequently depending on the -- the

8   situation that we've talked about.

9        Q   Okay.  We'll look at that a little bit more

10  later.  But, why would the -- the distinction that you've

11  described between Okeechobee and Indiantown impact whether

12  cooler workers receive overtime compensation?

13       A   Well, again, the purchase of eggs that you asked

14  about at Indiantown was a function of a loss of production

15  generated at that facility.  The purchase of eggs at

16  Okeechobee is a more routine item dealing with spikes and

17  sales or demand from customers being higher than what our

18  production might have been at that particular point.

19       Q   Okay.  And again, just to close the loop, why

20  would that impact the issue of overtime in your

21  understanding?

22       A   I'm sorry?

23       Q   My question to you is why -- my original question

24  was why are employees in the cooler worker position paid

25  overtime in Okeechobee and up until recently not paid

51

1  purchase off line eggs for the Indiantown facility?

2       A    It could be one of two things what we discussed

3  previously.  A shortfall in production from what would have

4  been expected or a surplus of -- or a higher than expected

5  demand.

6            MR. GALLAGHER:  The question was limited to

7       Indiantown?

8            MR. SPALTER:  Yes.

9            THE WITNESS:  I'm sorry.  I addressed that for

10      the overall.

11 BY MR. SPALTER:

12      Q    Okay.  No, the question was for Indiantown.

13      A    Okay.  I missed that.

14      Q    Okay.

15      A    Our purpose for Indiantown, going back to answer

16 your question as I now understand it, were to replace eggs

17 that would be necessary because of a shortfall of

18 production.

19      Q    Okay.  Does the demand fluctuate for Indiantown

20 at all?

21      A    Yes.

22      Q    During the course of the year?

23      A    Yeah, the demand fluctuates.  Certainly.

24      Q    And would the fluctuation of demand ever

25 necessitate the purchase of -- of off line eggs for

52

1   Indiantown?

2        A    Demand fluctuates, again, going back to how we

3   have our operation structured, to answer your question, our

4   Okeechobee plant was designed to be our off line plant, if

5   you will, and so therefore fluctuation and demand would be

6   buffered by the Okeechobee plant.

7        Q    I understand that.  But my question is, is there

8   ever a time that fluctuations in demand result in a

9   situation where you have to purchase off line eggs for

10  Indiantown or is it always completely accommodated by

11  Okeechobee?

12       A    No, it's not always completely accommodated by

13  Okeechobee.

14       Q    Okay.  So there are times when the fluctuations

15  and demand might require you to purchase off line eggs for

16  Indiantown as well, correct?

17       A    That would be correct.

18       Q    Is there a time of year that typically has a

19  higher demand or times of the year than others?

20       A    Yes.

21       Q    What times of year would that be?

22       A    The big traditional holidays, and those would be

23  say Christmas, Easter, Passover, occasionally Thanksgiving.

24       Q    Okay.  So I guess November, December, March,

25  April would be probably busy times of the year?

ESQUIRE REPORTING - STUART & FORT PIERCE, FLORIDA

53

1      A      Again, we're -- the weeks in which those holidays
2  would fall tend to be the big spikes, that's correct.
3      Q      Okay.  I'm going to run through a list of
4  companies that I believe are egg farms, and I'm just going
5  to ask you if these are farms that Tampa Farms has
6  purchased off line eggs from that were packaged at
7  Indiantown.  And again, we're talking about since 2000.
8  Wespar, Inc.?
9      A      I'm not familiar with the company Wespar, Inc.
10     Q      How about Sunny Morning Foods, Inc.?
11     A      Sunny Morning Foods I'm familiar with.  Would you
12 again remind me of what type of egg you're asking about?
13     Q      Is this a company or a farm that you purchase off
14 line eggs from?
15     A      Sunny Morning Foods is -- may have supplied us
16 eggs and they're also a customer of ours.
17     Q      Okay.  How about T.P. Trading, Inc.?
18     A      Yes.
19     Q      You purchase off line eggs from them?
20     A      Yes, uh-huh.
21     Q      Egg Marketers, Inc.?
22     A      Yes.
23     Q      And then there's U.S. Egg Marketers.  I don't
24 know if that's the same?
25     A      When you said Egg Marketers, Inc. I was thinking

ESQUIRE REPORTING - STUART & FORT PIERCE, FLORIDA

54

```
 1    it was U.S. Egg Marketing.
 2         Q    Okay.  How about Hillandale Farms?
 3         A    Yes.
 4         Q    How about Country Charm Egg Distributors?
 5         A    They're a customer of ours, and they may have
 6    supplied us eggs as well.
 7         Q    Okay.  Egg Clearinghouse, Inc.?
 8         A    Egg Clearinghouse, yes, is a broker.
 9         Q    A broker?
10         A    I believe they're a broker.  They actually may
11    take title to the eggs, I'm not certain.
12         Q    But they do supply you eggs.  They may not be a
13    farm, though?
14         A    Right, I'm familiar with the company.
15         Q    Cypress Foods Management Group?
16         A    I'm not certain if we purchase from them.  I do
17    know them, but I'm not certain if we purchase from them.
18         Q    Okay.  C & O Food Services, Inc.
19         A    Again, I know of the firm, but I'm not certain if
20    we purchased during that period of time.
21         Q    How about United Egg Producers?
22         A    Yes, I'm familiar with them.
23         Q    And is that a company that you purchase eggs
24    from?
25         A    It's a producer cooperative to which we belong.
```

55

1      Q    What does that mean?

2      A    It means it's kind of like a trade association,

3 but it's structured as a cooperative of farmers.  So egg

4 producers that are farmers can belong to that association.

5 It's a -- it has various membership services and one of

6 which is egg -- you know, egg trading among farmers.

7      Q    So to broaden the question, do you obtain off

8 line eggs through your relationship with united egg

9 producers?

10     A    We may have during that time.

11     Q    Okay.  How about Egg Innovations LLC?

12     A    Egg Innovations, yes, they're an egg producer

13 that we may have purchased from.

14     Q    And New England Egg Farms?

15     A    Um, they're an egg producer.  Again, I'm not

16 certain if we purchased during this particular point in

17 time.  I don't -- we've gone through a list of quite a few

18 producers names so.

19     Q    Sure.  Are there any companies or producers that

20 you are aware of other than the ones I've asked you about

21 that Tampa Farms has purchased off line eggs from during

22 the time period we're talking about, since the start of

23 2000 for Indiantown?

24     A    No, not that I'm aware of.

25        MR. SPALTER:  Okay.  Let's take five minutes.

ESQUIRE REPORTING - STUART & FORT PIERCE, FLORIDA

59

1        MR. GALLAGHER:  This is at Indiantown again?

2        MR. SPALTER:  Indiantown, yes.

3        THE WITNESS:  Describe the process that occurs?

4   BY MR. SPALTER:

5        Q    You order them, they get transported, they get

6   packaged, they get put in the cooler.  Just sort of

7   describe to me how it typically happens.

8        A    Okay.  Again, we're talking about off line eggs

9   that would arrive at Indiantown?

10        Q    Correct.

11        A    And then I've got to break that down into two

12   categories.

13        Q    Okay.

14        A    One of which would be off line eggs that are nest

15   run eggs, those are ungraded, and off line eggs that are

16   graded eggs, those would already be packaged and sized, you

17   know, extra large, or large, or something of that nature.

18   The ones that are -- that are nest run would be graded just

19   like we grade our in line nest run, and -- and quality

20   assured, and sized, and packaged and made ready for

21   shipment.  The ones they are graded would arrive and then

22   be reshipped to customers because the grading has already

23   occurred.

24        Q    Okay.  So you don't do anything as far as

25   repackaging or regrading eggs that come in graded and

60

1  packaged?

2      A    Typically I would say that would -- that wouldn't

3  happen because you're paying more money for the eggs that

4  are graded because someone else has already performed that

5  function.

6      Q    Okay.  And just so I understand the terminology,

7  which one of the two are you calling nest run?

