FILED by _____ D.C.

ELECTRONIC

**Oct 10 2003**

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

JOSEFINA FIERROS and
NORMA SOLANO,                          CASE NO. 03-14031-CIV-MOORE/LYNCH
on behalf of themselves and
all others similarly situated,

       Plaintiffs,

v.

TAMPA FARM SERVICE, INC.

       Defendant.

_____/

## TAMPA FARM'S REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT; and DEFENDANT'S OPPOSITION TO PLAINTIFFS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendant, Tampa Farm Services, Inc. ("Tampa Farms"), by and through its undersigned

counsel, files this Reply to Plaintiffs Josefina Fierros and Norma Solano ("Plaintiffs")

Opposition to Defendant's Motion for Partial Summary Judgment  ("Plaintiffs' Memo") and

Tampa Farms files its Opposition to Plaintiffs Cross-Motion for Partial Summary Judgment

("Plaintiffs' Cross-Motion").

## INTRODUCTION

The Plaintiffs' Memo misconstrues the issues of law established by *Walling v. Rocklin,*

132 F.2d 3 (8th Cir. 1942), *Adkins v.  Mid-American Growers, Inc.,* 167 F.3d 355, 357-358 (7th

Cir. 1999), *Mitchell v. Hornbuckle,* 155. F.Supp. 205 (M.D. Ga. 1957) and *Wirtz v. Jackson &*

*Perkins Company,* 312 F.2d 48 (2nd Cir 1963).  These cases allow Tampa Farm to retain the

agricultural exemption under the FLSA to process purchased eggs in the event of a catastrophic

loss of production. The Plaintiffs' Memo mischaracterizes these cases as involving *de minimis*

FTL:1108148:3

RUDEN, McCLOSKY, SMITH, SCHUSTER & RUSSELL, P.A.

1

doctrine, when in fact the cases do not address this issue.  Second, Tampa Farm only raised the *de minimis* doctrine regarding its sporadic, inconsequential purchases of eggs to meet holiday demand.  None of the Plaintiffs' cases address this issue. As a matter of law, the occasional purchase of eggs does not defeat the agricultural exemption.  The Plaintiffs' analysis relies on overturned authorities and mischaracterizes holdings.

The Plaintiffs' Cross-Motion must be denied because it raises an issue of fact regarding the number of eggs, <u>if any</u>, purchased to meet holiday demand in excess of those purchased to cover the catastrophic loss in production.  The Plaintiffs' Cross-Motion should also be denied because the Plaintiffs, who admit to being illegal aliens and who admit to using fraudulent immigration documents to obtain their jobs, are not entitled to recover any back pay.

## <u>MEMORANDUM OF LAW</u>

**A.**    **Plaintiffs Memo And Cross-Motion Incorrectly Argues That Defendant Relied On The *De Minimis* Doctrine To Maintain Its Agricultural Exemption Under The Fair Labor Standards Act ("FLSA") Where Defendant Purchased "Nest Run" Eggs To Cover Reduction In Egg Production Caused By A Catastrophic Loss In Chickens**

### 1.    Burdens of Proof under the FLSA

Plaintiffs correctly stated that the burden of proof is on the employer to establish that it is entitled to the Agricultural Exemption under the FLSA  (Plaintiffs' Motion at p. 8).  Tampa Farm satisfied this burden in its Motion for Partial Summary Judgment. (Defendant's Motion for Summary Judgment at pp. 4-5.)  However, Plaintiffs failed to point out that the burden of proof under the FLSA is on the employee to prove that they engaged in non-exempt work and that they are entitled to wages for overtime work. *See Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 685-687 (1946) & *Adkins v. Mid-American Growers, Inc.,* 167 F.3d 355, 359 (7th Cir. 1999). The Plaintiffs have not demonstrated that the eggs they packed were anything other than eggs

necessary to meet the decline in production caused by a catastrophic loss.  Further, the Plaintiffs cannot meet their burden, because, by admission, they have no facts or documents regarding egg production, egg sales, or egg purchases.  A copy of the excerpts from the deposition of Fierros is attached hereto as Exhibit A; see pp. 34-38.  A copy of the excerpts of the deposition of Solano is attached hereto as Exhibit B; see pp. 52-53.

### 2.      Catastrophic losses

The Plaintiffs have failed to address the primary issue raised by Tampa Farms in its motion for Partial Summary Judgment. The holdings of *Adkins v. Mid-American Growers, Inc.,* 167 F.3d 355 (7th Cir. 1999), *Walling v. Rocklin,* 132 F.2d 3 (8th Cir. 1942), *Mitchell v. Hornbuckle,* 155. F.Supp. 205 (M.D. Ga. 1957) and *Wirtz v. Jackson & Perkins Company,* 312 F.2d 48 (2nd Cir 1963), each allow agricultural employers, such as Tampa Farms, to the benefit of the FLSA's agriculture exemption when they purchase goods in the marketplace to cover for a catastrophic loss on their farms.[1] These cases do not apply the *de minimis* doctrine, and the Plaintiffs' attempt to characterize these cases as merely decisions relating to the de minimis doctrine is incorrect.

Tampa Farms has provided uncontroverted facts that it suffered a ventilation incident that killed 120,000 laying hens at its Indiantown plant in July 2001.  A copy of the Affidavit of Michael Bynum is attached hereto as Exhibit C.  (Bynum Affidavit at ¶7).  A copy of deposition

---

[1] *See Adkins v. Mid-American Growers, Inc.,* 167 F.3d 355, 357 (7th Cir. 1999) (The Court in *Adkins* stated that defendant, operator of a greenhouse, did not lose the agricultural exemption under the FLSA by ordering plants from outside growers to meet production shortfalls caused by "blight or other disasters."); *Walling v. Rocklin,* 132 F.2d 3, 7 (8th Cir. 1942) (Purchases by defendants, greenhouse operators, from outside greenhouses to meet production decline due to storms, frosts and other emergencies did not result in defendants losing the agricultural exemption under the FLSA.); *Wirtz v. Jackson & Perkins Co.,* 312 F.2d 48, 51 (2d Cir. 1963) (Defendants, plant growers, did not lose agricultural exemption by purchasing plants from other growers to fill shortages caused by 'adverse weather conditions' and other emergencies; and *Mitchell v. Hornbuckle,* 155 F. Supp. 205, 211-212 (N.D. GA. 1957) (Defendant, tomato farmer, 'did not defeat' the agricultural exemption under the FLSA by purchasing plants to meet his sales when such purchases were necessary because of 'crop failures and other emergencies'). *Id.*

excerpts from Solano's husband, Jose Serur, is attached hereto as Exhibit D  (Serur at pp. 96-101).  It produced uncontested facts that the ventilation incident resulted in a loss of production of 1.6 million dozen eggs, and that Tampa Farms purchased 1.58 million dozen eggs on the open market to cover for the loss of production. (Bynum Affidavit at ¶8).  These eggs were processed at Indiantown and the workers were paid hourly, but did not receive overtime for packing the eggs.  Based upon these uncontroverted facts, the issue of whether the agricultural exemption applies to production purchased to cover a catastrophic loss is a pure matter of law, and Tampa Farms is entitled to Partial Summary Judgment on that issue. All of legal authority relied upon by Tampa Farms permit the exemption in this circumstance, while none of the Plaintiffs' cases address application of the FSLA where a catastrophic loss of production has occurred.

### 3.    Plaintiffs incorrectly relied on cases to argue that Tampa Farms is not entitled to the FLSA Agricultural Exemption.