8      A    The ungraded.  Nest run would be ungraded.

9      Q    Okay.  I'd like to sort of go through the time

10 frames that are typical with a nest run purchase.

11          You call up a supplier.  How long does it usually

12 take to actually have the eggs delivered to your doorstep

13 at Indiantown?

14     A    Well, usually we're -- we would purchase eggs at

15 Indiantown because of a shortfall in production.  So those

16 would still be considered spot purchases, if we needed them

17 to meet that shortfall.  Usually you can order them today,

18 get them tomorrow kind of thing.  Sometimes you can

19 actually get them within the same day if -- if everything,

20 aligns just right; logistics of the truck and the

21 availability nearby.  So it kind of varies, depending on --

22 on the circumstances.

23     Q    Okay.  Now, the truck arrives with the -- with

24 the eggs that you've purchased.  Where do they go?

25     A    With the nest run eggs that have been purchased?

62

1    Q    Does it ever occur that they stay in the cooler
2 for more than a couple of weeks before they get graded?
3    A    No.
4    Q    What would the high end be to your understanding?
5    A    To the best of my knowledge, again, you're asking
6 me to summerize events of a weekly or daily nature over a
7 three-year period so -- my memory is not that precise.
8        Our normal pattern would be that these are
9 purchased for a spot shortage.  Let's use a hypothetical of
10 it's Wednesday and we've got big orders for Friday's
11 delivery.  We need these eggs in here on Thursday in order
12 to grade them so we can ship them on Friday.  That's a
13 typical modality of when you make a purchase from nest run
14 eggs.
15   Q    Okay.  Well, let me ask you it this way then.  Is
16 there any documents that would reflect how long eggs that
17 have been brought in as nest run ungraded off line eggs are
18 kept in the cooler before they go to the grading room?
19   A    I'm not aware of any -- of any documentation on
20 that.  Like I said, the invoice is pretty much the document
21 on the purchase.
22   Q    But that just tells you when they arrive?
23   A    Right.
24   Q    It doesn't tell you when they actually get to the
25 grading room?

ESQUIRE REPORTING - STUART & FORT PIERCE, FLORIDA

63

```
 1      A    That's correct.
 2      Q    So there is no document that tells us when they
 3 actually got to the grading room?
 4      A    No, I don't think there's any document to that
 5 effect.
 6      Q    Okay.  Since the start of 2000, has Tampa Farms
 7 Services altered its practices in any way with respect to
 8 the reasons or the frequency with which off line egg
 9 purchases are made for Indiantown?
10           MR. GALLAGHER:  What was your time frame again?
11           MR. SPALTER:  Since the beginning of 2000.
12           THE WITNESS:  Have we altered the time -- the
13      frequency?
14 BY MR. SPALTER:
15      Q    The practices.  You've described the practices as
16 being infrequent for shortages, and my question is, has
17 that been the case throughout the time from the beginning
18 of 2000 to today?
19      A    Well, it -- it changed somewhat.  Again, July
20 15th of 2001 was a -- was a bad event in Indiantown.  We
21 had a -- a ventilation failure, electrical problem caused a
22 loss of about 12 percent of the laying hens at that site.
23 So our purchases subsequent to that were -- occurred more
24 frequently than they might have occurred prior to that.
25      Q    Okay.  Let me ask you this.  After that event,
```

65

1        (Whereupon, Plaintiffs' Exhibit No. 2 was marked

2     for identification.)

3        MR. GALLAGHER:  Just out of curiosity, what is

4     the source of this document?  I think we had Bates

5     numbers on each of the documents.

6        MR. SPALTER:  I'm about to put that on the

7     record.  You anticipated me.

8  BY MR. SPALTER:

9     Q    What I've handed you and marked as Exhibit No. 2

10 was provided to us as an attachment to a letter from your

11 previous counsel in this lawsuit.

12    A    Uh-huh.

13       MR. EARLE:  Can you identify the counsel on the

14    record for me, please?  Was it Janet McEnery from the

15    Ferguson firm, Tampa firm?

16       MR. SPALTER:  Correct.

17       MR. EARLE:  Thank you.

18 BY MR. SPALTER:

19    Q    Have you seen this document before?

20    A    Yes.

21    Q    Okay.  Do you know who prepared this chart?

22    A    Actually, I did.

23    Q    Okay, great.

24       MR. GALLAGHER:  Did you prepare this chart for

25    counsel?

ESQUIRE REPORTING - STUART & FORT PIERCE, FLORIDA

66

1      THE WITNESS:  Yes.

2      MR. GALLAGHER:  At counsel's request?

3      THE WITNESS:  Yes, I did.

4      MR. GALLAGHER:  Just for --

5      MR. EARLE:  Can we go off for a second?

6      (Whereupon, a discussion as had off the record.)

7      MR. GALLAGHER:  Go on the record here.

8          The document which was marked as Plaintiffs'

9      Exhibit 2 was attached to a letter sent by prior

10     counsel for Tampa Farms to the Plaintiffs' counsel as

11     part of a settlement discussion.  The information

12     contained on this was forwarded to opposing counsel

13     for the purposes of settlement.  As it relates to

14     settlement, we -- since it was for the purposes of

15     settlement we object to the use of this document in

16     the deposition.  We object to the use of this document

17     for any purposes other than for settlement which is

18     what is appropriate under the rule, and we also, off

19     the record, agreed that he could go ahead and inquire,

20     but it is with the recognition that we have a standing

21     objection to any questions that arise out of this

22     document which we don't believe is appropriate to be

23     using in this context.

24     MR. SPALTER:  That's fine.

25  BY MR. SPALTER:

ESQUIRE REPORTING - STUART & FORT PIERCE, FLORIDA

67

1    Q    Okay.  This document in the top left-hand corner
2  has a date of 2/24/03.  Is that approximately the time that
3  you created this document?

4    A    I would have dated it as of that date, yes.

5    Q    Okay, very good.  There are several columns on
6  this chart.  The first is Dozens of Nest Runs Purchased?

7    A    Correct.

8    Q    Okay.  So these are, again, your -- you use the
9  term nest run as including in line and off line.  Is this
10 reflecting both, or one, or the other?

11   A    That would be off line nest runs.

12   Q    Okay.

13   A    Those not originating on the farm.

14   Q    Okay.  So this is only off line.  Now, down the
15 column in some of the weeks there is then a number
16 quantity.  Where did you get those numbers from?

17   A    Are you -- could you be -- could you give me a
18 specific entry and let me follow you?

19   Q    Sure, go to the week ending 2/12/00, under the
20 Dozens of Nest Runs Purchased, it says 23,400.  Where would
21 you have obtained that number?

22   A    That would have been information that I had
23 requested of our accounting department as far as when we
24 purchased eggs for Indiantown.

25   Q    Okay, so you got that from the accounting

1      Q     Okay.  What records would -- would you review to
2   confirm that assessment you just made?
3      A     Production data.
4      Q     Okay.  And that's the same data we were talking
5   about before?
6      A     Yes.
7      Q     Okay.  How often are you actually physically at
8   the Indiantown facility?
9      A     Infrequently.  I'm typically there for meetings
10   perhaps four times a year, something like that.
11            MR. SPALTER:  Okay.  I just want to talk to Lee
12       for a moment and then we're just about in the home
13       stretch.
14            MR. GALLAGHER:  Okay, great.
15            (Whereupon, a short break was taken.)
16   BY MR. SPALTER:
17      Q     Okay.  To sort of follow-up on the thought we
18   left off with, you had indicated that in peak capacity the
19   hen houses could produce -- a hen house could produce
20   possibly 95,000 dozen eggs?
21      A     That's correct.
22      Q     What would you say the average daily production
23   of a hen house would be?
24      A     Well, early on we talked about that, I think, and
25   I believe I indicated the range of production over the