Plaintiffs relied on several cases including *Marshall v. Abbott Farms, Inc.,* 559 F.2d 1006 (5th Cir. 1977), *Marshall v. Gulf & Western Industries, Inc.,* 552 F.2d 124 (5th Cir. 1977), *Mitchell v. Hunt,* 263 F.2d 913 (5th Cir. 1959), *Brennan v. Gustafson's Dairy, Inc.,* 382 F. Supp. 964 (M.D. FL. 1974) and *Hodgson v. Wittenburg,* 464 F.2d 1219 (5th Cir. 1972) and the Department of Labor ("DOL") regulation 29 C.F.R. §§ 780.137, 780.138 & 780.141 (1972)[2] to argue that the FLSA agricultural exemption does not apply to employees engaged in processing of commodities obtained from outside farms. (Plaintiffs' Motion at pp. 8-9) Plaintiffs' argument fails in many respects.  First, while Plaintiffs' case states a general rule, none of the cases relied upon by the Plaintiffs involve the exemption to that rule where there has been an unexpected loss of commodities due to freeze, drought or other unexpected event.  Second, all of these cases and

---

[2] These DOL regulations predate *Adkins v. Mid-American Growers, Inc.,* 167 F.3d 355 (7th Cir. 1999), and therefore do not affect the availability of the Agricultural Exemption under the FLSA particularly under the facts and circumstances under which Tampa Farms purchased eggs to cover for a catastrophic loss in laying hens.
FTL:1108148:3

RUDEN, McCLOSKY, SMITH, SCHUSTER & RUSSELL, P.A.
4

the DOL regulations addressed farmers that consistently and regularly obtained a substantial amount of products from outside farms and producers. *See Hodgson v. Wittenburg,* 464 F.2d 1219 (5th Cir. 1972); *Mitchell v. Hunt,* 263 F.2d 913 (5th Cir. 1959). *See Brennan v. Gustafson's Dairy, Inc.,* 382 F. Supp. 964 (M.D. FL. 1974). The corner stone of the Plaintiffs' case is *Marshall v. Abbott Farms, Inc.,* 559 F.2d 1006 (5th Cir. 1977), the defendant was not entitled to the FLSA agricultural exemption because the defendant, owner of an egg processing plant, purchased all its eggs from contract growers. *Id.* at 1007.[3]   These cases are substantially dissimilar to the facts and circumstances and business structure of Tampa Farms. Tampa Farms produced all of its own eggs.  It was only when 120,000 hens were killed and production was insufficient to meet planned orders, that Tampa Farm was required to purchase eggs in the marketplace.  These facts are not in dispute and Tampa Farms is entitled to Partial Summary Judgment in its favor as it relates to processing the 1.58 million dozen eggs purchased to cover for the unexpected loss.

      **B.**      **Plaintiffs Have Mixed Apples And Eggs In Addressing FLSA Cases; Plaintiffs Have Cited Authority Mostly Regarding Interstate Commerce Under The FLSA, And Failed To Provide Cases That Specifically Rejected The *De Minimis* Doctrine Where Occasional And Sporadic Outside Purchases Were Made.**

      **1.**      **The De Minimis Doctrine relates solely to the Holiday Spike in Egg Production.**

Application of the *de minimis* doctrine is a separate and distinct issue from eggs purchased to cover for catastrophic loss.  Tampa Farms sought Partial Summary Judgment based on the *de minimis* doctrine relating solely to those eggs purchased to cover a spike in demand just prior to holidays including Christmas, Easter, Passover and Thanksgiving. (Tampa Farm's

---

[3]    Tampa Farm obtained all its eggs from contract farmers prior to 1992, when it changed its business plan and began raising its own chickens rather than acquiring them from contract farmers.  See Tampa Farm's Memorandum in Opposition to Motion to Compel filed October 7, 2003 (Attached as Exhibit E).

FTL:1108148:3

RUDEN, McCLOSKY, SMITH, SCHUSTER & RUSSELL, P.A.

5

Motion for Partial Summary Judgment at p. 5)  Tampa Farms was not seeking to apply the *de minimis* doctrine to the 1.58 million dozen eggs purchased to cover for the loss of laying hens beginning in July 2001 and continuing through the end of 2002.

None of the cases cited in Plaintiffs' Memo regarding the *de minimis* doctrine apply to the occasional and sporadic purchase of commodities.  Plaintiffs relied on *Mabee v. White Plains Publishing Co.,* 327 U.S. 178 (1946), *Brennan v. Wilson Building, Inc.,* 478 F.2d 1090 (5th Cir. 1973) and *Maryland v. Wirtz,* 392 U.S. 183 (1968). First, the Supreme Court overruled *Maryland v. Wirtz* in *National League of Cities v. Usery*, 426 U.S. 833 (1976). In addition, the Supreme Court's analysis in *Mabee* and the Fifth Circuit's analysis in *Brennan* were focused primarily on sections of the FLSA involving shipment of goods in interstate commerce and what it means to be "engaged in commerce". *See Mabee,* at 182 & *Brennan,* at 1094.  It is only in these contexts the Supreme Court and Fifth Circuit rejected the *de minimis* doctrine. The Courts did not address the de minimis doctrine in the context of the Agricultural Exemption under the FLSA. In fact, in deciding whether the defendant was excluded from the FLSA in *Mabee,* the Supreme Court noted that any shipment of goods in interstate commerce by defendant did not exclude defendant from the FLSA "prohibition against shipment in commerce of any goods in the production of which employee was employed in violation of overtime…requirements of the FLSA… though we assume that sporadic and occasional shipments of insubstantial amounts of goods were not intended to be included in that prohibition." *Mabee,* at 182. (emphasis added)

Moreover, the Supreme Court's decision in *Mabee* and the Fifth Circuit's in *Brennan* implicitly suggest that the *de minimis* doctrine is rejected only in facts and circumstances in which non-exempt activities are done on a routine basis by the employer and actually becomes part of the business. *See Mabee,* at 182 & *Brennan,* at 1097.  Other than the ventilation incident,

RUDEN, McCLOSKY, SMITH, SCHUSTER & RUSSELL, P.A.

Tampa Farms only engaged in outside purchases on occasions in which there were holiday spikes in demand and these outside purchases are not routine and by no means continuous business activities of Tampa Farms.

Furthermore, Plaintiffs relied heavily on *Brennan v. Sugar Cane Growers Cooperative of Florida,* 486 F.2d 1006 (5th Cir. 1973) and *Ares v. Diaz Farms, Inc.,* 318 F.3d 1054 (11th Cir. 2003) in addressing the *de minimis* doctrine. Plaintiffs state in their Memo that the Court in *Ares* "implicitly" affirmed the rejection of the *de minimis* doctrine. In fact, the Eleventh Circuit did not address the *de minimis* doctrine in *Ares* and again, the Court in *Brennan v. Sugar Cane Growers Cooperative of Florida* rejected the *de minimis* doctrine in its analysis of the Sugar Cane processing employee exemption of the FLSA. *See* 29 U.S.C. § 213(b)(15).  None of these cases address the *de minimis* doctrine under the facts and circumstances in which Tampa Farms purchased eggs occasionally to meet spike in demands during various holidays.

### C.    Plaintiffs' Memo And Cross-Motion Raises Issue Of Fact As To Whether Any Eggs Were Purchased Beyond Those Needed To Cover For Loss Of Production. To That Extent, Plaintiffs' Cross-Motion Must Fail.

Based upon the Plaintiff's Memo, there appears to be a factual dispute as to the number of eggs purchased to cover holiday demand.  It is unrefuted that Tampa Farms bought 1.58 million dozen purchased to cover for 1.6 million dozen production losses beginning in July 2001. (Bynum Affidavit at ¶8)  However, it is unclear from the record whether Tampa Farms bought any eggs in excess of those needed to cover for the catastrophic loss. Therefore, summary judgment on the de minimis issue is not appropriate.  (Plaintiffs' Memo at pp. 16-17). Similarly, Plaintiffs' Cross-Motion for Partial Summary Judgment must be denied because it also rests on application of the de minimis doctrine and the facts are in dispute as to whether <u>any</u> outside production falls into this category.

RUDEN, McCLOSKY, SMITH, SCHUSTER & RUSSELL, P.A.