Exhibit B

REVIEW OF EGGS PRODUCED AND NEST RUNS PURCHASED

2/24/2003

| Week Ending | Dozens of Nest Runs Purchased | Dozens Produced | Total of Purchased Nest Runs + Produced | Nest Runs Purchased as a % of Total |
|---|---|---|---|---|
| 2/5/2000 | | 405,929 | 405,929 | |
| 2/12/2000 | 23,400 | 405,929 | 429,329 | 5.5% |
| 2/19/2000 | 26,100 | 405,929 | 432,029 | 6.0% |
| 2/26/2000 | 11,250 | 405,929 | 417,179 | 2.7% |
| 3/4/2000 | 11,500 | 405,929 | 417,429 | 2.8% |
| 3/11/2000 | 11,500 | 405,929 | 417,429 | 2.8% |
| 3/18/2000 | 11,500 | 405,929 | 417,429 | 2.8% |
| 3/25/2000 | | 405,929 | 405,929 | |
| 4/1/2000 | | 405,929 | 405,929 | |
| 4/8/2000 | | 419,405 | 419,405 | |
| 4/15/2000 | | 414,853 | 414,853 | |
| 4/22/2000 | | 411,333 | 411,333 | |
| 4/29/2000 | | 411,633 | 411,633 | |
| 5/6/2000 | | 384,336 | 384,336 | |
| 5/13/2000 | | 372,993 | 372,993 | |
| 5/20/2000 | | 375,844 | 375,844 | |
| 5/27/2000 | | 377,384 | 377,384 | |
| 6/3/2000 | | 374,267 | 374,267 | |
| 6/10/2000 | | 407,888 | 407,888 | |
| 6/17/2000 | | 397,268 | 397,268 | |
| 6/24/2000 | | 397,248 | 397,248 | |
| 7/1/2000 | | 361,485 | 361,485 | |
| 7/8/2000 | | 345,595 | 345,595 | |
| 7/15/2000 | 22,500 | 371,539 | 394,039 | 5.7% |
| 7/22/2000 | | 378,378 | 378,378 | |
| 7/29/2000 | | 386,155 | 386,155 | |
| 8/5/2000 | | 396,659 | 396,659 | |
| 8/12/2000 | | 407,908 | 407,908 | |
| 8/19/2000 | | 375,704 | 375,704 | |
| 8/26/2000 | | 445,622 | 445,622 | |
| 9/2/2000 | 24,000 | 413,321 | 437,321 | 5.5% |
| 9/9/2000 | | 411,722 | 411,722 | |
| 9/16/2000 | | 419,204 | 419,204 | |
| 9/23/2000 | | 397,693 | 397,693 | |
| 9/30/2000 | | 405,721 | 405,721 | |
| 10/7/2000 | | 401,594 | 401,594 | |
| 10/14/2000 | | 402,337 | 402,337 | |
| 10/21/2000 | | 402,515 | 402,515 | |
| 10/28/2000 | | 406,889 | 406,889 | |
| 11/4/2000 | | 411,226 | 411,226 | |
| 11/11/2000 | | 416,237 | 416,237 | |
| 11/18/2000 | | 432,224 | 432,224 | |
| 11/25/2000 | | 434,552 | 434,552 | |
| 12/2/2000 | | 443,152 | 443,152 | |
| 12/9/2000 | | 457,095 | 457,095 | |
| 12/16/2000 | | 465,125 | 465,125 | |
| 12/23/2000 | | 460,488 | 460,488 | |
| 12/30/2000 | | 436,123 | 436,123 | |
| 1/6/2001 | | 436,685 | 436,685 | |
| 1/13/2001 | | 398,664 | 398,664 | |
| 1/20/2001 | 21,600 | 401,589 | 423,189 | 5.1% |
| 1/27/2001 | 23,400 | 387,337 | 410,737 | 5.7% |
| 2/3/2001 | | 390,507 | 390,507 | |
| 2/10/2001 | | 360,373 | 360,373 | |

PLAINTIFF'S EXHIBIT 2 G-5-03

REVIEW OF EGGS PRODUCED AND NEST RUNS PURCHASED

2/24/2003

| Week Ending | Dozens of Nest Runs Purchased | Dozens Produced | Total of Purchased Nest Runs + Produced | Nest Runs Purchased as a % of Total |
|---|---|---|---|---|
| 2/17/2001 | | 361,840 | 361,840 | |
| 2/24/2001 | | 390,222 | 390,222 | |
| 3/3/2001 | | 406,477 | 406,477 | |
| 3/10/2001 | | 402,439 | 402,439 | |
| 3/17/2001 | | 413,951 | 413,951 | |
| 3/24/2001 | | 434,298 | 434,298 | |
| 3/31/2001 | | 436,724 | 436,724 | |
| 4/7/2001 | | 438,236 | 438,236 | |
| 4/14/2001 | 47,700 | 441,693 | 489,393 | 9.7% |
| 4/21/2001 | | 420,121 | 420,121 | |
| 4/28/2001 | | 407,078 | 407,078 | |
| 5/5/2001 | | 393,727 | 393,727 | |
| 5/12/2001 | | 357,900 | 357,900 | |
| 5/19/2001 | | 356,366 | 356,366 | |
| 5/26/2001 | | 365,714 | 365,714 | |
| 6/2/2001 | | 375,030 | 375,030 | |
| 6/9/2001 | | 389,817 | 389,817 | |
| 6/16/2001 | | 407,255 | 407,255 | |
| 6/23/2001 | | 424,573 | 424,573 | |
| 6/30/2001 | | 444,533 | 444,533 | |
| 7/7/2001 | | 453,781 | 453,781 | |
| 7/14/2001 | | 462,111 | 462,111 | |
| 7/21/2001 | 40,500 | 401,999 | 442,499 | 9.2% |
| 7/28/2001 | | 421,167 | 421,167 | |
| 8/4/2001 | | 441,600 | 441,600 | |
| 8/11/2001 | | 463,686 | 463,686 | |
| 8/18/2001 | | 447,566 | 447,566 | |
| 8/25/2001 | | 440,931 | 440,931 | |
| 9/1/2001 | | 428,462 | 428,462 | |
| 9/8/2001 | | 403,749 | 403,749 | |
| 9/15/2001 | | 353,241 | 353,241 | |
| 9/22/2001 | | 322,539 | 322,539 | |
| 9/29/2001 | 21,600 | 299,222 | 320,822 | 6.7% |
| 10/6/2001 | 81,900 | 297,270 | 379,170 | 21.6% |
| 10/13/2001 | 23,400 | 306,595 | 329,995 | 7.1% |
| 10/20/2001 | 72,988 | 322,100 | 395,088 | 18.5% |
| 10/27/2001 | | 348,366 | 348,366 | |
| 11/3/2001 | | 376,607 | 376,607 | |
| 11/10/2001 | | 408,175 | 408,175 | |
| 11/17/2001 | 46,800 | 430,433 | 477,233 | 9.8% |
| 11/24/2001 | | 436,507 | 436,507 | |
| 12/1/2001 | 1,580 | 449,224 | 450,804 | 0.4% |
| 12/8/2001 | | 442,495 | 442,495 | |
| 12/15/2001 | | 436,067 | 436,067 | |
| 12/22/2001 | | 416,557 | 416,557 | |
| 12/29/2001 | | 400,549 | 400,549 | |
| 1/5/2002 | | 373,723 | 373,723 | |
| 1/12/2002 | 70,200 | 363,491 | 433,691 | 16.2% |
| 1/19/2002 | 193,500 | 363,952 | 557,452 | 34.7% |
| 1/26/2002 | 94,380 | 359,043 | 453,423 | 20.8% |
| 2/2/2002 | | 375,414 | 375,414 | |
| 2/9/2002 | | 352,573 | 352,573 | |
| 2/16/2002 | | 347,186 | 347,186 | |
| 2/23/2002 | | 353,155 | 353,155 | |