**D.    Plaintiffs' Cross-Motion Must Be Precluded Because Plaintiffs Admittedly Are Illegal Aliens, And Are Not Entitled To Receive Any Additional Back Pay From The Defendant, As A Matter Of Law.**

As a secondary basis to deny Plaintiffs' Cross-Motion for Partial Summary Judgment, Plaintiffs admit that they are illegal aliens and are in this country illegally. (Deposition of Solano p. 9; and Deposition of Fierros at pp. 11-12). Plaintiffs also admit that they falsified their green cards and social security cards to obtain their jobs at Tampa Farm. As a matter of law, Plaintiffs, because they are illegal aliens and were not legally permitted to work in the United States, are estopped from seeking unpaid back wages from Tampa Farms. The United States Supreme Court in *Hoffman Plastic Compounds, Inc. v. National Labor Relations Board*, 535 U.S. 137, 122 S.Ct. 1275 (2002) *citing Sure-Tan, Inc. v. National Labor Relations Board*, 467 U.S. 883 (1984) stated "…any alien who is not lawfully entitled to be present and employed in the United States cannot claim back pay." *Id.* at 1282. The Supreme Court in *Hoffman* further stated "The Immigration Reform and Control Act of 1986 ("IRCA") makes it a crime for an unauthorized alien to subvert the employer verification system by tendering fraudulent documents…it prohibits aliens from using or attempting to use any forged, counterfeit, altered, or falsely made document …for the purposes of obtaining employment in the United States." *Id.* at 1283. *See also, Renteria v. Italia Foods, Inc.,* 2003 WL 21995190, *6 (N.D.Ill 2003) ("…the IRCA is the law of the land, and the Supreme Court has made it clear that awarding back pay to undocumented aliens contravenes the policies embodied in that law.") *Id.* Therefore, as a matter of law, Plaintiffs' Cross-Motion for Partial Summary Judgment must be denied because Plaintiffs are not entitled to any damages they seek.

## CONCLUSION

Based on the foregoing reasons, Defendant's Motion for Partial Summary Judgment should be granted, especially, as to the primary issue; that Defendant does not lose the Agricultural Exemption under the FLSA where outside purchases were necessitated by a drastic decrease in egg production due to a catastrophic loss of approximately 120,000 laying hens. On the same note, Plaintiffs' Cross-Motion for Partial Summary Judgment must be denied because there exist a factual dispute as to the amount of eggs, if any, that were purchased from outside producers beyond those eggs that were purchased to cover for the loss in production. Finally, Plaintiffs' Cross-Motion must be denied as a matter of law because Plaintiffs admitted they are illegal aliens and that they falsified documents to obtain employment at Tampa Farms.

## CERTIFICATE OF SERVICE

**WE HEREBY CERTIFY** that a true and correct copy of the foregoing was furnished by U.S. Mail to: **David H. Spalter, Esquire**, Law Office of David H. Spalter, P.A., Rolling Hills Executive Center, 3325 S. University Drive, Suite 102, Davie, Florida 33328 and **Lee J. Baggett, Esquire**, Lewis, Mortell & Lewis, P.A., 1115 East Ocean Boulevard, Stuart, Florida 34996 Counsel for Plaintiffs, and **David B. Earle, Esquire**, Ross, Earle & Bonan, P.A., Royal Palm Financial Center, 759 South Federal Highway, Suite 212, Stuart, Florida 34994, Co-Counsel for Defendant, this __10th__ day of October 2003.

Respectfully submitted,

RUDEN, McCLOSKY, SMITH,
SCHUSTER & RUSSELL, P.A.
Attorneys for Defendant
200 East Broward Boulevard, 15th Floor
Fort Lauderdale, Florida 33302
(954) 764-6660; Fax: (954) 764-4996

By: ___s/Thomas K. Gallagher_____
     Thomas K. Gallagher
     Florida Bar No. 793574
     Shahabudeen K. Kahn
     Florida Bar No. PENDING

FTL:1108148:3

RUDEN, McCLOSKY, SMITH, SCHUSTER & RUSSELL, P.A.

9

<u>Co-Counsel for Defendant:</u>
David B. Earle, Esquire
Ross, Earle & Bonan, P.A.
Royal Palm Financial Center
759 South Federal Highway, Suite 212
Stuart, FL 34994

FTL:1108148:3

RUDEN, McCLOSKY, SMITH, SCHUSTER & RUSSELL, P.A.
10

1

1
2
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

3
CASE NO. CIV-MOORE 03-14031

4
5
JOSEFINA FIERROS and NORMA SOLANO,
on behalf of themselves and all others
similarly situated,

6
7
    Plaintiffs,

vs.

8
TAMPA FARMS SERVICES, INC.,
a Florida corporation,

9
    Defendant.

10
_____/

**CERTIFIED COPY**

11
VIDEOTAPED DEPOSITION

12
OF JOSEFINA FIERROS

13
DATE:                    Friday, September 5, 2003

14
TIME:                    1:40 o'clock P.M.

15
PLACE:                   422 Camden Avenue
                         Stuart, Florida

16
TAKEN BY:                Defendant

17
REPORTER:                Deanne S. Morris, RPR, Notary
18
                         Public of the State of Florida
                         at Large.

19
APPEARANCES:

20
21
FOR THE PLAINTIFFS:

22
                         LAW OFFICE OF DAVID H. SPALTER, P.A.
                         BY:  DAVID H. SPALTER, ESQUIRE
23
                         Rolling Hills Executive Center
                         3325 S. University Drive
24
                         Suite 102
                         Davie, Florida  33328

25

ESQUIRE REPORTING - STUART & FORT PIERCE, FLORIDA

**Defendant's Exhibit A**

11

1    Q    Okay.  Prior to that location, where did you

2  live?

3    A    Before the place in Mexico?  That's the only

4  place I've lived in.

5    Q    Okay.  So in your entire life, you've only lived

6  in two locations?

7    A    Yes.

8    Q    Can you give me your Social Security number?

9    A    I don't have a Social Security number.

10    Q    You don't have a Social Security number?

11    A    No.

12    Q    Did you provide a Social Security number to Tampa

13  Farms Services, Inc. when you became employed there?

14    A    Yes.

15    Q    Okay.  Who's -- explain to me why you don't have

16  a Social Security number now but you did have one at the

17  time you began your employment.

18    A    Well, um, what you call it?  It's not, um - not a

19  legal Social Security number.  It's a -- you know, it's a

20  trick number because I'm not here legal in the country.

21    Q    Where did you obtain the fake Social Security

22  number?

23    A    My -- one of my brothers got it for me.

24    Q    Where did your brother get it?

25    A    With a person that does that.

12

1    Q    Okay.  What is your brother's name?

2    A    Adan.

3    Q    What is his full name?

4    A    Adan Fierros.

5    Q    Does your brother have a real Social Security

6    number or a fake Social Security number?

7    A    A real one.

8    Q    Okay.  When you say you're here illegally, what

9    do you mean by that?

10   A    That I don't have legal paperwork.

11   Q    Did you tell anyone at Tampa Farms that you did

12   not have legal paperwork at the time you began employment

13   there?

14   A    Yes.

15   Q    Who did you tell?

16   A    To -- I told the secretary and the man that was

17   in charge of the area that I worked at.

18   Q    Okay.  Who is the secretary?

19   A    She doesn't work there anymore.

20   Q    What was her name?

21   A    I don't know what her name was.

22   Q    Where did you tell her that?

23   A    Right there in the office when I went to ask for

24   the job.

25   Q    You told her that -- when you went to ask for the

34

1  with the clean up, all of that was part of the operation of

2  getting those eggs from -- from the farm to the market,

3  correct?

4  　　A　Yes.

5  　　Q　The work that you performed was always done right

6  there at -- on the Tampa Farms property, correct?

7  　　A　Yes.

8  　　Q　And that was the same facility that also included

9  the chicken houses?

10 　　A　No.

11 　　Q　Well, it was at the same location?

12 　　A　No, they're separated from our area.

13 　　Q　They are separate buildings, correct?

14 　　A　Yes, they're separated.

15 　　Q　Okay.

16 　　A　There's just a conveyor belt that comes from

17 there to us to where we are working.

18 　　Q　Okay.  So the eggs get delivered from the hen

19 houses by conveyor belt to your location?

20 　　A　Yes.

21 　　Q　Okay.  Are you aware of any time when Tampa Farms

22 purchased eggs?

23 　　A　Yes.

24 　　Q　Okay.  How do you know when they purchased eggs?

25 　　A　Um, when -- sometimes when I came to work I see

ESQUIRE REPORTING - STUART & FORT PIERCE, FLORIDA

35

1  trucks there that did not belong to Tampa Farms, and then

2  some of my co-workers sometimes will tell me that -- the

3  ones that worked in the cooler would tell me that eggs came

4  today, you know, and eggs -- in case they break.