**REVIEW OF EGGS PRODUCED AND NEST RUNS PURCHASED**

2/24/2003

| Week Ending | Dozens of Nest Runs Purchased | Dozens Produced | Total of Purchased Nest Runs + Produced | Nest Runs Purchased as a % of Total |
|---|---|---|---|---|
| 3/2/2002 | 65,700 | 381,893 | 447,593 | 14.7% |
| 3/9/2002 | 23,400 | 392,869 | 416,269 | 5.6% |
| 3/16/2002 | 136,800 | 385,941 | 522,741 | 26.2% |
| 3/23/2002 | 134,100 | 385,489 | 519,589 | 25.8% |
| 3/30/2002 | 178,200 | 404,797 | 582,997 | 30.6% |
| 4/6/2002 | | 413,911 | 413,911 | |
| 4/13/2002 | 21,600 | 381,896 | 403,496 | 5.4% |
| 4/20/2002 | 21,600 | 387,323 | 408,923 | 5.3% |
| 4/27/2002 | 21,600 | 395,563 | 417,163 | 5.2% |
| 5/4/2002 | 21,600 | 382,370 | 403,970 | 5.3% |
| 5/11/2002 | 21,600 | 344,922 | 366,522 | 5.9% |
| 5/18/2002 | 22,080 | 333,283 | 355,363 | 6.2% |
| 5/25/2002 | | 374,514 | 374,514 | |
| 6/1/2002 | 21,600 | 396,810 | 418,410 | 5.2% |
| 6/8/2002 | 21,600 | 427,822 | 449,422 | 4.8% |
| 6/15/2002 | | 448,515 | 448,515 | |
| 6/22/2002 | | 469,786 | 469,786 | |
| 6/29/2002 | 22,500 | 472,671 | 495,171 | 4.5% |
| 7/6/2002 | | 465,849 | 465,849 | |
| 7/13/2002 | 44,100 | 468,598 | 512,698 | 8.6% |
| 7/20/2002 | 23,400 | 434,534 | 457,934 | 5.1% |
| 7/27/2002 | 22,500 | 434,471 | 456,971 | 4.9% |
| 8/3/2002 | 44,100 | 422,488 | 466,588 | 9.5% |
| 8/10/2002 | 22,500 | 419,138 | 441,638 | 5.1% |
| 8/17/2002 | | 443,426 | 443,426 | |
| 8/24/2002 | | 468,090 | 468,090 | |
| 8/31/2002 | 20,700 | 481,015 | 501,715 | 4.1% |
| 9/7/2002 | | 448,344 | 448,344 | |
| 9/14/2002 | | 445,799 | 445,799 | |
| 9/21/2002 | | 462,559 | 462,559 | |
| 9/28/2002 | | 465,837 | 465,837 | |
| 10/5/2002 | | 470,620 | 470,620 | |
| 10/12/2002 | | 471,729 | 471,729 | |
| 10/19/2002 | | 455,298 | 455,298 | |
| 10/26/2002 | | 455,612 | 455,612 | |
| 11/2/2002 | | 467,749 | 467,749 | |
| 11/9/2002 | | 469,040 | 469,040 | |
| 11/16/2002 | | 472,503 | 472,503 | |
| 11/23/2002 | | 443,700 | 443,700 | |
| 11/30/2002 | | 427,208 | 427,208 | |
| 12/7/2002 | | 422,641 | 422,641 | |
| 12/14/2002 | 45,000 | 424,819 | 469,819 | 9.6% |
| 12/21/2002 | 109,800 | 432,930 | 542,730 | 20.2% |
| 12/28/2002 | 22,500 | 422,434 | 444,934 | 5.1% |
| 1/4/2003 | 45,000 | 436,024 | 481,024 | 9.4% |
| 1/11/2003 | 67,500 | 426,624 | 494,124 | 13.7% |
| 1/18/2003 | 45,000 | 436,543 | 481,543 | 9.3% |
| 1/25/2003 | 22,500 | 427,096 | 449,596 | 5.0% |
| 2/1/2003 | | 417,150 | 417,150 | |
| 2/8/2003 | | 419,861 | 419,861 | |
| **Totals** | **2,149,878** | **64,666,864** | **66,816,742** | **3.2%** |

# Exhibit C



# SUNNY MORNING FOODS, INC.

5330 N.W. 35th AVENUE • FORT LAUDERDALE, FL 33309
SOUTH FLORIDA TOLL FREE: 930-3447 • MAIN OFFICE (954) 735-3447 • FAX (954) 735-4842
www.sunnymorning.com • sunnymorning@sunnymorning.com • operations@sunnymorning.com
dale@sunnymorning.com • ken@sunnymorning.com • tedh@sunnymorning.com

PLEASE REMIT TO:  SUNNY MORNING FOODS INC.
5330 NW 35TH AVE                    FORT LAUDERDALE , FL 33309

**SOLD TO:**
TAMPA FARM SERVICE
P.O. BOX 600
14425 HAYNES RD.
DOVER FL 33527
813-659-0605

**SHIP TO:**
TAMPA FARM SERVICE
SHIP TO: TAMPA FARM
INDIANTOWN FL

| CUSTOMER NO | CUSTOMER PO NO | PLANT | SHIPPED VIA | ROUTE CDS | INVOICE TERMS | INVOICE TERMS |
|---|---|---|---|---|---|---|
| 510 | 27342 | | OUR TRUCK | 124 | NET 30 DAYS | 00000 |

PRODUCT NUMBER: 1303101

| DESCRIPTION | CASES | UNITS | UNIT PRICE | EXTENDED AMOUNT |
|---|---|---|---|---|
| LARGE LOOSE WHITE EGGS GP A 30/C30 | 300 CS | 9000.00 DZ | 0.4100 | 3690.00 |
| ATTN OFFICE: FAX A COPY OF INV. TO TAMPA FARMS A/P ATTN: PAT! | | | | |
| MUST DELIVER AT 8 A.M. SHARP! | | | | |
| *** TOTAL CASES AND UNITS: | 300 | 9000 | | |

PAYMENT MUST BE RECEIVED NO LATER THAN 02/20/00. PLEASE RETURN COPY
WITH REMITANCE. THANK YOU! PRODUCT RECEIVED IN GOOD CONDITION!

DRIVER:

SHIP DATE/TIME:

CUSTOMER:

REC. DATE/TIME:

**CUSTOMER DELIVERY COPY**

| | |
|---|---|
| TOTAL EXTENDED | 3690.00 |
| SALES TAX | .00 |
| OTHER | |
| INVOICE TOTAL DUE IN U.S. DOLLARS | 3690.00 |

LETS  OUT ___ IN ___ NET ___



# T.P. TRADING, INC.

**Invoice**

P.O. BOX 0427
CLINTON, MS
39060

| DATE | INVOICE # |
|------|-----------|
| 1/27/00 | 18096 |

**BILL TO**

Tampa Farm Service, Inc.
P.O. Box 600
Dover, FL 33527

**SHIP TO**

INDIANTOWN, FL.

| P.O. NO. | TERMS | SALES PERSON |
|----------|-------|--------------|
|          | 14 DAYS | TP |

| QUANTITY | DESCRIPTION | DOZEN | RATE | AMOUNT |
|----------|-------------|-------|------|--------|
| 750/30 | AA LARGE LOOSE | 22,500 | 0.38 | 8,550.00 |

14-601103

RECEIVED
JAN 3 1 2000

We appreciate your prompt payment.

| **Total** | $8,550.00 |
|-----------|-----------|

Remit To:
T.P. Trading, Inc.
P.O. Box 0427
Clinton, MS 39060

TAM 01050

# SUNNY MORNING FOODS, INC.

5330 N.W. 35th AVENUE • FORT LAUDERDALE, FL 33309
SOUTH FLORIDA TOLL FREE: 930-3447 • MAIN OFFICE (954) 735-3447 • FAX (954) 735-4842
www.sunnymorning.com • sunnymorning@sunnymorning.com • operations@sunnymorning.com
dale@sunnymorning.com • ken@sunnymorning.com • tedh@sunnymorning.com