5      Q     In case they break?

6      A     Those eggs would come from different trucks.

7  Those trucks did not belong to -- I don't know what you

8  call it, but, you know, wasn't the same truck that -- that

9  -- where I worked at.

10     Q     Okay.  When you looked at the eggs that were

11 coming down the line, could you tell whether those eggs

12 were from Tampa Farms or purchased from someone else?

13     A     They -- we were the ones that would empty them

14 out.  So the same people that would -- you know, that

15 packed the other eggs would be the ones that repacked the

16 other eggs again.  Because they came in a different

17 package, so we knew.

18     Q     Okay.  And so you would know what eggs were

19 coming from a location other than the hen houses behind the

20 packing location because you would unpack those eggs onto

21 the conveyor belt?

22     A     The reason we would usually know that the eggs

23 came from somewhere else also was that they would add

24 another person on the other side to clean the eggs because

25 the eggs would come dirty too, so we still had to wash

36

1  these eggs too.  And then we had to empty them out, you
2  know, and do the whole thing.  So that's how we usually
3  knew that they were from somewhere else.

4      Q    All right.  All the eggs that came from the hen
5  houses at Tampa Farms also had to be washed, didn't they?

6      A    Yes, they would pass by there too.

7      Q    And they were placed on the same conveyor -- any
8  eggs that were coming from a different location would be
9  placed on the same conveyor belt as the eggs that came from
10  Tampa Farms, correct?

11      A    Yes.

12      Q    And that would be done prior to the time the eggs
13  went into the washer?

14      A    Yes.  Yes, before you wash.

15      Q    Okay.  So all of the eggs, whether it's Tampa
16  Farms' eggs or incoming eggs from another location, all had
17  to be washed?

18      A    Yes.

19      Q    So you couldn't tell the difference between
20  unwashed Tampa Farms eggs and unwashed eggs coming from
21  another location?

22      A    The only reason we could tell was because they
23  came in a different package and because they had the extra
24  person on the other side close to where we were standing
25  packing them, so we could see the person unpacking them.

37

1    Q    Unpacking eggs from the truck?

2    A    Yes, and then they would mix up, you know, with

3    the eggs from the company and from the truck.

4    Q    Okay.  What was the difference in packaging on

5    the incoming eggs as opposed to the eggs that were from the

6    farm?

7    A    Because our packages -- packaging says Publix and

8    the other ones came with packages that had different names,

9    or with the brown boxes they came with no name at all.

10   Q    When you were at the packing location, where were

11   the boxes that were being unloaded?

12   A    They put them in the cooler.

13   Q    Okay.  Did your job include going into the

14   cooler?

15   A    No.

16   Q    How could you see them in the cooler?

17   A    Because where we worked at, they would pass by us

18   with the boxes to empty them out and then go around.  They

19   would pass right by us.

20   Q    Is there any way to tell whether they came from a

21   different Tampa Farms farm location as -- as opposed to any

22   other outside source?

23   A    No.

24   Q    Okay.  And your job as it related to those eggs

25   didn't change, right?  You were -- your function of packing

ESQUIRE REPORTING - STUART & FORT PIERCE, FLORIDA

38

1   the eggs would be the same whether they were eggs coming

2   from the farm or eggs from another location?

3       A    No.

4           MR. GALLAGHER:  Is this a good time to take a

5   break?

6           MR. SPALTER:  Sure.

7           THE VIDEOGRAPHER:  Off the record at 2:48.

8           (Whereupon, a short break was taken and

9   Defendant's Exhibit No. 2 was marked for

10  identification.)

11          THE VIDEOGRAPHER:  We're back on the record at

12  3:01.

13          MR. GALLAGHER:  Thank you.

14  BY MR. GALLAGHER:

15      Q    Josefina, when you were performing the duties at

16  the beginning of the day with the cones and the papers and

17  that sort of thing, were other people also doing that --

18  those tasks?

19      A    No.

20      Q    Did other people do those tasks on other days?

21      A    The other helpers they had.  But the days that I

22  would help them, I would do them.

23      Q    Okay.  So you would do it on Thursday and Friday,

24  somebody else would do it on Saturday and Sunday, and

25  somebody else might do it on Monday and Tuesday?

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. CIV-MOORE 03-14031

JOSEFINA FIERROS and NORMA SOLANO,
on behalf of themselves and all others
similarly situated,

     Plaintiffs,

vs.

TAMPA FARMS SERVICES, INC.,
a Florida corporation,

     Defendant.

_____/

**CERTIFIED
COPY**

VIDEOTAPED DEPOSITION

OF NORMA SOLANO

DATE:              Monday, September 8, 2003

TIME:              11:47 o'clock A.M.

PLACE:             422 Camden Avenue
                     Stuart, Florida

TAKEN BY:        Defendant

REPORTER:        Deanne S. Morris, RPR, Notary
                     Public of the State of Florida
                     at Large.

APPEARANCES:

FOR THE PLAINTIFFS:

                     LAW OFFICE OF DAVID H. SPALTER, P.A.
                     BY:  DAVID H. SPALTER, ESQUIRE
                     Rolling Hills Executive Center
                     3325 S. University Drive
                     Suite 102
                     Davie, Florida  33328

ESQUIRE REPORTING - STUART & FORT PIERCE, FLORIDA

**Defendant's
Exhibit B**

9

1   the United States?

2       A    No.

3       Q    When you came into the United States, were you

4   issued an official Resident Alien card or Social Security

5   number?

6       A    No.

7       Q    To this day, do you have a legitimate Social

8   Security number?

9       A    No.

10      Q    Do you have a legitimate Resident Alien card or

11  green card?

12      A    No, I made my application.

13      Q    Where did you get the Social Security card which

14  you used to -- with your application to Tampa Farms?

15      A    When I came here, the people that I was with,

16  they took me to a man that gave me a Social Security number

17  and a working card.

18      Q    What is the man's name?

19      A    I didn't know him.  The man that I came with is

20  the one that took me there.  I don't know.

21      Q    Who is the man you came with?

22      A    I just know that his name is Francisco.

23      Q    When did he take you there?

24      A    As soon as I got here.

25      Q    Back in 1996?

52

1          THE INTERPRETER:  Let me finish first.

2     A     When the eggs would come in, yeah, we all knew

3 that eggs were coming in.  We would tell each other

4 everything in between us.

5     Q     Okay.  Let me -- let me try this a different way.

6 Okay.  You didn't order eggs, did you?

7     A     Of course not.

8     Q     You didn't work in receiving, did you?

9     A     No.

10    Q     You didn't work in the cooler, did you?

11    A     No.

12    Q     You weren't there when the eggs were delivered,

13 were you?

14    A     No.

15    Q     You didn't talk to the truck driver who delivered

16 the eggs, did you?

17    A     No.

18    Q     You didn't keep a separate count of how many eggs

19 were delivered, did you?

20    A     No.

21    Q     You don't have a record of when the eggs were

22 delivered, do you?

23    A     No.

24    Q     You have no personal knowledge as to the number

25 of eggs that were delivered to Tampa Farms at Indiantown

53

1   from other sources, do you?

2        A    I don't know how many eggs.  I do know they came

3   from other places.  I know we would break a lot of eggs.

4   Eggs would come from another place because we knew it.

5        Q    Okay.  You weren't in charge of production, were

6   you?

7        A    No.

8        Q    You weren't in charge of selling eggs to Publix

9   or to any other store, were you?

10       A    No.

11       Q    You don't know what the amount of orders were for

12   the various retail or wholesale outlets, do you?

13       A    No.

14       Q    So as it relates to the number of nest run eggs

15   that were being processed through that plant, the best you

16   can do is guess at the exact number, correct?

17       A    Well, I didn't guess the number, but I know how

18   many pallets, you know, would come in.

19       Q    And how many pallets came in?

20       A    Sometimes it would come in -- we would empty ten

21   to 15.  Sometimes three times a week anywhere from ten to

22   15.  Sometimes all week, sometimes three or four days.

23       Q    How many pallets can a truck hold?

24       A    I don't know.  I never carried one.

25       Q    Tell me about the events that led to your

FILED by _EG_ D.C.
ELECTRONIC

**Sep 26 2003**

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

JOSEFINA FIERROS and NORMA SOLANO,    CASE NO. 03-14031-CIV-MOORE/LYNCH
on behalf of themselves and all others
similarly situated,

        Plaintiffs,

v.