**PLEASE REMIT TO:**

SOLD TO:
TAMPA FARM SERVICE
P.O. BOX 600
1425 HAYNES RD.
DOVER FL 33527
813-659-0605

SHIP TO:
TAMPA FARM SERVICE
SHIP TO: TAMPA FARM
INDIANTOWN FL

SUNNY MORNING FOODS INC.
5330 NW 35TH AVE
FORT LAUDERDALE , FL 33309

| ORDER TYPE AND STATUS | SHIP DATE | INVOICE AND DELIVERY DATE | INVOICE AND ORDER NUMBER |
|---|---|---|---|
| | 02-10-00 | 02-10-00 | 198567 |

| PRODUCT NUMBER | CUSTOMER NO. | | PLANT |
|---|---|---|---|
| 1300101 | 15610 | | |

CUSTOMER P.O. NO.
27501

| DESCRIPTION | SHIPPED VIA | ROUTE CS | INVOICE TERMS |
|---|---|---|---|
| | OUR TRUCK | 108 | NET 30 DAYS |
| | | 00000 | |

## CORRECTED INVOICE

ATTN OFFICE: FAX A COPY OF INV. TO TAMPA FARMS A/P ATTN PAT

| PRODUCT NUMBER | DESCRIPTION | CASES | UNITS | UNIT PRICE | EXTENDED AMOUNT |
|---|---|---|---|---|---|
| | LARGE LOOSE WHITE EGGS GR A 30/030 | 845 CS | 25350.00 DZ | 0.7100 | 17998.50 |

*** TOTAL CASES AND UNITS:    845     25350

RECEIVED FEB 14 2000

| | PAGE NUMBER |
|---|---|
| TOTAL EXTENDED | 17998.50 |
| SALES TAX | 0.00 |
| OTHER | |
| **INVOICE TOTAL DUE IN U.S. DOLLARS** | 17998.50 |

PAYMENT MUST BE RECEIVED NO LATER THAN 03/11/00. PLEASE RETURN COPY
WITH REMITTANCE.  THANK YOU! PRODUCT RECEIVED IN GOOD CONDITION!
THANK YOU!

LBS. OUT _____   IN _____   NET _____

DRIVER: _____

SHIP DATE/TIME: _____

REC. DATE/TIME: _____

CUSTOMER: _____

ORIGINAL

**TAM 01054**

# SUNNY MORNING FOODS, INC.

5330 N.W. 35th AVENUE • FORT LAUDERDALE, FL 33309
SOUTH FLORIDA TOLL FREE: 930-3447 • MAIN OFFICE (954) 735-3447 • FAX (954) 735-4842
www.sunnymorning.com • sunnymorning.com
dale@sunnymorning.com • ken@sunnymorning.com • tedh@sunnymorning.com
operations@sunnymorning.com

PLEASE REMIT TO:

**SOLD TO**
SUNNY MORNING FOODS INC.
5330 NW 35TH AVE
FORT LAUDERDALE , FL 33309

**SHIP TO**
TAMPA FARM SERVICE
SHIP TO: TAMPA FARM
INDIANTOWN FL

| ORDER TYPE AND STATUS | INVOICE AND ORDER NUMBER |
|---|---|
| | 198305 |

| SHIP DATE | INVOICE AND DELIVERY DATE |
|---|---|
| 02-10-00 | 02-10-00 |

| PAGE NUMBER |
|---|
| 1 |

| CUSTOMER NO | | | | |
|---|---|---|---|---|

SOLD TO:
TAMPA FARM SERVICE
P.O. BOX 600
1425 HAYNES RD.
DOVER FL 33527

CUSTOMER P.O.
915-639-0608

| PRODUCT NUMBER | CUSTOMER PRODUCT | DESCRIPTION | SHIPPED VIA | ROUTE CCS | INVOICE TERMS |
|---|---|---|---|---|---|
| 1300101 | DAN | LARGE LOOSE WHITE EGGS GR A 30/C30 | DELIVER TRUCK | 139 | NET 30 DAYS |
| 300305 | | LARGE LOOSE WHITE EGGS GR AA 15/C15 | | | |

MUST DELIVER AT 8:00 A.M. SHARP!!!!!
DELIVERED ON 02-04-00

ATTN OFFICE: FAX A COPY OF INV. TO TAMPA FARMS A/P ATTN:

| | NET CASES | UNITS | UNIT PRICE | EXTENDED AMOUNT |
|---|---|---|---|---|
| | 210 CS | 6300.00 DZ | 0.7100 | 4473.00 |
| | 480 CS | 7200.00 DZ | 0.7100 | 5112.00 |

*** TOTAL CASES AND UNITS:

PAYMENT MUST BE RECEIVED NO LATER THAN 03/11/00. PLEASE RETURN COPY
WITH REMITANCE. THANK YOU! PRODUCT RECEIVED IN GOOD CONDITION!

| TOTAL CASES AND UNITS: | | TOTAL EXTENDED |
|---|---|---|
| 690 | 1350 | 9585.00 |

| SALES TAX | OTHER |
|---|---|
| | 0.00 |

**INVOICE TOTAL DUE IN U.S. DOLLARS**

DRIVER:

SHIP DATE /TIME:

CUSTOMER:

REC. DATE /TIME:

ORIGINAL

TAM 01059



# SUNNY MORNING FOODS, INC.

5330 N.W. 35th AVENUE • FORT LAUDERDALE, FL 33309
SOUTH FLORIDA TOLL FREE: 930-3447 • MAIN OFFICE (954) 735-3447 • FAX (954) 735-4842
www.sunnymorning.com • sunnymorning@sunnymorning.com • ken@sunnymorning.com • tedh@sunnymorning.com
dale@sunnymorning.com • operations@sunnymorning.com

PLEASE REMIT TO:
SUNNY MORNING FOODS INC.
5330 NW 35TH AVE
FORT LAUDERDALE , FL 33309

SOLD TO:
TAMPA FARM SERVICE
P.O. BOX 600
14425 HAYNES RD.
DOVER FL 33527
813-659-0605

SHIP TO: TAMPA FARM
SHIP TO: TAMPA FARM
INDIANTOWN FL
00000

| ORDER DATE | SHIP DATE | INVOICE NUMBER |
|---|---|---|
| 03-02-00 | 03-02-00 | 199887 |
| | | PAGE NUMBER |
| | | 1 |

| PRODUCT NUMBER | CUSTOMER(TO) PLANT | DESCRIPTION | SHIPPED VIA | ROUTE CS | CASES | UNITS | UNIT PRICE | EXTENDED AMOUNT |
|---|---|---|---|---|---|---|---|---|
| | 1510 CAPTAIN DAN | | OUR TRUCK | 250 | | NET 30 DAYS | | |
| 1300101 | | LARGE LOOSE WHITE EGGS GR A 30/C30 | | | 216 CS | 6480.00 DZ | 0.4000 | 2592.00 |
| 1300305 | | LARGE LOOSE WHITE EGGS GR AA 15/C15 | | | 1152 CS | 17280.00 DZ | 0.4000 | 6912.00 |

ATTN OFFICE: FAX A COPY OF INV. TO TAMPA FARMS A/P ATTN: PAT

*** TOTAL CASES AND UNITS:   1368   23760

PAYMENT MUST BE RECEIVED NO LATER THAN 04/01/00. PLEASE RETURN COPY WITH REMITTANCE. THANK YOU! PRODUCT RECEIVED IN GOOD CONDITION!