TAMPA FARM SERVICE, INC.

        Defendant.

_____/

### NOTICE OF FILING ORIGINAL AFFIDAVIT OF MICHAEL BYNUM

    NOTICE IS HEREBY GIVEN of the filing of the original Affidavit of Michael Bynum as Exhibit A to Defendant's Motion for Partial Summary Judgment which was filed September 17, 2003.

### CERTIFICATE OF SERVICE

    **I HEREBY CERTIFY** that a true and correct copy of the foregoing was furnished by U.S. Mail to: **David H. Spalter, Esquire**, Law Office of David H. Spalter, P.A., Rolling Hills Executive Center, 3325 S. University Drive, Suite 102, Davie, Florida 33328 and **Lee J. Baggett, Esquire**, Lewis, Mortell & Lewis, P.A., 1115 East Ocean Boulevard, Stuart, Florida 34996 Counsel for Plaintiffs, and **David B. Earle, Esquire**, Ross, Earle & Bonan, P.A., Royal Palm Financial Center, 759 South Federal Highway, Suite 212, Stuart, Florida 34994, Co-Counsel for Defendant, this  26th day of  September  2003.

                Respectfully submitted,

                RUDEN, McCLOSKY, SMITH,
                SCHUSTER & RUSSELL, P.A.
                Attorneys for Defendant
                200 East Broward Boulevard, 15th Floor
                Fort Lauderdale, Florida 33302
                (954) 764-6660; Fax:  (954) 764-4996

                By:_____s/Thomas K. Gallagher_____
                    Thomas K. Gallagher
                    Florida Bar No. 793574

FTL:1103302:1

**Defendant's
Exhibit C**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

JOSEFINA FIERROS and NORMA SOLANO,    CASE NO. 03-14031-CIV-MOORE/LYNCH
on behalf of themselves and all others
similarly situated,

      Plaintiffs,

v.

TAMPA FARM SERVICE, INC.

      Defendant.

_____/

STATE OF FLORIDA      )
                      ) SS
COUNTY OF MARTIN     )

## AFFIDAVIT OF MICHAEL BYNUM

    BEFORE ME, an officer authorized to take oaths under the laws of the State, this day

personally appeared MICHAEL BYNUM, who being by me first duly sworn deposes and states

as follows:

    1.    I am the president of Tampa Farm Service, Inc.  The statements contained in this

affidavit are true and correct and based upon my personal knowledge.

    2.    Tampa Farms produces and processes eggs at its farming operations in

Indiantown, Okeechobee, and Dover, Florida.  Conveyor belts transport the eggs from the hen

houses to a processing area at each farm.

    3.    Egg processing consists of washing, weighing/grading, testing and packing the

eggs in cartons.  This portion of the work is entirely mechanized.  Once the eggs are in cartons,

the "packers" place cartons in crates or baskets which have been cleaned by the "basket

FTL:1098453:1

**DEFENDANT'S
EXHIBIT A**

washers". The "stackers" then stack the crates or baskets on pallets, and the "cooler workers" move the pallets into the refrigerated loading dock for shipment to market.

4.      Packers, stackers, basket washers, and cooler workers generally work more than 40 hours per week. At Indiantown these processing employees are not paid overtime.

5.      The Okeechobee farm is the only Tampa Farms facility which was designed for processing eggs that are purchased on the open market. Okeechobee is the only Tampa Farm facility which routinely processes eggs purchased in the open market. Since purchased eggs are routinely processed at Okeechobee, most workers at Okeechobee are paid overtime during any week when eggs are purchased. At all times material to this case, the Okeechobee facility had a special machine to transfer purchased eggs to the processing equipment.

6.      The Indiantown farm was not designed to process purchased eggs and does not do so routinely. The only time the Indiantown farm processes purchased eggs is to cover for an unexpected loss of production. Very rarely (i.e. three to four times a year) the Indiantown plant will also purchase eggs to meet holiday demand.

7.      In July 2001, there was an unexpected high voltage power surge at the Indiantown facility, damaging the motors in the ventilation fans in the chicken houses, resulting in the loss of 120,000 birds at the Indiantown facility with a corresponding 10% decline in egg production (the "ventilation incident").

8.      As a result of the ventilation incident, Tampa Farms was required to purchase "nest run" eggs on the open market to cover its production shortfalls and process them at Indiantown. It took more than a year to recover from the production shortfalls caused by the ventilation incident. In the 12 month period between July 2001 and July 2002, Tampa Farms

FTL:1098453:1

Page 2 of 3

hens produced 1.6 million dozen fewer eggs than expected, and Tampa Farms purchased 1.58 million dozen during the same time frame to cover the shortfall.

9.      The nest run eggs were processed on the farm in the same manner as the eggs produced by the hens owned by Tampa Farms.  The purchased eggs were placed by hand on the conveyor belt, washed, tested, graded, packed, stacked and shipped to market

10.     With the cost to purchase and transport nest run eggs, Tampa Farms does not make any money on eggs it buys to cover for the short fall in production.

11.     Generally, there is a spike in demand for eggs associated with various holidays including Easter, Christmas, Thanksgiving and Passover. Defendant purchases less that one (1) percent of its annual production of eggs to meet this spike in demand.

FURTHER DEPONENT SAYETH NAUGHT

Dated   September 17, 2003

_____
MICHAEL BYNUM

Sworn to and subscribed before me this _17th_ day of _September_ 2003.

_____
Notary Public



_____
Typed, printed or stamped name of Notary Public

My Commission Expires:

Lisa A. Dibble
MY COMMISSION # DD046488 EXPIRES
July 31, 2005
BONDED THRU TROY FAIN INSURANCE, INC.

FTL:1098453:1

Page 3 of 3

1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF FLORIDA
2
     CASE NO. CIV-MOORE 03-14031
3

4    JOSEFINA FIERROS and NORMA SOLANO,
     on behalf of themselves and all others
5    similarly situated,

6            Plaintiffs,

7    VS.

8    TAMPA FARMS SERVICES, INC.,
     a Florida corporation,

9            Defendant.
     _____/

10           VIDEOTAPED DEPOSITION OF JOSE SERUR

11

12   DATE:              Monday, September 8, 2003

13   TIME:              8:31 o'clock A.M.

14   PLACE:             422 Camden Avenue
                        Stuart, Florida

15   TAKEN BY:          Defendant

16   REPORTER:          Deanne S. Morris, RPR, Notary
                        Public of the State of Florida
17                      at Large.

18   APPEARANCES:

19   FOR THE PLAINTIFFS:

20                      LAW OFFICE OF DAVID H. SPALTER, P.A.
                        BY:  DAVID H. SPALTER, ESQUIRE
21                      Rolling Hills Executive Center
                        3325 S. University Drive
22                      Suite 102
                        Davie, Florida  33328

23

24

25

**CERTIFIED COPY**

**Defendant's Exhibit D**

96

1    delivered to Tampa Farms Services?

2        A    No, I don't.

3        Q    Are you aware of any other documentation which

4    would indicate how many times nest run eggs were delivered

5    to Indiantown?

6        A    Yeah, I spoke to them before in the past, and one

7    season he told me he bought 100 and some loads just to keep

8    up with a...

9        Q    What year was that?

10        A    It was last year.  That was before he got -- he

11    had moved.  He had transferred to Okeechobee.  Then he got

12    transferred back to Indiantown.  It was 2002.

13        Q    So it was in 2001 or 2002 that 100 loads were

14    delivered?

15        A    They -- Dan had bought 100 and some loads just to

16    keep up for the season, yeah.

17        Q    Were you assistant farm manager in 2001?

18        A    Yes, sir.

19        Q    Okay.  In July 2001, were you familiar with a

20    ventilation incident?

21        A    Yes, sir.

22        Q    Tell me about that.

23        A    We have problems with generators.  If that's --

24    that's what they mean.  I don't know if that's the

25    incident.  Okay, we have problems with generators.  And if

97

1   you look at the reports, I used to crank the generators

2   once a week.  And in the reports I stated that we have

3   problems with one of the generators.  Generator number one.