DRIVER:
SHIP DATE/TIME:
REC. DATE/TIME:
CUSTOMER:
ORIGINAL

PALLETS: OUT ___ IN ___ NET ___

| TOTAL EXTENDED | 9504.00 |
|---|---|
| SALES TAX | 0.00 |
| OTHER | |
| INVOICE TOTAL DOLLARS | 9504.00 |

TAM 01063

P.3

954735484842   SUNNY MORNING FOODS INC.

# SUNNY MORNING FOODS, INC.

5330 N.W. 35th AVENUE • FORT LAUDERDALE, FL 33309

SOUTH FLORIDA TOLL FREE: 933-3447 • MAIN OFFICE (954) 735-3447 • FAX (954) 735-4842

www.sunnymorning.com • sunnymorning.com • operations@sunnymorning.com

dale@sunnymorning.com • kent@sunnymorning.com • tech@sunnymorning.com

| ORDER TYPE AND STATUS | INVOICE AND ORDER NUMBER | | |
|---|---|---|---|
| | 230329H | | |
| SHIP DATE | 10-01-01 | | |
| INVOICE AND DELIVERY DATE | 10-04-01 | | |
| PAGE NUMBER | 1 | | |

**PLEASE REMIT TO:** SUNNY MORNING FOODS INC.
5330 NW 35TH AVE

| SOLD TO | | SHIP TO | |
|---|---|---|---|
| TAMPA FARM SERVICE | | TAMPA FARM | |
| P.O. BOX 608 | | DOCK PICK UP | |
| 14425 HAYNES RD. | | | |
| DOVER FL 33527 | FORT LAUDERDALE, FL 33309 | | |
| 813-659-0605 | | | |

| CUSTOMER NO | CUSTOMER PO NO. | PLANT | SHIPPED VIA | ROUTE/ZE | INVOICE TERMS |
|---|---|---|---|---|---|
| 1510 | 36369 | | OUR TRUCK | 499 | NET 30 DAYS |

| PRODUCT NUMBER | DESCRIPTION | CASES | UNITS | UNIT PRICE | EXTENDED AMOUNT |
|---|---|---|---|---|---|
| 100305 | EX-LARGE LOOSE WHITE EGGS GR AA 15/CS | 360 CS | 5400.00 DZ | 0.5000 | 2700.00 |
| 300101 | LARGE LOOSE WHITE EGGS GR AA 30/C30 | 468 CS | 14040.00 DZ | 0.5000 | 7020.00 |

*** TOTAL CASES AND UNITS:  828  19440

ATTN OFFICE: FAX A COPY OF INV. TO

TAMPA FARMS A/P ATTN: ELIZABETH

PAYMENT MUST BE RECEIVED NO LATER THAN 11/03/01. PLEASE RETURN COPY
WITH REMITTANCE. THANK YOU! PRODUCT RECEIVED IN GOOD CONDITION!

| | | |
|---|---|---|
| TOTAL EXTENDED | 9720.00 | |
| SALES TAX | 0.00 | |
| OTHER | | |
| INVOICE TOTAL DUE IN U.S. DOLLARS | 9720.00 | |

CUSTOMER NO: _____

PRODUCT NUMBER: _____

DRIVER: _____

SHIP DATE/TIME: _____

REC. DATE/TIME: _____

CUSTOMER: _____

ORIGINAL

PALLETS  OUT ___  IN ___  NET ___

TAM 01093



# Country Charm Egg Distributors, Inc.

2080 Industrial Drive
Gainesville, Georgia 30504

Gainesville Telephone (770) 532-6471
FAX (770) 536-8006

**INVOICE No.** 152921 - P

**INVOICE DATE:** 11/09/2001

Sold To: 3183
TAMPA FARM SERVICE

P.O. BOX 600
DOVER, FL  33527

Ship To: TAMPA FARM SERVICE

| SOLD BY | CASH | CHARGE | B/L NO. | DATE SHIPPED | SHIPPED VIA | TERMS |
|---------|------|--------|---------|--------------|-------------|-------|
| 20 | | X | B22015 | 11/09/2001 | | 14 DAYS |

| NO. SHIPPED | PRICE UNIT | PRODUCT NO. | PRODUCT DESCRIPTION | QUANTITY | PRICE | AMOUNT |
|-------------|------------|-------------|---------------------|----------|-------|--------|
| 520 | DZ | 106112 | LG A CC CTN HALF 15 DZ | 24300.00 | .5975 | 14519.25 |
| 520 | | | TOTALS | 24300.00 | | 14519.25 |

Received By

NOV 16 REC'D

14
601
103

To ensure proper credit to your account, please detach this portion and return with your remittance. Thank You.

REMITTANCE FROM 3183
TAMPA FARM SERVICE

P.O. BOX 600
DOVER, FL  33527

This invoice will be PAST DUE if your payment is not received by:   11/23/2001

| INVOICE DATE | 11/09/2001 |
| INVOICE NO. | 152921 - P |
| AMOUNT PAID | $ |

## COUNTRY CHARM EGG DISTRIBUTORS, INC.
2080 Industrial Drive, Gainesville, Georgia 30504

TAM 01096

United States

# EGG MARKETERS, INC.
Drawer CS - 198098
Atlanta, Georgia  30384-8098

| INVOICE NUMBER | |
|---|---|
| INVOICE DATE | |
| DUE DATE | |

## BROKERAGE FORM

20479

| | PURCHASED FROM | 25'   1   Great Lakes Egg Marketing<br>P.O. Box 529<br>Milan, OH  44846 |
|---|---|---|

| SOLD TO | Tampa Farms Services, Inc.<br>P.O. Box 966<br>Indiantown, FL  34956 | SHIP TO | 2  Tampa Farms Services, Inc.<br>P.O. Box 966<br>Indiantown, FL  34956 |
|---|---|---|---|

550

| SHIPPING DATE | ARRIVAL DATE | TERMS |
|---|---|---|
| 01/28/00 | 01/28/00 | NET 14 DAYS FROM DELIVERY |

| CASES | | | EGGS | | PRICE | AMOUNT |
|---|---|---|---|---|---|---|
| 840.00 | 30 | 25200.00 | NEST RUN EGGS - 47.8# | | 0.340 | 8568.00 |
| | | | | | TOTAL | 8,568.00 |

COMMENTS: 

INVOICE

TAM 01102



# Country Charm Egg Distributors, Inc.

2080 Industrial Drive
Gainesville, Georgia 30504

Gainesville Telephone (770) 532-6471
FAX (770) 536-8006

**INVOICE No.** 153201 – P

**INVOICE DATE:** 11/16/2001

Sold To: 3183
TAMPA FARM SERVICE

P.O. BOX 600
DOVER, FL 33527

Ship To: TAMPA FARM SERVICE

| OLD BY | CASH | CHARGE | B/L NO. | DATE SHIPPED | SHIPPED VIA | TERMS |
|---|---|---|---|---|---|---|
| 20 | | X | B22023 | 11/16/2001 | | 14 DAYS |

| O. SHIPPED | PRICE UNIT | PRODUCT NO. | PRODUCT DESCRIPTION | QUANTITY | PRICE | AMOUNT |
|---|---|---|---|---|---|---|
| 20 | DZ | 106112 | LG A CC CTN HALF 15 OZ | 24300.00 | .5975 | 14519.25 |
| 20 | | | TOTALS | 24300.00 | | 14519.25 |

NOV 2 3 REC'D

Received By _____

To ensure proper credit to your account, please detach this portion and return with your remittance. Thank You.

REMITTANCE FROM: TAMPA FARM SERVICE

P.O. BOX 600
DOVER, FL 33527

**INVOICE DATE** 11/16/2001

**INVOICE NO.** 153201 – P

**AMOUNT PAID** $_____

This invoice will be PAST DUE if your payment is not received by: 11/30/2001

**COUNTRY CHARM EGG DISTRIBUTORS, INC.**
2080 Industrial Drive, Gainesville, Georgia 30504

TAM 01099

EGG TRADERS, LLC

P.O. BOX 759
RAYMOND, MS  39154

# Invoice

| DATE | INVOICE # |
|------|-----------|
| 11/20/2002 | 9373 |

| BILL TO | SHIP TO |
|---------|---------|
| TAMPA FARMS<br>P. O. BOX 600<br>DOVER, FL  33527 | TAMPA FARMS<br>INDIAN TOWN |

| P.O. NUMBER | TERMS | REP | SHIP | VIA | F.O.B. | PROJECT |
|-------------|-------|-----|------|-----|--------|---------|
| 9373 | net 14 | | 11/20/2002 | | | |

| QUANTITY | ITEM CODE | DESCRIPTION | PRICE EACH | AMOUNT |
|----------|-----------|-------------|------------|--------|
| 24,900 | L Loose 15 | Large Loose Packed 15 dozen<br>1660/15  LARGE LOOSE AA | 0.635 | 15,811.50 |