4   And sometimes it did crank up, sometimes it didn't.  So

5   we'd call -- we'd call people to come and check 'em.

6        And one incident it was one technician checking

7   up the generators because they didn't transferred properly.

8   So he came and fixed it.  We crank it up, I crank it up.

9   It transferred good up to the houses.  So from the FPL,

10  they transferred up to the generators.  All the fans came

11  in, everything was fine.  Well, we shut it down again and

12  it transferred back okay to the FPL, and the technician

13  told me to crank it up again.  So when I did that, I mean,

14  it just blew up right in my face.  I thought that the guy

15  that was next to me was dead.  Okay, I ran out there.  I

16  got a little bit of air.  I run back in there.  I thought

17  the guy was dead, and he was just shaking on the ground.

18       We got out of there.  Rich Mc -- Rich was there.

19  He came in and said, "What happened"?  I said, "The thing

20  just blew up," and we lost a lot of fans through the farm

21  so I was -- I called Joe McClernan with my cell phone

22  number and he kind of got me what to do.  So I was over

23  there pushing contactor, sticking feathers up.  Overload

24  blow up right in my face, and I told him.  You know, he

25  said go and crank the main power so and so.  I did that,

98

1    and it blew right up in my face.  He told me get a piece of

2    stick, and I start sticking feathers up on the overload

3    trying to get a couple fans running on the farm.

4           If -- if you lose fans for about 20, 30 minutes,

5    you can kill the whole flock -- I mean the whole house with

6    the birds.  There's 100 and some thousand birds.  If you

7    don't have no air on them.

8    Q     And in fact in July of 2001, was there an

9    incident where you lost over 100,000 birds?

10   A     That happens twice.  I'm not sure if he -- that's

11   the one that -- that the buzzard came in and hit one of the

12   electric poles and we lost everything on the farm.  It was

13   two times that that happened so.

14   Q     Okay.

15   A     I don't know which time.  I'm not --

16   Q     When were the two times?

17   A     Okay, the first time one buzzard -- it was a

18   buzzard, and it came and hit one of the FPL poles.  And the

19   generators didn't kick in.  It blew up something in there,

20   so that's the time that we lost a lot of birds, yeah.

21   Q     How many birds did you lose?

22   A     It was over 100,000.

23   Q     Uh-huh.  And when was the second time?

24   A     The second time, that was when the generator

25   technician was over there checking out the generators with

ESQUIRE REPORTING - STUART & FORT PIERCE, FLORIDA

99

1    me.

2         Q    And you indicated the -- the second time was when

3    the generator technician that was working with you, he was

4    electrocuted?

5         A    He wasn't electrocuted, but -- I was close to him

6    myself.  I mean, he just -- he was here and he end up over

7    there on the floor like that so.  I was right next to the

8    panel.  I thought he was dead though.  I just walked out of

9    the generator room and kind of figure what happened.  I

10   walked in there, he was on the floor all stretched out.

11   That was the second time.

12        Q    And you were right next to him when that

13   happened?

14        A    Yeah, we were -- he was checking up the load as

15   soon as it crank.

16        Q    Okay.  That was an outside contractor who was

17   brought in?

18        A    That's -- yeah.

19        Q    Okay.  He was not an employee of the farm?

20        A    No.  Joe McClernan had called him to come and

21   check out the generators.

22        Q    Okay.  And in that second incident, did you lose

23   any birds as well?

24        A    Yeah, we lost some birds.

25        Q    How many?

100

1    A    About 100 or so.  100,000 or so.

2    Q    Okay.  So --

3    A    Somewhere.

4    Q    So when was -- what were the dates of these two

5 incidents when you lost 100,000 birds?

6    A    I don't know right on top of my head.

7    Q    What year was it then?

8    A    I think one was this year and a year before that.

9    Q    So one incident occurred in 2003 and one incident

10 occurred in 2001?

11    A    I think, yes.  I'm not 100 percent sure, but it

12 was twice.

13    Q    And in each incident you lost in excess of

14 100,000 laying hens?

15    A    Yeah.  First time was bad.

16    Q    And the second time as well?

17    A    Not so bad.  The first, that was real bad, yeah.

18 The second time we more or less know how to go about it, so

19 we save a whole lot of 'em.

20    Q    Okay.  But how many did you lose the second time?

21    A    A whole bunch of birds.  We figured over 100,000.

22    Q    Okay.  And as a result of losing 100,000 birds

23 the first incident, that would impact production, wouldn't

24 it?

25    A    Oh, yes, sir.

ESQUIRE REPORTING - STUART & FORT PIERCE, FLORIDA

1   Q    Okay.  And losing 100,000 birds the second time,

2   that would also impact production?

3   A    Yes, sir.

4   Q    And these were unusual unforeseen events, right?

5   A    Yes, sir.

6   Q    Okay.  Do you know what level -- how much

7   production you lost as a result of losing 100,000 birds?

8   A    Not really sure, no.  I figure 10, 20,000 dozen

9   probably a day or so.  I'm not sure.

10   Q    And in order to make up for that loss, 10 to

11   20,000 dozen per day, it's necessary to bring in or to

12   process eggs from another source, right?

13   A    Yes, sir, yeah.

14   Q    Other than talking to the truck driver on

15   7/25/03, talking to Dan TenPas and signing a couple of

16   bills of lading, do you have any other information to be

17   able to tell how many eggs were purchased by Tampa Farms,

18   Inc. for Indiantown?

19   A    I had talked to the owner last week, Ronny

20   Harrell himself.  I had talked to him last week.  As a

21   matter of fact he gave me a pen and a card.  I talked to

22   him and kind of asked him how many loads they were moving

23   and he confirmed that.  He says, "We're moving a lot of

24   eggs for Tampa Farms."  I didn't ask him how many loads.

25   But he says, yeah, they're moving loads for us.

FILED by _____WC_____ D.C.
ELECTRONIC

**Oct 7 2003**

CLARENCE  MADDOX
CLERK  U.S.  DIST.  CT.
S.D.  OF  FLA.-MIAMI

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

JOSEFINA FIERROS and NORMA SOLANO,  CASE NO. 03-14031-CIV-MOORE/LYNCH
on behalf of themselves and all others
similarly situated,

   Plaintiffs,

v.

TAMPA FARM SERVICE, INC.

   Defendant.

_____/

### TAMPA FARM'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL DISCOVERY

  Defendant, Tampa Farm Services, Inc. ("Tampa Farm"), by and through its undersigned

counsel, files this Memorandum in Opposition to Plaintiffs Josefina Fierros and Norma Solano

Motion to Compel Discovery and Incorporated Memorandum of Law ("Plaintiffs' Motion") and

Moves for a Protective Order pursuant to Federal Rule of Civil Procedure 30(d)(4).

### INTRODUCTION

  Plaintiffs' requests are harassing and not intended to lead to the discovery of admissible

evidence. The requests are based upon Plaintiffs counsel's misunderstanding of the term

"contract farming" and the differences between Tampa Farm's business today, compared to its

business more than a decade ago, when the Department of Labor ("DOL") conducted its only

investigation of the Defendant. The Plaintiffs' Motion mischaracterizes Tampa Farm's

instructions to the witness at the deposition. Further, the Plaintiffs have attached the report they

are seeking to their motion to compel. Since they have the document in their possession, and

have equal access to the DOL, the Plaintiffs can demonstrate no need for the document. As a

FTL:1104249:1

RUDEN, McCLOSKY, SMITH, SCHUSTER & RUSSELL, P.A.

1

**Defendant's
Exhibit E**

result, the Plaintiffs' Motion to Compel should be denied and Tampa Farm's Motion for Protective Order should be granted.

## ARGUMENT

### Tampa Farm Properly Invoked Rule 30(d)(4) at the Deposition

Months ago, Tampa Farm objected to Plaintiffs' written discovery regarding the DOL investigations dating back more than a decade. (See Request to Produce Nos. 5 and 6)  Rather than seek to compel better answers to the written discovery, Plaintiffs proceeded with the deposition of Tampa Farm's corporate representative and requested the same information. Days before the deposition, Tampa Farm's counsel informed Plaintiffs' counsel that he would seek a protective order pursuant to Rule 30(d)(4) if he (Plaintiffs' counsel) inquired into the antiquated DOL investigation at the deposition.  (See transcript of deposition at pp 9, line 15-16.)  At the deposition, Plaintiffs' counsel inquired and Tampa Farm properly asserted its rights under FRCP 30.