REC'D
NOV 2 6 2002
BY:

JRN
11/28/02

PLEASE REMIT TO: P.O. BOX 759
RAYMOND, MS  39154-0759

| **Total** | $15,811.50 |
|-----------|------------|

TAM 01458

# Exhibit D



**Card 1 — No. 4201**

| DATE | DAY | SHIFT | IN/M | OUT/M | HOURS WORKED | ACCUMULATED HOURS | OVERTIME |
|---|---|---|---|---|---|---|---|
| 23 | WED | | 7:26 | 21:25 | 13.48 | 13.48 | |
| 24 | TH | | 6:27 | 16:20 | 9.38 | 22.87 | |
| 26 | TH | | 7:23 | 19:34 | 11.68 | 34.55 | |
| 27 | FR | | 7:25 | 20:37 | 12.63 | 47.18 | |
| 28 | SA | | 8:14 | 16:50 | 8.10 | 55.28 | |

*Handwritten:* 55,28

**Card 2 — No. 4201**

| DATE | DAY | SHIFT | IN/M | OUT/M | HOURS WORKED | ACCUMULATED HOURS | OVERTIME |
|---|---|---|---|---|---|---|---|
| 15 | SU | | 7:22 | 18:06 | 10.23 | 10.23 | |
| 16 | MO | | 7:22 | 20:44 | 12.78 | 23.02 | |
| 17 | TU | | 7:15 | 21:18 | 13.55 | 36.57 | |
| 18 | WE | | 7:18 | 21:04 | 13.27 | 49.83 | |
| 19 | TH | | 7:15 | 21:11 | 13.43 | 63.27 | |
| 20 | FR | | 7:05 | 21:03 | 13.47 | 76.73 | |
| 21 | SA | | 6:44 | 21:51 | 14.62 | 91.35 | |

*Handwritten:* 89,75

**Card 3 — No. 4201**

| DATE | DAY | SHIFT | IN/M | OUT/M | HOURS WORKED | ACCUMULATED HOURS | OVERTIME |
|---|---|---|---|---|---|---|---|
| 8 | SU | | 7:00 | 19:33 | 12.03 | 12.03 | |
| 9 | MO | | 6:52 | 17:53 | 10.15 | 22.18 | |
| 10 | TU | | 6:59 | 17:38 | 10.15 | 32.33 | |
| 12 | TH | | 7:16 | 18:52 | 10.77 | 43.10 | |
| 13 | FR | | 7:30 | 20:39 | 12.65 | 55.75 | |
| 14 | SA | | 7:21 | 17:28 | 9.62 | 65.37 | |

*Handwritten:* 100,00

TAM 00616



TAM 01325



**Card 1** — NO. 14201 — PAY PERIOD ENDING 7/13/02 — NAME Josefina Fierros

| DATE | DAY | SHIFT | IN | OUT | HOURS WORKED | ACCUMULATED HOURS | OVERTIME |
|---|---|---|---|---|---|---|---|
| 7 | SU | | 7:16 | 20:15 | 12.48 | 12.48 | |
| 8 | MO | | 7:14 | 18:38 | 10.90 | 23.38 | |
| 9 | TU | | 7:12 | 19:13 | 11.52 | 34.90 | |
| 10 | WE | | 7:14 | 17:30 | 9.77 | 44.67 | |
| 12 | FR | | 7:20 | 17:54 | 10.07 | 54.73 | |
| 13 | SA | | 7:16 | 19:04 | 11.30 | 66.03 | |

(handwritten: 01.)

**Card 2** — 6.14/201 — PAY PERIOD ENDING 7/20/02 — NAME Josefina Fierros

| DATE | DAY | SHIFT | IN | OUT | HOURS WORKED | ACCUMULATED HOURS | OVERTIME |
|---|---|---|---|---|---|---|---|
| 14 | SU | | 7:13 | 17:55 | 10.20 | 10.20 | |
| 15 | MO | | 7:12 | 17:07 | 9.42 | 19.62 | |
| 16 | TU | | 7:12 | 17:14 | 9.53 | 29.15 | |
| 17 | WE | | 7:14 | 17:43 | 9.98 | 39.13 | |
| 18 | TH | | 7:23 | 20:06 | 12.22 | 51.35 | |
| 19 | FR | | 7:16 | 18:36 | 10.83 | 62.18 | |
| 20 | SA | | 7:18 | 18:28 | 10.67 | 72.85 | |

(handwritten: 07)

**Card 3** — NO. 14201 — PAY PERIOD ENDING 7/27/02 — NAME Josefina Fierros

| DATE | DAY | SHIFT | IN | OUT | HOURS WORKED | ACCUMULATED HOURS | OVERTIME |
|---|---|---|---|---|---|---|---|
| 22 | MO | | 7:19 | 20:57 | 13.13 | 13.13 | |
| 23 | TU | | 6:45 | 18:35 | 11.33 | 24.47 | |
| 24 | WE | | 6:49 | 18:33 | 11.23 | 35.70 | |
| 25 | TH | | 6:43 | 21:20 | 14.12 | 49.82 | |
| 26 | FR | | 6:58 | 19:15 | 11.78 | 61.60 | |
| 27 | SA | | 7:20 | 17:26 | 9.60 | 71.20 | |

(handwritten, circled: 65.75)



TAM 00603

# Exhibit E

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 03-14031 CIV-MOORE

NORMA SOLANO and JOSEFINA FIERROS,
on behalf of themselves and all others
similarly situated,

                        Plaintiffs,

vs.


TAMPA FARMS SERVICES, INC., a Florida
corporation,

                        Defendant.

_____/

### SECOND AFFIDAVIT OF JOSE SERUR

STATE OF FLORIDA    )
                            ) SS:
COUNTY OF MARTIN   )

BEFORE ME, the undersigned authority, on this date personally appeared JOSE

SERUR who, after being duly sworn deposes and says:

1.     My name is Jose Serur.  I have personal knowledge of the facts recited in

this affidavit.

2.     From in or about 1997, until the present, I have been employed by the

Defendant as both a mechanic, initially, and currently, the assistant Farm

Manager, in their Indiantown, Martin County, Florida Location.

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. CIV-MOORE 03-14031

JOSEFINA FIERROS and NORMA SOLANO,
on behalf of themselves and all others
similarly situated,

                              Plaintiffs,

vs.

TAMPA FARMS SERVICES, INC., a Florida
corporation,

                              Defendant.
_____/

### SECOND AFFIDAVIT OF MARIN ESCOBEDO

STATE OF FLORIDA      )
                      ) SS:
COUNTY OF MARTIN      )

        BEFORE ME, the undersigned authority, on this date personally appeared

MARIN ESCOBEDO who, after being duly sworn deposes and says:

        1.      My name is Marin Escobedo.  I have personal knowledge of the facts

        recited in this affidavit.

        2.      From in or about 1995 until the present, I have been employed by the

        Defendant in duties such as processing machine maintenance worker in

        their Indiantown, Martin County, and Okeechobee, Florida Locations.