> MR. GALLAGHER:  Let me make it real clear to you then.  The objection is a motion for protective order because we have consistently taken the position anything beyond five years is too remote in time.  I'm not instructing him not to answer.  I am – I am letting you know that we will terminate the deposition and take the motion for protective order in front of the Court, either right now, or you can continue your deposition into all other areas of inquiry you want to, if that's your choice.

(Deposition transcript at p. 10, lines 1-10.)  Thereafter the deposition continued into all other areas of inquiry.

There was no violation of the Local or the Federal Rules.  Local Rule 30.1(A)(3) specifically permits counsel to present a motion under Rule 30(d)(4) which is precisely the intent of counsel's instructions set forth above.  However, when the interrogating attorney continues with the deposition thereafter, there is no need to seek a protective order and it is appropriate

RUDEN, McCLOSKY, SMITH, SCHUSTER & RUSSELL, P.A.

2

merely to respond to a subsequent motion to compel. *See Riddell Sports, Inc. v. Pursuit Athletic Footwear, Inc.,* 158 F.R.D 555, 558 (S.D.N.Y. 1994) (". . . Rule 37(a)(2)(B) specifically contemplates a motion to compel when a deponent refuses to answer a question, thus suggesting that it is acceptable for the witness to decline to answer and then wait to defend such a motion."). Since Tampa Farm's counsel utilized the Rules precisely as intended, Plaintiff's Motion should be denied on this ground.

### Information Regarding the 1992 DOL Investigation is Not Discoverable

Information regarding the 1992 DOL investigation is not reasonably calculated to lead to the discovery of admissible evidence. There is no "direct parallel" between 1992 DOL findings and the issues in this lawsuit, (Plaintiffs' Motion at p 4), and the "exact same issues" are not involved. (Plaintiffs' Motion at p. 5). Plaintiffs' Motion is either intentionally misleading, or it is based on Plaintiffs counsel's misinterpretation of the term "contract farming."

In 1992, Tampa Farm was involved in "contract farming." At that time, Tampa Farm, like most other egg producers, did not raise its own chickens. Instead, Tampa Farm entered into independent contract arrangements with farmers to raise the chickens. The eggs from the contract farmers were then delivered to Tampa Farm for processing. The 1992 DOL investigation found the Tampa Farm egg packers were not exempt from FLSA overtime requirements as long as they were processing eggs from contract farms.

The DOL investigation attached to Plaintiffs' Motion as Exhibit A specifically states:

> Most of the EE's of this firm are engaged in agriculture and are exempt from OT even though they work in the processing plant. The exempt question hinges on a court case *Marshall vs. Abbot Farms*. The court held that if the plant processed only its own eggs EE's working on those eggs would be exempt. <u>If the firm had contract farms, they were not exempt</u>. Further, if the processing

RUDEN, McCLOSKY, SMITH, SCHUSTER & RUSSELL, P.A.

3

lines were segregated between EE's working contract and non-contract only, non-contract EE's would be exempt.[1]

See Exhibit A to Plaintiffs' Motion. While the DOL concluded that processing eggs from contract farms is not exempt from FLSA overtime requirements, there is no dispute that Tampa Farm is no longer in the business of contract farming.

Following the DOL investigation, Tampa Farm changed its entire business and stopped using contract farms. Now it raises its own chickens, and packages the eggs on the chicken farm. (Depo. of M. Bynum at pp. 13 – 14.) The 1992 DOL investigation regarding overtime pay for processing eggs from contract farms does not apply to Tampa Farm structure existing today, where contract farms are not used.

The Plaintiffs well know Tampa Farm is no longer involved in contract farming. Tampa Farms has more than a million chickens producing eggs at its Indiantown farm, and the only eggs purchased there were to cover for a catastrophic loss in chickens that affected egg production from July 2001 until the end of 2002. (See Tampa Farm's Motion for Partial Summary Judgment, Docket Entry 45.) The 1992 DOL investigation did not address use of eggs to cover a catastrophic loss. However, other courts have consistently held that a farm does not lose its agricultural exemption when purchasing products to cover for such a loss. *See, Adkins v. Mid-American Growers, Inc.,* 167 F.3d 355, 357 (7th Cir. 1999) (The Court in *Adkins* stated that defendant, operator of a greenhouse, did not lose the agricultural exemption under the FLSA by ordering plants from outside growers to meet production shortfalls caused by "blight or other disasters."). *See also, Walling v. Rocklin*, 132 F.2d 3, 7 (8th Cir. 1942) (Occasional purchase by

---

[1] The case cited by the DOL, *Marshall v Abbot Farms, Inc.,* 559 F.2d 1006 (5th Cir. 1977), relies on *Bayside Enterprises, Inc. v NLRB,* 429 U.S. 298, 97 S.Ct. 576 (1977) which helps define contract farming. "The chickens are raised on 119 separate farms owned and operated by independent contractors. Pursuant to a standard contractual arrangement, Bayside provides each such farm with chicks, feed, medicine, fuel, litter and vaccine. Bayside retains title to the chicks and pays the farmer a guaranteed sum, plus a bonus . . . in exchange for the farmer's services in housing and caring for the chicks."

RUDEN, McCLOSKY, SMITH, SCHUSTER & RUSSELL, P.A.
4

defendants, greenhouse operators, from outside greenhouses to meet production decline due to storms, frosts and other emergencies did not result in defendants losing the agricultural exemption under the FLSA.); *Wirtz v. Jackson & Perkins Co.,* 312 F.2d 48, 51 (2d Cir. 1963) (Defendants, plant growers, did not lose agricultural exemption by purchasing plants from other growers to fill shortages caused by 'adverse weather conditions' and other emergencies); and *Mitchell v. Hornbuckle,* 155 F. Supp. 205, 211-212 (N.D. GA. 1957) (Defendant, tomato farmer, 'did not defeat' the agricultural exemption under the FLSA by purchasing two (2) percent of his volume to meet his sales when such purchases were necessary because of 'crop failures and other emergencies'). *Id.*

While the Court has broad discretion in discovery matters, several cases are instructive in addressing the reasonableness of discovery requests.  Courts have restricted the discovery of documents that existed under facts and circumstances of prior cases, which are dissimilar to the facts and circumstances of the present lawsuit.  For instance, in *Amcast Industrial Corp. v. Detrex Corp.,* 138 F.R.D. 115, 116-117 (N.D.Ind. 1991) the plaintiffs sued defendants for damages to their real property allegedly cause by a hazardous substance that Defendant spilled on the property.  While making deliveries to plaintiffs' Plant. *Id.*  Plaintiffs requested documents relating to prior clean-ups by defendant, which were unrelated to the instant case and concerned other hazardous substance clean-ups, which were not caused by delivery spills.  *Id.*  The defendant argued that the discovery request was broad and irrelevant and therefore, the documents were not discoverable. *Id.* at 120.  The court held that the request was "overbroad in light of the subject matter of plaintiffs' action." *Id.*  Similarly, Plaintiffs' discovery request that involve facts and circumstances that are dissimilar to the facts of the present lawsuit should also

RUDEN, McCLOSKY, SMITH, SCHUSTER & RUSSELL, P.A.

5

be denied.  Plaintiffs' request is not reasonably calculated to lead to the discovery of admissible evidence.

Finally, this dispute may constitute an interesting academic exercise.   The Plaintiffs already have the information they are seeking, and in fact have attached it to the Plaintiffs' Motion.  Simply put, since they already have what they are asking for, they have no need for these unrelated documents.  *See Marshall v. Westinghouse Electric Corp.*, 576 F.2d 588, 592 (5th Cir. 1978). *See also, Equal Employment Opportunity Commission v. General Motors Acceptance Corp.*, 569 F.2d 315, 319 (5th Cir. 1978) (The Court of Appeals affirmed the trial court's denial to enforce an investigative subpoena where "plaintiff showed no particular need for the document and where the document appeared to already be in plaintiff's possession."); and *Welker v. Beckman*, 1989 WL 121894, *1 (E.D.Pa. 1989) (Although discovery is generally broad pursuant to Rule 26(b), there must be "a particularized need and relevance for the requested discovery."). *Id.*

## CONCLUSION

Based on the foregoing, Defendant, Tampa Farm Services, Inc., respectfully requests this Court to deny the Plaintiffs' Motion to Compel Discovery, to grant Defendant's Motion for Protective Order, and for any and all other and further relief this Court deems just and proper.