# Exhibit G

Compliance Action Report

Employment Standards Administration
Wage and Hour Division

| 1. Case Number | | | 2. Area Office Cross Reference File No | 3. CO ID | 4. Area Office Location |
|---|---|---|---|---|---|
| Year | Area | Serial No. | | | |
| 92 | 417 | 95611 | | 25 | Tampa |

| 5. Investigation Type | 6. Investigation Program | 7. Special Investigation Code |
|---|---|---|
| INV ☒   CONC ☐   OTH ☐ | | 1 |

| 8. Establishment | Trade Name | | Firm W/Estab. Outside AO Jurisdiction | Establishment Code |
|---|---|---|---|---|
| | Tampa Farm Service, Inc. | | Yes ☐   No ☒ | |
| | Legal Name | | | |
| | | | | |
| | Street Address | | | |
| | Haynes Rd. | | | |
| | City | State | Zip | County Code | SIC Code |
| | Dover | Fl | 33577 | 12057 | 0252 |

| 9. Parent Co. | Name | | | Parent Establishment ID |
|---|---|---|---|---|
| | Street Address | | | |
| | City | State | ZIP | |

| 10. Reinvestigation | 11. Recurring Violation | 12. BNPI |
|---|---|---|
| Yes ☒   No ☐ | Yes ☐   No ☒ CL | |

| 13. Number of Employees |
|---|
| Under 10 ☐   10-49 ☐   50-99 ☐   100-249 ☐   250-499 ☒   500-1000 ☐   Over 1000 ☐ |

| Compliance Action Results | | Will There Be Further Action On This Case? |
|---|---|---|

| 14. Period Investigated | 15. BW Installments to be Collected By AO | 16. Other Action |
|---|---|---|
| From: MM YY 07 / 90   To: MM YY 07 / 92 | Yes ☐   No ☒ | Yes ☐   No ☒ |

Monetary Findings and Agree to Pay

| 17. Act | | 18. Employee (Findings) | 19. Amount (Findings) | 20. Employee (Agree to Pay) | 21. Amount (Agree to Pay) | 22. Computed Liquidated Damages |
|---|---|---|---|---|---|---|
| A. FLSA | MW | | $ | | $ | |
| | OT | 45 | $ 10118 | 45 | $ 10118 | |
| | Unduplicated | 45 | | 45 | | |
| B. PCA | MW | | $ | | $ | |
| | OT | | | | $ | |
| | Unduplicated | | | | | |
| C. SCA | MW | | $ | | $ | |
| | FR | | $ | | $ | |
| | OT (CWHSSA) | | $ | | $ | $ |
| | Unduplicated | | | | | |
| D. DBRA | MW | | $ | | $ | |
| | OT (CWHSSA) | | $ | | $ | $ |
| | Unduplicated | | | | | |
| E. SMW | Act | Program | $ | | $ | |
| | | | $ | | $ | |
| | | | $ | | $ | |
| F. Other | | | $ | | $ | $ |
| | | | $ | | $ | $ |
| | | | $ | | $ | $ |
| G. Unduplicated Grand Total | | 45 | 10118 | 45 | 10118 | |

PLAINTIFF'S EXHIBIT 4-5-3

| 23. Auxiliary Act Employee Counts | 24. Co Signature | Date 08/3/92 |
|---|---|---|
| Garnishment Exc. | Garnishment III. | Reviewed By | Date 10-14-92 |
| Arts and Humanities | | 25. Trailer Forms Attached |
| Other Aux. Act | Count | CL ☐   SMW ☐   FLCRA ☐   Other ☐ |

26. Concl. & Recomm. /9 hrs.Current ▓▓▓▓▓ adv. not pd t½. Invest found mosr EE's exempt 13(b)(12).Some EE's on one processing machine non-exempt. Firms Consult. C.Garringer agreed on behalf of firm to pay all BW's and proper OT in Future.

Form WH-51 MIS
Rev. Oct. 1987

Tampa Farm Service, Inc.                    C. Garringer, Consult.
P.O. Box 600                                Tel: 813-963-7736
Haynes Rd.                                  EIN ▮▮▮▮▮▮▮▮▮▮▮
Dover, Fl 33577

## FLSA NARRATIVE REPORT

### Coverage

Subject is a multi million dollar enterprise which produces and
processes eggs for shipment to Publix Super markets in Florida and
Georgia.  EE's are covered on an enterprise as well as individual
basis.  This is the second investigation of this firm.  The first
investigation was conducted, by this CO, in 1980 and resulted in
approx. $145,000 in BW's paid.  This investigation was done on a
Self Audit basis and limited to one particular production line.

### Exemptions

#### 13(b)(1)
This area was not investigated but some of the firms truck drivers
deliver goods out of this state and are exempt.

#### 13(b)(12)
Most of the EE's of this firm are engaged in agriculture and are
exempt from OT, even though they work in the processing plant.  The
exempt question hinges a court case Marshall vs. Abbott Farms.  The
court held that if the plant processed only its own eggs EE's working
on those eggs would be exempt.  If the firm had contract farms they
were not exempt.  Further, if the processing lines were segregated
between EE's working contract and non-contract only non-contract EE's
would be exempt.

### Status of Compliance



### Sec. 7, OT
Per the exemption section some EE's can be agricultural exempt and
some are not.  The firm received information from their attorney
that all EE's were exempt, in the processing plant,  this was not
correct.  Only EE's working on eggs owned and produced by the firm
on their own farm would be exempt.  The firm had one line which
processed contract eggs.  Those EE's were not exempt.  It was
determined that forty-five EE's were due $10,117.92 in OT BW's.  BS's
were computed at the rate of one half the RROP, times OT hours worked.
EE's had been paid ST wages.  See computations, "A" exhibits.

Tampa Farm Service, Inc.
P.O. Box 600
Haynes Rd.
Dover, Fl 33577

## FLSA NARRATIVE REPORT (continued)

### Child Labor
The plant was not physically investigated by this CO, however, the firms consultant advised that no minors are employed by the firm.

### Disposition

This file was initiated as a Self Audit.  Negotiations were conducted with the firm, their attorney Mr. John Dinkins and for the most part, with their consultant, Chris Garringer, 15438 North Florida Ave., Suite 106, Tampa, Fl 33613, Tel: (813)963-7736.  Mr. Garringer conducted all negotiations for the firm and reviewed the wage payments and computed BW's due.  These were checked by this CO for accuracy.  Mr. Garringer agreed on behalf of the firm to pay all BW's and to comply in the future.  He said the firm will pay proper OT until they can stop using contract eggs at which time the EE's will be exempt from OT.  He was advised of the provisions of 52(c)(21). and stated he would comply, however, his answer was not of a tone that would lead one too believe he would advise his client to follow the procedure. Mr. Garringer will have the firm send proof of payment to the DO.  All EE's are to be paid within two weeks of the final conference which was held on 08/03/92. *ER WILL SEND PROOF OF PAYMENT TO DO.*

### Recommendation
The firms consultant, on behalf of the firm, has agreed to pay BW's and proper OT until the plant can be changed over to all exempt workers. ~~Based on the above~~ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓ved.

Thomas J. Ponton, WHI
Lakeland, Fl FS *08/3/92*

Summary of Unpaid Wages

PAGE 3 OF 3

**U.S. Department of Labor**
Employment Standards Administration
Wage and Hour Division

(Area Office Address)
124 S. TENN. AVA, ROOM 122
LAKELAND, FL 33801

Compliance Officer: THOMAS J. PONTON

Date: 8/21/92

Employer Fed. Tax ID Number:

| 1. Name | 2. Address | 3. Period Covered by Workweek Ending Dates | | 4. Act(s) (see code below)* | 5. Gross Amounts Due |
|---------|-----------|---------|---------|---------|---------|
| ▮▮▮▮▮ | | ▮▮ | ▮▮ | 1 | ▮▮ |
| ▮▮▮▮▮ | | ▮▮ | ▮▮ | 1 | ▮▮ |
| ▮▮▮▮▮ | | ▮▮ | | 1 | ▮▮ |
| ▮▮▮▮ | | ▮▮ | | | ▮▮ |
| ▮▮▮▮ | | ▮▮ | | | ▮▮ |

LAST PAGE OF
Summary of Upaid Wages

I agree to pay the listed employees the back wages shown due and to mail proof of payment to the Wage and Hour Area Office address shown above by _____
(date)

Signed: _____

Employer Name and Address:
TAMPA FARM SERVICES, INC.
P.O. BOX 600, HAYNES RD,
DOVER, FL 33577

**TOTAL** $10,117.92

* Column 4-Code

| | |
|---|---|
| FLSA | 1 |
| PCA | 2 |
| SCA | 3 |
| DBRA | 4 |
| CWHSSA | 5 |
| CCPA | 6 |

WAGE AND HOUR COPY 2

Form WH-56
Rev. July, 1988