## <u>CERTIFICATE OF SERVICE</u>

**WE HEREBY CERTIFY** that a true and correct copy of the foregoing was furnished by facsimile copier and U.S. Mail to: **David H. Spalter, Esquire**, Law Office of David H. Spalter, P.A., Rolling Hills Executive Center, 3325 S. University Drive, Suite 102, Davie, Florida 33328 and **Lee J. Baggett, Esquire**, Lewis, Mortell & Lewis, P.A., 1115 East Ocean Boulevard, Stuart, Florida 34996 Counsel for Plaintiffs, and **David B. Earle, Esquire**, Ross, Earle & Bonan, P.A.,

FTL:1104249:1

RUDEN, McCLOSKY, SMITH, SCHUSTER & RUSSELL, P.A.

6

Royal Palm Financial Center, 759 South Federal Highway, Suite 212, Stuart, Florida 34994, Co-

Counsel for Defendant, this __7th__ day of _____October_____ 2003.

<div align="center" style="margin-left:40%">

Respectfully submitted,

RUDEN, McCLOSKY, SMITH,
SCHUSTER & RUSSELL, P.A.
Attorneys for Defendant
200 East Broward Boulevard, 15th Floor
Fort Lauderdale, Florida 33302
(954) 764-6660; Fax:  (954) 764-4996

By:___ s/Thomas K. Gallagher_____
      Thomas K. Gallagher
      Florida Bar No. 793574

      Co-Counsel for Defendant:
      David B. Earle, Esquire
      Ross, Earle & Bonan, P.A.
      Royal Palm Financial Center
      759 South Federal Highway, Suite 212
      Stuart, FL 34994
      (772) 287-1745
      (772) 287-8045 (Fax)

</div>

RUDEN, McCLOSKY, SMITH, SCHUSTER & RUSSELL, P.A.
7

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. CIV-MOORE 03-14031

JOSEFINA FIERROS and NORMA SOLANO,
on behalf of themselves and all others
similarly situated,

     Plaintiffs,

vs.

TAMPA FARMS SERVICES, INC.,
a Florida corporation,

    Defendant.

_____/

**CERTIFIED COPY**

### DEPOSITION OF MICHAEL BYNUM

| | |
|---|---|
| <u>DATE</u>: | Friday, September 5, 2003 |
| <u>TIME</u>: | 9:50 o'clock A.M. |
| <u>PLACE</u>: | 422 Camden Avenue<br>Stuart, Florida |
| <u>TAKEN BY</u>: | Plaintiffs |
| <u>REPORTER</u>: | Deanne S. Morris, RPR, Notary<br>Public of the State of Florida<br>at Large. |

<u>APPEARANCES</u>:

<u>FOR THE PLAINTIFFS</u>:

    LAW OFFICE OF DAVID H. SPALTER, P.A.
    BY:  DAVID H. SPALTER, ESQUIRE
    Rolling Hills Executive Center
    3325 S. University Drive
    Suite 102
    Davie, Florida  33328

ESQUIRE REPORTING - STUART & FORT PIERCE, FLORIDA

9

1    MR. GALLAGHER:  Let me go ahead and object to the

2    question and assert a motion for protective order with

3    regard to that as we have previously done with our

4    earlier responses to discovery.  We've -- we'll allow

5    inquiry into those which are reasonable in time.  And

6    I think, what was it, David, for the last five years.

7    Anything beyond that would be -- we have taken the

8    position in our discovery as to remote and we will

9    move for a protective order with regard to that.

10   MR. SPALTER:  So you're going to instruct the

11   witness not to answer anything beyond five years, is

12   that my understanding of your objection?

13   MR. GALLAGHER:  With regard to that.  And if you

14   want to stop the deposition and take that -- we've

15   told you that that's what we were going to do.  We've

16   had this telephone conversation.

17   MR. SPALTER:  I understand.  I'm just making sure

18   that your objection and your instruction is clear on

19   the record.  I don't think it's a basis to -- I don't

20   think relevance is a basis to instruct a witness not

21   to answer a question in deposition, but you're

22   certainly entitled to make whatever objection you want

23   to make and we can deal with it later.  I want to make

24   sure I understand what the objection and the

25   instruction is.

ESQUIRE REPORTING - STUART & FORT PIERCE, FLORIDA

10

1    MR. GALLAGHER:  Let me make it real clear to you,

2    then.  The objection is a motion for protective order

3    because we have consistently taken the position

4    anything beyond five years is too remote in time.  I'm

5    not instructing him not to answer.  I am -- I am

6    letting you know that we will terminate the deposition

7    and take the motion for protective order in front of

8    the Court, either right now, or you can continue your

9    deposition into all other areas of inquiry you want

10   to, if that's your choice.

11   MR. SPALTER:  Well, I have not asked him any

12   specific question.  The only question I've asked him

13   right now is whether he's familiar with any previous

14   claims or investigations.  So that's the only question

15   pending.  And I -- what I need to know is are you

16   allowing him to answer that specific question.  And

17   we'll worry about whatever other questions I might

18   want to ask when I get around to them.

19   MR. GALLAGHER:  Sure.  And I'm just making sure

20   that the record is clear here that what we have done

21   is move for a protective order.  We are preserving our

22   objections that we have raised in our earlier

23   discovery.

24   MR. SPALTER:  I understand.

25   MR. GALLAGHER:  And if you ask an open-ended

ESQUIRE REPORTING - STUART & FORT PIERCE, FLORIDA

13

1          MR. GALLAGHER:  Okay.

2          THE WITNESS:  I'm not aware of any Department of

3      Labor investigation within the last five years.

4  BY MR. SPALTER:

5      Q    Okay.  And how about any other lawsuits?

6      A    I'm not aware of any other lawsuits pertaining to

7  that type of matter.

8      Q    Pertaining to alleged claims of unpaid overtime?

9      A    That would be correct.

10     Q    Okay.  Let's talk about the facilities that Tampa

11 Farms operates at Indiantown, Florida.

12         Tell me just sort of the basic structure of the

13 facilities as they sit today in terms of buildings and

14 operations and -- and what is done in each part of the

15 facility.

16     A    Okay.  Indiantown is what is known as a

17 vertically integrated egg operation.  It's fairly standard

18 in our industry.  And at that site you basically have all

19 phases of egg production processing and grading.

20         We have a feed mill which produces the feed for

21 the chickens.  We have pullet rearing houses where the

22 young birds that will become mature later house.  We have

23 egg laying houses where hens that are producing eggs house.

24 And we have a egg grading plant in which those eggs are

25 delivered by conveyer belts.

14

1    Q    Is the grading plant the same thing as the
2    packaging facility?

3    A    Yeah, that would be synonymous.

4    Q    Okay.  How many hen houses are at that -- the
5    Indiantown facility?

6    A    There are 12 hen houses there.

7    Q    And is that an appropriate term to use, "hen
8    house"?

9    A    That's a fine term to use, sure.

10    Q    You say 12, you said?

11    A    That's correct.

12    Q    Approximately how many eggs are produced by a
13    single hen house in a given day?  What would the range be?

14    A    I would have to do the math real quickly.  Um,
15    each house holds about a hundred thousand birds.  And an
16    average rate of production would be somewhere about 65
17    percent to 70 percent, so that would be 65 to 70,000 eggs
18    nominally.

19    Q    Per each house?

20    A    That is correct.

21    Q    Okay.  Let's go back to the job titles that we
22    were talking about earlier.  Explain what a packer does.

23    A    A packer stands at the end of an egg grading
24    machine and receives cartons or trays of eggs, depending on
25    how they're packed, from a conveyer belt and places them

ESQUIRE REPORTING - STUART & FORT PIERCE, FLORIDA